```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF OREGON

 3   SETH D. HARRIS, Acting      )
     Secretary of Labor, United  )
 4   States Department of Labor, )
                                 )
 5             Plaintiff,        ) No. 3:13-cv-728-HZ
                                 )
 6        vs.                    ) May 15, 2013
                                 )
 7   OAK GROVE CINEMAS, INC., an ) Portland, Oregon
     Oregon domestic business    )
 8   corporation; BARRINGTON     )
     MANAGEMENT, LLC, an Oregon   )
 9   domestic limited liability  )
     company; BARRINGTON VENTURE, )
10   LLC, an Oregon domestic     )
     limited liability company; and)
11   DAVID EMAMI, an individual and)
     in his official capacity,    )
12                               )
               Defendants.       )
13   -----------------------------

14

15

16

17

18        HEARING ON MOTION FOR PRELIMINARY INJUNCTION

19              TRANSCRIPT OF PROCEEDINGS

20        BEFORE THE HONORABLE MARCO A. HERNANDEZ

21         UNITED STATES DISTRICT COURT JUDGE

22

23

24

25
```

1                          APPEARANCES

2    FOR THE PLAINTIFF:    Susan Brinkerhoff
                           Bruce L. Brown
3                          U.S. Department of Labor
                           Office of the Solicitor
4                          300 Fifth Avenue
                           Suite 1120
5                          Seattle, WA 98104

6    FOR THE DEFENDANTS:   Richard C. Hunt
                           Edwin A. Harnden
7                          Banu K. Ramachandran
                           Barran Liebman, LLP
8                          601 S. W. Second Avenue
                           Suite 2300
9                          Portland, OR  97204-3159

10   COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
                           United States District Courthouse
11                         1000 S. W. Third Avenue, Room 301
                           Portland, OR  97204
12                         (503) 326-8186

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  Your Honor, we're here today on the

3  case of Harris versus Oak Grove Cinemas, et al., Civil

4  Case 3:13-CV-00728-HU, on a motion for preliminary

5  injunction, Docket No. 3.

6          Counsel, please state your appearances for the

7  record.

8          MR. BROWN:  Good morning, Your Honor, Bruce Brown

9  and Susan Brinkerhoff for the Secretary.  With us at

10  counsel table is Julieanna Elegant, who is the wage and

11  hour investigator.

12          THE COURT:  Thank you.

13          MR. HARNDEN:  Ed Harnden for defendant, along

14  with Richard Hunt and Banu Ramachandran.

15          THE COURT:  Thank you.

16          So you're the plaintiffs in this case, and you're

17  asking me to issue a preliminary injunction, which means

18  that you would have the burden of proof, which also means

19  you get to go first.  What do you want to tell me?

20          MR. BROWN:  Well, thank you, Your Honor.  Let me

21  start by saying that I'm going to address a few of the

22  more general legal issues that counsel raised, if it's

23  acceptable to the Court, and Ms. Brinkerhoff will address

24  the more specific issues relating to the test that we

25  have to meet for a preliminary injunction.

1           We're also prepared to present additional factual

2    evidence if the Court is inclined to hear Ms. Elegant's

3    testimony.   There's been a lot of talk about the

4    tape-recording.   If the Court wants to hear the

5    tape-recording, we're prepared to play that for the

6    Court.

7           I'd like to start by just addressing a couple of

8    the general issues that they raised.   I think they're

9    kind of peripheral, but we can, I hope, not spend a lot

10   of time on them by addressing them quickly and just kind

11   of getting them out of the way.

12           THE COURT:   Sure.

13           MR. BROWN:   Thank you, Your Honor.

14           Is it okay if I talk from here or do you want me

15   at the podium?

16           THE COURT:   You're fine.

17           MR. BROWN:   Thank you.

18           First I wanted to just briefly address the First

19   Amendment issue that counsel raised in response to some

20   of the specific remedies that were put into the TRO that

21   we asked for in our preliminary injunction.   And I would

22   just note that their entire argument on the First

23   Amendment issue is really based on either a misreading or

24   a mischaracterization of the recent NLRB case out of the

25   D.C. Circuit.   That case is *National Association of*

1    *Manufacturers v. NLRB*, 2013 Westlaw 1876234.  They

2    characterize the case in their briefing and their

3    argument to the Court as "The District of Columbia

4    Circuit recently vacated, on First Amendment grounds, a

5    National Labor Relations Board rule."

6         And if Your Honor has had an opportunity to read

7    the case, you'll know that that's simply a

8    mischaracterization.  The case was not decided on the

9    First Amendment grounds at all.  It was decided on the

10   Court's determination that the rule that was under

11   review, that the NRLB promulgated, was in conflict with

12   another section of the National Labor Relations Act.  The

13   first holding is that the posting requirement, which was

14   at the heart of the dispute, in the Court's opinion they

15   concluded that the Board's rule violates Section 8(c) of

16   of the NLRA.  All of the discussion about the First

17   Amendment is really peripheral to the holding to the

18   case, which is that it violated a section of the National

19   Labor Relations Act.  It's not a First Amendment case at

20   all.

21        None of the cases cited either in the *National*

22   *Association of Manufacturers* decision or in respondent's

23   brief, none of the cases are in the same situation that

24   we are here, evidence of a violation of an Act, and we're

25   asking the Court to fashion a remedy to prevent

 1   additional violations.  It's not a rule-making matter.

 2   It's not a case affecting 6 million employers as the NLRB

 3   case was.

 4            The other -- the second issue I'd like to just

 5   briefly address, which I think is another kind of

 6   distracting issue in respondent's briefing, is this issue

 7   about whether or not the tape-recording was taken in

 8   violation of Oregon state law.  And, quite simply, it

 9   doesn't matter, and I was a little surprised when I read

10   the argument.

11            Counsel is aware that there is a federal statute

12   that governs admissibility of evidence in federal

13   proceedings, and the federal statute makes a

14   tape-recording admissible as long as one party to the --

15   if the person taping it was a party to the conversation.

16   The case law is all clear that if it's admissible under

17   the federal statute, it doesn't matter whether it

18   violated a state law or not.

19            And I'll just refer the Court to one case,

20   *Roberts v. Americable International*, A-m-e-r-i-c-a-b-l-e,

21   883 F.Supp. 499, where the Court, in rejecting the motion

22   to suppress because the tape-recording in that case

23   clearly violated -- taking a tape-recording clearly

24   violated California's privacy act, in denying the motion

25   to suppress, the Court noted the Ninth Circuit has

1  consistently held that recordings of conversations are

2  admissible in federal court proceedings when obtained in

3  conformance with federal law, without regard to state

4  law.  Similarly, it's a red herring issue about how this

5  recording was made and whether it was made in violation

6  of Oregon law or not.

7        The other issue I'd just like to briefly address

8  is most of the discussion in the response brief was about

9  the TRO, the procedure for how the TRO came about.  If

10  the Court is interested in hearing some of what we

11  believe are the factual inconsistencies and inaccuracies,

12  we can address those.  But really I think at this point,

13  what does it matter, right?

14        We're going to present evidence and argument, and

15  you're going to decide whether or not we have met the

16  standard for preliminary injunction.  If you agree with

17  us that an injunction is warranted, then the TRO is

18  effectively dissolved because you're going to replace it

19  with a preliminary injunction.  If you disagree with us

20  and don't think we've met the burden, then the TRO will

21  be dissolved.  So it doesn't seem to be a good use of the

22  Court's time to spend a lot of time talking about how the

23  TRO itself came about as an issue.

24        Would the Court like to hear testimony or would

25  you prefer legal argument?

1          THE COURT:  Well, let me tell you one of the

2    things that is tugging at me, and one is that the

3    tape-recording, as I recall, was taken back in September,

4    and then something occurred in April where the

5    allegations are that workers were being threatened with

6    physical harm as well as other forms of retaliation.

7          And so we're in May, and there is a question in

8    my mind as to why it took so long for you to get in here

9    if there is such urgency to what you are saying has

10   happened.

11         MS. BRINKERHOFF:  We -- we did know about the

12   tape-recordings for some time, and we didn't like them

13   when we heard about them then.  But it really wasn't

14   until we heard about the physical harm sometime after

15   April 9th that we realized that we probably needed to

16   step forward and seek an injunction.  And we -- the

17   process began within the government as soon as we found

18   out about the physical harm threat.

19         THE COURT:  It just takes the government a month

20   to put together a request for a temporary restraining

21   order?

22         MS. BRINKERHOFF:  It was less than a month.  I

23   think we filed our -- I believe the physical threat was

24   around April 9th, that conversation, and I believe we

25   filed our motion on April -- or May 1st or 2nd.

1            THE COURT:  Okay.  Three weeks.

2            MS. BRINKERHOFF:  So three weeks.

3            THE COURT:  Okay.  That explains it.  I was just

4    curious.  I was used to state court:  Something happens

5    on Monday, and they're in court by Tuesday.

6            MS. BRINKERHOFF:  But that we could work so fast.

7            THE COURT:  So did you communicate with the other

8    side and say, "We have a problem.  This is what the

9    problem is," and describe to them in detail what the

10   problem was?

11           MS. BRINKERHOFF:  We described that we were in

12   possession of a recording that contained threats of

13   retaliation against employees.

14           THE COURT:  What about the issue that occurred on

15   April the 9th?

16           MS. BRINKERHOFF:  The physical harm?  I don't

17   recall having a conversation about that threat.

18           THE COURT:  Why?

19           MS. BRINKERHOFF:  Well, because by that time we

20   had decided that we were going to file the motion for the

21   TRO and the preliminary injunction.  We did as soon

22   as --

23           THE COURT:  Well, let me interrupt you.  If you

24   are worried that workers might get harmed and you have

25   access to their lawyer, why aren't you on the phone

Elegant - D

1  saying, "Hey, your guy or your defendants or your clients

2  are threatening physical harm.  You need to talk to them

3  about that.  That's a huge problem for us," right?

4          MS. BRINKERHOFF:  Yes.

5          THE COURT:  So why didn't that conversation

6  occur?

7          MS. BRINKERHOFF:  Frankly, probably because we

8  were so caught up in drafting the motion.

9          THE COURT:  Okay.  What else do you want to tell

10  me?

11          MS. BRINKERHOFF:  Would you like to hear

12  Ms. Elegant's testimony?

13          THE COURT:  Sure.  She can come up and take the

14  stand.

15          THE CLERK:  You can step around to the stairway.

16  Remain standing.  Raise your right hand, please.

17

18                  JULIEANNA ELEGANT

19  called as a witness in behalf of the Plaintiff, having

20  been first duly sworn, is examined and testifies as

21  follows:

22

23          THE CLERK:  Please be seated.  Please state your

24  name for the record and spell both your first and last

25  names.

Elegant - D

1           THE WITNESS:  My name is Julieanna Elegant,

2      J-u-l-i-e-a-n-n-a, no space, and the last name is

3      Elegant, E-l-e-g-a-n-t.

4           THE COURT:  You're probably better off

5      questioning her from behind your table over there because

6      the microphone is going to be better able to pick you up.

7      If you need to move around for any reason, hand papers,

8      things like that, please feel free to do so.  But for

9      purposes of our record, it helps our court reporter if

10     you're right behind a microphone.

11          MS. BRINKERHOFF:  Okay.  I will do that.

12

13                     DIRECT EXAMINATION

14     BY MS. BRINKERHOFF:

15     Q.  Ms. Elegant, would you briefly summarize your

16     education for the Court?

17     A.  I have a bachelor's degree in history, I have a

18     master's degree in international development, and I have

19     a law degree.

20     Q.  And how are you presently employed?

21     A.  I currently work for the U.S. Department of Labor,

22     with the Wage and Hour Division.  I'm an investigator.

23     Q.  Would you briefly summarize your duties as a wage and

24     hour investigator?

25     A.  So I am -- my supervisors will determine which cases

Elegant - D

are given to me.  Once a case is given to me, I either
send a letter or draft a letter which talks about the
investigative process.  Sometimes we do drop-ins.
Sometimes we send that letter ahead of time.

Then we -- with the letter, we will initiate the
investigation.  The letter will detail what occurs in an
investigation.  So usually we have an initial conference
with a managing or a member of the company or owner,
where we get additional information, explain the process.
We do a tour of an establishment.  We will look at
records like payroll and time records.  We'll interview
employees, both on site and off, both present and past.

And then that usually takes anywhere from a few
weeks to a few months, depending on a lot of variables.
And we will have a final conference to talk about the
findings, make sure that the owner is or the manager is
in compliance; and if any back wages are owed, we'll
present them at that time.

Q.  And is the owner at the final conference?

A.  Usually the owner is at the final conference, yes.

Q.  In your role as a wage and hour investigator, have
you been involved in the investigation of David Emami and
the associated companies?

A.  Yes, I have.

Q.  And that would include Oak Grove Cinemas?

Elegant - D

1   A.   Oak Grove Cinemas and Barrington Management, also

2   touched tangentially on Barrington Ventures.

3   Q.   Okay.  And what was your role in the investigation?

4   Was it the same as you just described when you described

5   what you do?

6   A.   Yes.  I was the lead investigator.  So the steps that

7   I described would be the same steps that I did for that

8   particular investigation.

9   Q.   When did you begin your investigation?

10  A.   I believe it was August 30th of 2012.

11  Q.   Did your investigation involve interviewing

12  Mr. Emami?

13  A.   I did talk with Mr. Emami at -- so I had two initial

14  conferences, I guess you could call it.  The first one

15  was with the manager of Oak Grove Cinemas.  At the time

16  Mr. Emami and Mrs. Emami were out of the country.  So

17  then I followed up with a second meeting when they came

18  back in the country.  I believe that was September 7th.

19  It was early September.

20  Q.   Was that the only time you spoke with Mr. Emami?

21  A.   No.  I had -- I spoke with him probably twice in

22  person and I think two or three times by phone.

23  Q.   So can you give us an approximate amount of time you

24  spoke with him on each of those occasions?

25  A.   In person -- I believe it was probably about two

Elegant - D

1   hours for the first initial conference in person.  And I

2   think it was a follow-up of about an hour, when we were

3   discussing child labor.  And then by the phone, I would

4   say two or three conversations were probably between 10

5   to 30 minutes, depending on the conversation.

6   Q.  Okay.  And you spoke with employees, also?

7   A.  Yes, I did.

8   Q.  About how many employees did you speak with?

9   A.  I spoke with about 35 present and past employees.

10  Q.  Okay.  What language did you use when you spoke with

11  Mr. Emami?

12  A.  I spoke with him in English.

13  Q.  Did you have any trouble understanding him?

14  A.  No.

15  Q.  And did he indicate to you that he had trouble

16  understanding you?

17  A.  When we talked, it was -- if he had any questions or

18  any clarification, we would discuss, you know, "I didn't

19  understand what exactly you meant by this," and we would

20  discuss it more.  So I believe that he understood just

21  fine.

22  Q.  All right.  And when you spoke with the employees,

23  what language did you use?

24  A.  With some of the employees, I spoke English.  With

25  other employees, I spoke Spanish.

Elegant - D

1  Q.  Are you fluent in Spanish?

2  A.  I am.

3  Q.  And during the course of your investigation, did you

4  come into possession of any recordings?

5  A.  Yes.  Recordings were sent to me.

6  Q.  Okay.  Without talking about the content of the

7  recordings or who may have submitted those recordings to

8  you, can you tell us how you came into possession of

9  them?

10 A.  They were sent to my work e-mail account.  They were

11 attachments.

12 Q.  Okay.  And again, without identifying employees or

13 discussing, you know, the content of the recordings, what

14 did the recordings represent?

15 A.  The recordings were a conversation that Mr. Emami was

16 having at a meeting, I believe.  He was talking with

17 workers in English.  There was some translation into

18 Spanish.

19 Q.  Was it -- I'm using the word plural, "recordings,"

20 but was it just one meeting?

21 A.  Yes, I believe so.  It was many recordings because

22 they were short, maybe six-minute snippets or parts that

23 were -- it was sort of recorded in parts, if that makes

24 sense.

25 Q.  Okay.  And when was the meeting held?

Elegant - D

1   A.   That meeting was in mid September.

2   Q.   When did you receive the recordings?

3   A.   I received them in mid October.

4   Q.   And was the person who gave you the recordings an

5   employee of the defendant's?

6   A.   Yes.

7   Q.   And is it your understanding that the person was an

8   employee at the time the recordings were made?

9   A.   Yes.

10  Q.   And was it your understanding that the person who

11  made the recording was present at the meeting?

12  A.   Yes.

13  Q.   And was his presence known to Mr. Emami?

14  A.   Yes.

15  Q.   Did you listen to the recording?

16  A.   I did.

17  Q.   How many voices, if any, did you recognize?

18  A.   I recognized one of the voices.

19  Q.   And whose voice did you recognize?

20  A.   Mr. Emami.

21  Q.   And is there any doubt in your mind that the voice

22  you heard on the recording was Mr. Emami?

23  A.   No.

24  Q.   And what language was Mr. Emami speaking?

25  A.   He was speaking English.

Elegant - D

1  Q.  Did you have any trouble understanding what he was

2  saying?

3  A.  So some of the recordings are a bit difficult to

4  understand, so there were some where I had to listen a

5  few times to make sure I understood.  But I feel like

6  after I listened, if I needed to more than once, that I

7  did understand what he was saying.

8  Q.  Do you recall signing a declaration concerning what

9  you heard on the recordings?

10  A.  Yes.

11  Q.  And do you recall that in the declaration there were

12  several sentences that you declare as being remarks of

13  Mr. Emami?

14  A.  Yeah.

15  Q.  Did you paraphrase his remarks in the declaration or

16  are they verbatim or did you quote them?

17  A.  Those remarks are verbatim.

18  Q.  And to the best of your recollection, are the

19  remarks, as stated in your declaration, accurate quotes

20  of what Mr. Emami was saying at the meeting?

21  A.  Yes.

22  Q.  Okay.  In your declaration you state that on

23  April 9th of this year you spoke to an employee of the

24  defendant's.  Do you know the name of the individual you

25  spoke to?

Elegant - D

1   A.   Yes.

2   Q.   And do you know if that person is still an employee

3   or is still an employee of the defendant or was on

4   April 9th?

5   A.   Yes.

6   Q.   And was that conversation that you had with the

7   person on April 9th of this year concerning events that

8   occurred during the course of that individual's

9   employment?

10  A.   Yes.

11  Q.   And what did that person tell you?

12  A.   The person told me that they were concerned that they

13  had heard that threats had been made against a

14  complainant that initiated this process.

15  Q.   Okay.  And what kind of threat?

16  A.   To -- what was said to me in Spanish was "golpear,"

17  which is to beat.

18  Q.   To beat?

19  A.   Yes.

20  Q.   As in to beat up?

21  A.   Right, exactly.

22       MR. HUNT:  Objection.  I think she's leading.

23  The answer was given, "to beat," and then counsel was

24  leading.

25       THE COURT:  Your objection is overruled.

                         Elegant - D

1            Go ahead.

2            MS. BRINKERHOFF:  Pardon?

3            THE COURT:  Go ahead.

4            MS. BRINKERHOFF:  Okay.

5    BY MS. BRINKERHOFF:  (continuing)

6    Q.  So did you speak to anybody else about that threat?

7    A.  Yes.

8    Q.  And when did you speak -- who did you speak to about

9    the threat?

10   A.  I spoke with quite a few people about that threat:

11   My supervisors, immediately after receiving it.  I also

12   talked with one of the employees who was identified as

13   having heard that.

14   Q.  And what did that person tell you?

15   A.  So that person stated that he talked with Mr. Emami

16   and that Mr. Emami asked who was the person who made the

17   complaint.  This individual said he didn't know.  He then

18   asked if it was -- and identified two particular workers,

19   and the individual said he didn't know.

20          He also -- and then he said that he didn't -- he

21   wanted to know who was trying to bring problems to him,

22   he being Mr. Emami; and that if this person found out who

23   made the complaint, to let him know, because he would

24   send someone to -- to beat up this person.  Again, this

25   person used the word "golpear."  I asked him if he had

Elegant - D

1    said the word in Spanish, and he said he made a motion
2    like a fist.
3    Q.  You're stating that Mr. Emami wanted to know who made
4    the complaint.  Are wage and hour investigations always
5    initiated by complaints?
6    A.  No, they are not.  There are some that are initiated
7    by complaints, and some are initiated as a directed
8    investigation.
9    Q.  So as far as you know, does Mr. Emami have any reason
10   to believe that there was a complaint issued against him,
11   from anything that you or your colleagues might have
12   said?
13   A.  We never disclose why we initiate an investigation.
14   Somebody can guess that it's a complaint.  We always say
15   investigations are initiated either through a directed
16   initiated investigation or through a complaint.  We do
17   not disclose what reason we are initiating an
18   investigation.  And the investigation itself, once
19   initiated, is run the same way, so in that way we're
20   trying to steer the conversation away from that.
21            I never said to Mr. Emami that there was a
22   complaint.  I would never do so.
23   Q.  Okay.  You stated in your declaration that the
24   employees mentioned in your declaration are not willing
25   to come forward at this time.  What do you base that

Elegant - D

1  conclusion on?

2  A.  Well, the employees are very afraid of losing their

3  job.  They said that.

4        MR. HUNT:  Your Honor, this is just her

5  characterizer, her subjective evaluation.  It's a

6  compound question because it involves all employees.

7  We're not talking about just one person.  She's just

8  characterizing 35 people as all having the exact same

9  emotion.

10        THE COURT:  Your objection is overruled.

11        Go ahead.

12        THE WITNESS:  So I say that because they said,

13  "I am afraid."  So that's, you know -- the conversations

14  I've had, that sentence has been said to me:  "I'm

15  afraid.  I'm afraid I'm going to lose my job."  So

16  they're very reluctant to come forward.

17  BY MS. BRINKERHOFF:  (continuing)

18  Q.  You then go on in your declaration to state that the

19  employees have assured you that they will testify in this

20  matter.  What would make them testify at some point?

21  A.  Well, the employees that I've talked with are hoping

22  that this will be resolved without the necessity to

23  testify.  They're hoping for a resolution.  They're

24  hoping to be able to keep their jobs as well.  If it

25  becomes necessary -- they have told me if down the road

Elegant - X

1   it becomes necessary, they are willing to testify if it
2   cannot be resolved before then.
3   Q.   Okay.  And do you have an idea of how many employees
4   have indicated that they would testify at a hearing?
5   A.   So of the ones that I have talked to about this, I
6   think about eight have indicated -- around eight have
7   indicated that they are willing to come forward and
8   testify.
9        MS. BRINKERHOFF:  I have no more questions, Your
10  Honor.
11       THE COURT:  Cross-examine.
12
13                    CROSS-EXAMINATION
14  BY MR. HUNT:
15  Q.   Could you tell me who within your department decides
16  whether to pursue an investigation?  Is that you or
17  somebody else within your department?
18  A.   No, it's -- well, I get the information from my
19  supervisor.  I'm not sure if it's my direct supervisor or
20  the supervisor above him who makes that decision, but I
21  get the information from my direct supervisor.
22  Q.   And have you completed your investigation in this
23  matter?
24  A.   At this point, at this date?
25  Q.   Yes.

Elegant - X

```
 1  A.   So the investigation has been turned in.  What that
 2  means is it's been given to my supervisor.  So the
 3  investigative part has been concluded.  The investigation
 4  is usually a two- or three-year period, which that ends
 5  when we first enter.
 6  Q.   You spoke with the manager of Oak Grove Cinemas?
 7  A.   That's correct.
 8  Q.   Who was that individual?
 9  A.   So his first name is Colin.  His last name starts
10  with an S.  I honestly -- I don't want to guess at it.
11  So it is in there.  I can get that for you.
12  Q.   Did he cooperate in your investigation?
13  A.   Yes, he did.
14  Q.   Did Mr. Emami and his wife cooperate in the
15  investigation?
16  A.   Yes.
17  Q.   And is it -- apparently it is the hope of the
18  employees, at least with whom you spoke, that they would
19  like to see this matter resolved?
20  A.   That's correct.
21  Q.   Is that the position of the Department, if you know?
22          MS. BRINKERHOFF:  I'm going to object.
23          THE COURT:  Overruled.
24          Go ahead.  Answer the question.
25          THE WITNESS:  Yes.
```

Elegant - X

1   BY MR. HUNT:   (continuing)

2   Q.   You talked about recordings.   And as I heard your

3   testimony, I believe you said that they were in several

4   recordings.   Is that correct?

5   A.   Right.

6   Q.   They were all made by the same person?

7   A.   Right.

8   Q.   Do you know whether they were all made at the same

9   time or whether they were made at different times?

10  A.   The same time.

11  Q.   How do you know that?

12  A.   You can follow the conversation.   There's even

13  sometimes some overlap.   So what I believe is that they

14  were made into smaller amounts so they could be sent, if

15  that makes sense.

16  Q.   Well, that's your belief.   You don't know for sure?

17  A.   Well, when they overlap, it becomes very apparent

18  that it's a continual conversation.

19  Q.   And was Mr. Emami speaking with anyone?

20  A.   Yes.

21  Q.   And were there other voices that were on the tape?

22  A.   So what you generally hear on the tape is Mr. Emami

23  will speak for a long time, as though speaking to a

24  group.   And then somebody will translate what's being

25  said from English into Spanish.

Elegant - X

1   Q.   Were there any questions that came back from the

2   employees?

3   A.   No, I don't believe so.

4   Q.   You don't know for sure?

5   A.   I have to listen to the whole tape to be able to say

6   for sure.

7   Q.   And was the person who was doing the translating, was

8   that person just summarizing his remarks or was he making

9   a -- he or she making a verbatim translation of the

10  remarks?

11  A.   Summary.

12  Q.   And the persons -- some of the persons that were

13  listening to his remarks, do you know if any of them --

14  whether their first language was English or not?

15  A.   I don't know.  I don't think so, but I don't know.

16  Q.   Did you hear any words uttered in English by anyone

17  other than Mr. Emami?

18  A.   No.

19  Q.   And this tape came into your possession when?

20  A.   It was sent October 10th of 2012.

21  Q.   And at any point have you provided the defendants or

22  the defendants' counsel with a copy of the tape?

23  A.   I have not.

24  Q.   And did you provide this tape to somebody else at

25  your department?

Elegant - X

1   A.   Yes.

2   Q.   How much time elapsed between October 10 and the time

3   when you provided it to others?

4   A.   Probably a few days.   We actually had a difficulty in

5   playing them.   Our computer wouldn't play them.   So it

6   took a while.   I was working with my supervisor to try to

7   get it to a form where we could listen to it.   So that

8   happened probably within a few days after receiving it.

9   And, you know, at that point my supervisor then had a

10  copy of that as well.

11  Q.   And once you learned what was on the tape, why was it

12  that you didn't take action at that point?

13  A.   So I informed my supervisor, and it went up the

14  chain.

15  Q.   And I'm not clear what the word, at some point during

16  that tape -- well, do you remember what was said?

17  A.   On the tape?

18  Q.   Yes.

19  A.   Yes.

20  Q.   What do you recall?

21  A.   Excuse me.

22        So the tape is quite long, but in general

23  Mr. Emami is talking about the investigation.   He's

24  talking to the employees and encouraging them --

25  Q.   I didn't want a summary.   Do you remember the exact

Elegant - X

1  words that were uttered by Mr. Emami?

2  A.   Not off the top --

3  Q.   You'd need the tape?

4  A.   -- of my head.

5  Q.   There was -- in your declaration, there are some

6  portions of -- there are some statements that are

7  opposite bullet points.  There are five bullet points in

8  your declaration, in paragraph 10.

9  A.   Correct.

10  Q.   Were those -- those were selected items that you took

11  from the tape?

12  A.   That's correct.

13  Q.   And in some instances did you, when you would -- when

14  you would refer to a particular statement, did you delete

15  portions of it?  There seemed to be some dots between

16  certain portions of statements.

17  A.   When there are dots, it indicates that there are

18  words there that are not included, that's correct.

19  Q.   All right.  Why didn't you include them?

20  A.   So -- that decision was made by the solicitor's

21  office.

22  Q.   There are also some comments in the tape that I would

23  characterize as editorial comments or characterizing

24  comments about statements, such as in brackets, there's a

25  comment, "intimidating" --

Elegant - X

1   A.   Intimidating?

2   Q.   I'm sorry, "imitating the government."  Beg your

3   pardon.

4   A.   Correct.

5   Q.   Now, did you put that phrase in there or did someone

6   else?

7   A.   That was done at the solicitor's office.

8   Q.   And there are other phrases that were also added,

9   correct, in brackets, "imitating worker"?

10  A.   Correct.

11  Q.   That was somebody's characterization of what was

12  being said; is that correct?

13  A.   Correct.

14  Q.   So how long is the tape?  Is it a total of 30

15  minutes?

16  A.   It's more than 30 minutes.

17  Q.   Is it an hour?

18  A.   I think it's around 50 minutes.  I'm not -- I'm not

19  positive about that.

20  Q.   So would you agree with me that the -- the five items

21  that are taken here were just selective bits and pieces

22  of the tape?

23  A.   That's correct.

24  Q.   And were they -- were the pieces that were selected,

25  were they selected to -- to show that Mr. Emami was

Elegant - X

1   misbehaving or saying something that wasn't appropriate?

2   A.   They were selected by the solicitor's office.

3   Q.   Do you know what --

4   A.   But in the tape, those are words that he said, and

5   those are things that were conveyed to workers.

6   Q.   Do you know what was said by Mr. Emami before the

7   tape began?

8   A.   Before the tape began?

9   Q.   Yes.

10  A.   No.

11  Q.   And you're confident that without exception, of the

12  five -- or how many tapes were there?

13  A.   There were about 10 recordings.

14  Q.   And is it your testimony that without exception,

15  there was never a break between any of the 10 or so

16  recordings?

17  A.   I don't believe so.

18  Q.   But you're not certain?

19  A.   I'm not a hundred percent certain, no.

20  Q.   So what you put in your declaration, of course, you

21  didn't hear that?

22  A.   Excuse me?

23  Q.   You didn't hear -- you personally weren't a party to

24  these events?

25  A.   That's correct.

Elegant - X

1    Q.   These are tapes, and they were selectively quoted, or
2    in some instances bits and pieces of a sentence were
3    quoted, correct?
4    A.   That's correct.
5    Q.   And then there were characterizations that were added
6    to some of the items that were quoted by the solicitor.
7    A.   That's correct.
8    Q.   And did -- so you -- the person who was translating
9    was not translating all 50 minutes?
10   A.   They were translating during the entire period;
11   verbatim, no.
12   Q.   And was there more than one translator?
13   A.   No.  It was one individual.
14   Q.   Do you know who the translator was?
15          MS. BRINKERHOFF:  Objection, Your Honor.  That's
16   informant's privilege.
17          MR. HUNT:  I'm just asking if she knows who the
18   translator -- I've not asked who it was.  I've asked
19   whether she knows who it is.
20          THE COURT:  The objection is overruled.
21          Go ahead.
22          THE WITNESS:  Yes.
23   BY MR. HUNT:  (continuing)
24   Q.   There is a statement in your declaration that -- that
25   on or around April 9 you spoke to an individual, an

Elegant - X

1   employee, who reported to you that Mr. Emami continues to

2   ask his workers if they are talking with you.

3   A.   Yes, that's correct.

4   Q.   Is that against the law, to ask an employee whether

5   they're speaking with an investigator?

6   A.   No.

7   Q.   And then you gave some testimony about the word

8   "beat" was used by this individual.

9   A.   Yes.

10  Q.   What specifically did the individual state to you?

11  A.   The word -- the conversation was in Spanish, and the

12  word that was used was "golpear."

13  Q.   Which -- what does that mean?

14  A.   It can mean to beat, to beat up, to hit.

15  Q.   Well, which -- which was it?  Or did the person

16  explain?  Did you follow up to find out whether Mr. Emami

17  was going to hit the person or beat up the person or beat

18  the person?

19  A.   No.  At the time I did not.

20  Q.   And did you -- in your declaration, anyway, you

21  didn't make any suggestion or statement that Mr. Emami

22  was going to direct that someone else beat up the

23  individual, correct?

24  A.   No, I did not.

25  Q.   So which was it?  Did the person say -- use the word

Elegant - X

1  "beat" or "beat up"?  Or did the person say that

2  Mr. Emami had told -- or the individual had heard that

3  Mr. Emami was going to direct that someone else would

4  beat up the person?

5  A.   That Mr. Emami was going to direct somebody -- he was

6  going to send someone to do that.

7  Q.   But you didn't mention that in your declaration?

8  A.   I did not correctly clarify that, that's correct.

9  Q.   So your declaration isn't accurate in that respect?

10  A.   In that respect, it is not.

11  Q.   You also testified that the employees that you

12  interviewed are worried.

13  A.   Yes.

14  Q.   Now, did they use that word?  Did they say -- did

15  each of them say, "I'm worried"?

16  A.   No.  The word would be "preocupado," and that's not

17  the word that they would use.

18        Usually it would be "Tengo miedo," "I'm afraid."

19  Usually that's followed by things like "that I would lose

20  my job."

21  Q.   But you didn't put in your declaration that they were

22  afraid or that they were afraid they would would lose

23  their job, correct?

24  A.   No, I did not.  I was not quoting them directly.

25  Q.   So the use of the word "worried" is just your

Elegant - X

1  characterization as what you heard from some of them?

2  A.  Correct.

3  Q.  And I gather you didn't hear it from all 35 -- from

4  all of the persons that you interviewed?

5  A.  I have not talked with all 35 individuals about

6  whether or not they are afraid that they will keep their

7  job.

8  Q.  Did anyone that you spoke with use the word

9  "worried"?

10  A.  I am not sure.

11  Q.  Now, did any -- any of the persons that you

12  interviewed state that they were threatened?

13  A.  That they were threatened?

14  Q.  Yes.  Did they use that word, by Mr. Emami?

15  A.  Directly, no.

16  Q.  It was more that they were telling you that they were

17  worried or afraid, not that they had been directly

18  threatened by Mr. Emami?

19  A.  Threatened that they would lose their job?  "If you

20  talk to the government, you will not work for me," that's

21  a direct threat.

22  Q.  I want to know whether any of them said that they

23  felt that they were threatened by Mr. Emami.

24  A.  So Mr. Emami -- yes, they said that they were

25  directly threatened by Mr. Emami that they would lose

Elegant - X

1  their job.

2  Q.  Okay.  Somebody said that they were directly

3  threatened?  They used those words, they were directly

4  threatened that they would lose their jobs?

5  A.  They would say, "He told me if I talked to them and

6  told them that I worked additional hours, I would lose my

7  job.  He told me if I received money, that I would

8  not -- I would not have a job."  That would be what they

9  would say.  They wouldn't use the word "threatened."  It

10  would be like "He told me."

11  Q.  They didn't all say that, all of the --

12  A.  Every single person did not say that, no.  Some of

13  the individuals said that, yes.

14  Q.  Did some of the people speak -- make favorable

15  remarks about Mr. Emami?

16  A.  No.

17  Q.  Did -- did anyone suggest -- so no one said anything

18  positive about him, that you interviewed?

19  A.  No.

20  Q.  Did any of them -- you don't have any evidence that

21  any of them were in fact beat, do you?

22  A.  No.

23  Q.  Do you have any evidence that any of them were

24  terminated because they had been interviewed by you?

25  A.  No.

Elegant - X

1   Q.   Did you speak with the person that made the initial

2   complaint?

3   A.   Yes.

4   Q.   And --

5            MS. BRINKERHOFF:  Objection, Your Honor.

6            THE COURT:  Overruled.

7   BY MR. HUNT:  (continuing)

8   Q.   More than once, did you speak with that individual?

9   A.   Yes.

10  Q.   And was that individual -- were these comments about

11  "beat" or "beat up" directed at that individual or

12  someone else, if you know?

13  A.   To someone else.

14  Q.   Well, the statement was made to somebody else?

15  A.   The statement was made to someone else.

16  Q.   And what was -- and was the statement made that the

17  person who was hearing it would be beat up?  Or was the

18  statement that some other person would be beat or beat

19  up?

20  A.   So the statement, as I said before, was to an

21  individual; and if that person knew who the complainant

22  was, then the complainant would be beaten up.

23  Q.   You mentioned -- well, did you ever question

24  Mr. Emami about these matters?

25  A.   About which matters?

Elegant - X

1  Q.  The ones you just testified to.

2  A.  No, I did not.

3  Q.  Why not?

4  A.  At that point he was represented by an attorney.  In

5  our investigation, we'll work directly with the owner or

6  manager.  If somebody is represented by an attorney, then

7  it is expected that we would go through an attorney.

8  Q.  Did you ever go through an attorney to interview him

9  regarding the --

10 A.  Well, at that point my case had been turned in.  So

11 at that point I notified our attorneys of the matter.  So

12 at that point I was also no longer speaking with the

13 attorneys.

14 Q.  How many individuals that you interviewed said that

15 David, their boss, said directly to them that if they

16 were paid money, they would lose their job, if any?

17 A.  Directly, I think three or four.

18 Q.  And those persons are still working?

19 A.  Some of them.

20 Q.  Do you know whether some of them have voluntarily

21 quit?

22 A.  Some of them have left.

23 Q.  And you don't know why?

24 A.  I've been told for some, reasons why some of them

25 have left, yes.  Some of them have found jobs in other

Elegant - X

1  places.

2  Q.  Do you know whether they've found higher-paying jobs?

3  A.  I did not ask.

4  Q.  There was a -- I think there was mention in your

5  testimony about a clenched fist or a -- do you know

6  what -- do you know anything more about that, other than

7  somebody reported that Mr. Emami had his fist clenched?

8  A.  So the sentence was -- that was reported to me was

9  that if Mr. Emami found out who made the complaint, he

10  would send somebody, and his fist was raised.  So that's

11  what --

12  Q.  Do you know whether David, the boss, would ever put

13  his fist on his hand just to make a point, saying, "We've

14  got to get this done by noon" or "We've got to get this

15  work done"?

16  A.  I don't know.

17  Q.  How many persons told you -- employees said they

18  feared losing their jobs?

19  A.  I believe I said about three to four.

20  Q.  And did you interpret, then -- I'll withdraw that.

21          MR. HUNT:  That's all I have, Your Honor.

22          THE COURT:  Thank you.

23          Do you have any redirect?

24          MS. BRINKERHOFF:  I do.

25

1        REDIRECT EXAMINATION

2    BY MS. BRINKERHOFF:

3    Q.  First of all, opposing counsel, as they characterized

4    it, the editorial bracketed material, do you agree that

5    those phrases were appropriately contextual?

6    A.  I do.

7    Q.  And how do you know that?

8    A.  As he's talking, he changes his voice.  So let's say

9    he's talking like this.  And then he'll talk -- and then

10   he'll -- he'll change the tone of his voice to show that

11   he's taking on another character.

12   Q.  You've testified that Mr. Emami continues to ask his

13   employees if they are talking to you.

14   A.  Yes.

15   Q.  So is it your understanding that those questions by

16   Mr. Emami are asked, you know, during coffee breaks or at

17   the water fountain, just casual questions?

18   A.  No.

19   Q.  How -- what is your understanding of the tenor of

20   those questions?

21   A.  Well, the questions are usually, are they talking to

22   me, and often tells them what they shouldn't say.  "Tell

23   them you only work 40 hours a week."  So it's not just,

24   "Hey, is the investigation still ongoing?"  It's more of

25   an instructive.

Elegant - ReX

1  Q.  Okay.  And is it your understanding that the

2  employees are feeling kind of badgered by Mr. Emami?

3          MR. HUNT:  Objection, Your Honor.

4          THE COURT:  Overruled.

5          THE WITNESS:  Yes.

6  BY MS. BRINKERHOFF:  (continuing)

7  Q.  Okay.  So I recall from your testimony, from your

8  testimony this morning, you had two conversations about

9  somebody -- Mr. Emami beating somebody up.  Is that

10  correct?

11  A.  Yes.

12  Q.  And the second conversation, which was the more

13  recent conversation, that was where you found out that he

14  was going to send somebody.

15  A.  Yes.

16  Q.  And that conversation was held after you signed your

17  declaration; is that correct?

18  A.  That's correct.

19          MS. BRINKERHOFF:  I have no further questions.

20          THE COURT:  You can step down.

21

22                  RECROSS-EXAMINATION

23  BY MR. HUNT:

24  Q.  Do you have a file on this matter, an investigative

25  file?

Elegant - ReX

1  A.  Yes.

2  Q.  Where is it?  Do you have it or does somebody else

3  have it?

4  A.  It's been given to the solicitor's office.

5          THE COURT:  You can step down.

6          THE WITNESS:  Thank you.

7          THE COURT:  Do you have anything else?

8          MS. BRINKERHOFF:  I was going to talk about the

9  preliminary injunction analysis.

10          THE COURT:  Sure.  Go ahead.

11          MS. BRINKERHOFF:  I think the Department has met

12  its burden to show that a preliminary injunction is

13  warranted here.  First, the Department is likely to

14  succeed on the merits because it's got evidentiary proof

15  that Mr. Emami has made threatening remarks to his

16  employees.  We have the tape-recordings that, you know,

17  the provenance of those were testified to by what I feel

18  is a credible reliable witness, Ms. Elegant, who also

19  testified to the remarks that employees made to her about

20  the physical threats.

21          And those employees stuck their necks out to talk

22  to her about these things because they don't know what

23  Mr. Emami might do or what might happen to them or

24  whether the Department can protect them or not.  So the

25  fact that they took on that risk, to me, makes them even

1   more credible.

2           And it doesn't really matter how many employees

3   Mr. Emami might have threatened or tried to coerce or

4   coach, any of those things.  Even just one person is a

5   violation of the Fair Labor Standards Act.

6           Second, unless the Court immediately restrains

7   Mr. Emami from making the threats against his employees

8   and continuing to make threats against them, the

9   Department is going to suffer irreparable harm, because

10  it will be constrained in its future investigations.

11  Employers will think that they can get away with

12  retaliating against their employees or threatening their

13  employees, because they'll know that nothing will happen

14  to them.  And employees will be reluctant to come forward

15  to the Department because they have no guarantee that

16  they're going to be protected.

17          Then the balance of equities tilts in the

18  Department's favor.  As we said in our brief and

19  defendants even admitted, the defendants really have no

20  legitimate interest in threatening their employees.

21  Their interest is the self-interest, and it's to cow

22  their employees into not cooperating with the Secretary's

23  investigation.

24          But in contrast, the Secretary's interest in the

25  defendant is the defendant's immediate compliance with

1  the Fair Labor Standards Act and also with giving the

2  employees assurance that they are going to be protected

3  by their government.

4          So the differences in the parties' interest is

5  very stark, and there's just no doubt that it weighs

6  heavily in the Secretary's favor.

7          Fourth, an injunction will be in the public

8  interest.  And the relief that we seek and sought was

9  designed to send a message to employers that they are not

10  going to be -- they will be held accountable for any acts

11  of retaliation against employees who engage in protected

12  activities under the FLSA.  And the public interest will

13  not be served if Mr. Emami is not restrained by this

14  Court from his ongoing retaliatory conduct and threats.

15          And I'd like to mention that there is a line of

16  cases that state -- that hold that when a statute

17  provides for equitable relief, that we really don't have

18  to go through that four-stage or four-step analysis that

19  I just went through.  But we chose to do that.  All we

20  have to do, under those holdings, is show that the

21  defendant made -- did something that was in violation of

22  the statute, which we have done.  But we've decided we

23  ought to go through with this analysis, because we just

24  wanted to show that either way we would prevail.

25          So in closing, we just want to emphasize that our

goal here, our mission is twofold.  First of all, we want

to protect the employees of Mr. Emami from any sort of

coercion regarding the wage and hour investigation and

the Department's enforcement action.  And, second, we

want to send a very clear signal to employers who are

within the jurisdiction of this Court that they are going

to be held accountable if they engage in the kind of

conduct that Mr. Emami engaged in and that they cannot

interfere with the Secretary's mandate to protect

employees.

Thank you.

THE COURT:  Thank you.

Mr. Hunt.

MR. HUNT:  Your Honor, first -- well, we in our

papers raised a number of procedural issues and due

process issues and First Amendment issues, and I'm not

going to go over all of them, but it's important to note

that the defendants to this day have still not been

served.  Their lawyers have been sent some of the papers,

but not all of the papers.

The temporary restraining order --

THE COURT:  I'm sorry.  When you say they haven't

been served, they haven't been served a copy of the

Complaint?

MR. HUNT:  They haven't been served a copy of

anything.

THE COURT:  Okay.

MR. HUNT:  Not the Complaint or summons.  They simply haven't been served, which is a rather fundamental procedural event that should have occurred in this case and did not.

In the temporary restraining order, in our view it didn't assert specific facts that would warrant having granted the order.  It cited conclusions and statements from a declaration, but there were no declarations from any of the employees who had firsthand knowledge of the events.

Counsel for the defendants didn't really have an opportunity to appear and argue these points at the temporary restraining order because as far as we know, there was no hearing.  If I'm wrong on that, correct me, Your Honor, but we're not aware of any hearing or opportunity to be heard.  We learned of the temporary restraining order being entered the day after Your Honor signed it, because no attorney had appeared on behalf of Mr. Emami.

Part of the problem with the temporary restraining order is that the Department -- it seemed to go from the investigator to the solicitor.  And somewhere along the line, things just sort of moved along without

1    reflection on complying with the rules.  And then after

2    the order was entered, somehow a contact was made with

3    the Bloomberg BNA service, and this got reported in

4    the -- essentially in the national press.  And the report

5    included comments from a spokesperson from the

6    Department, stating that the Department obtained a

7    tape-recording of a meeting in which Emami threatened to

8    fire his workers if they cooperated with wage and hour

9    investigators.  And then it went on to say that a worker

10   also reported a threat of physical violence was made at

11   another time.

12           So all of this is reported in the press.  The

13   defendants don't have an opportunity to conduct any

14   discovery or appear through counsel.  And it's hard to

15   sort of unring that bell.

16           We believe that the order that was issued, the

17   temporary restraining order, and what the Department is

18   now seeking in the form of a preliminary injunction has a

19   number of defects.  We think it's overly broad.  It's

20   vague in some respects.  It makes -- it gives the

21   writer -- would presumably give the Department the right

22   to seek contempt proceedings against Mr. Emami if the

23   Department felt that Mr. Emami believed that -- that

24   somebody was going to testify or participate or cooperate

25   in the investigation.

1          So those words are not in the statute.  And it

2     would give the Department a -- quite a range of latitude

3     to seek contempt if they concluded that in their minds

4     there was a belief by Mr. Emami that somebody was doing

5     something.

6          The --

7          THE COURT:  I'm sorry.  I lost you on that last

8     point.  What you're -- I mean, in every restraining order

9     an individual is restrained from doing something.  And of

10     course if that individual does something they're not

11     supposed to be doing, the other side gets to bring that

12     matter before the Court; and the Court will decide

13     whether or not somebody is in violation of the order.  I

14     don't see the problem with that.

15          MR. HUNT:  Well, the wording, though, wasn't --

16     it was dependent upon not the individual, Mr. Emami,

17     doing these things, but a conclusion by the Department

18     that he may have believed that somebody was doing

19     something.  It's sort of a fine point.  But the wording

20     "believe" isn't in the statute.

21          THE COURT:  That's fine, and I don't -- I don't

22     disagree with you that the order itself can use some

23     work.

24          Go ahead.

25          MR. HUNT:  And on that score, counsel -- general

business counsel for the defendants here attempted to

talk about the order or learn what the form of order was

going to be in advance and got nowhere in that respect.

There wasn't any dialogue or communication.

So we have eight months of time passed when we

think that -- that to the defendants' perception, anyway,

they're cooperating in the investigation, they're hoping

for a resolution, and then -- then this -- they're

notified that there's going to be a TRO complaint sought

and a complaint filed, but they're not told exactly when

it's going to happen.  And then they ultimately learn

that there's not going to be a hearing and that there's

not going to be sharing of papers that the Department

intended to file with the counsel for the defendant.

So needless to say, you -- you were presented

with one side of the -- one version of facts, not both

sides.

THE COURT:  Yeah, that doesn't trouble me so much

either.  That's the nature of temporary restraining

orders.

But I will say I am troubled that there were

conversations going on for months, and this was not

specifically discussed with you, with opposing counsel.

It should have been.  They should have called you and

said, "We have a problem with your client.  This is what

1    it is.  You need to talk to your client and fix this

2    problem.  If it's happening, you need to fix it."  That

3    conversation didn't happen, and I think it should have.

4          MR. HUNT:  And it's happened, but in the form of

5    formal papers.  But yes, we agree, Your Honor, that if

6    those issues had been brought, lawyers for the defendants

7    would say, "Do not engage in any behavior that even

8    approaches what has been reported to us.  There's no

9    upside for it, to you, in doing that."

10          And that's our position today.  We don't -- we

11    don't want our client to be in trouble.  We don't want

12    contempt proceedings to be brought.  But we don't think a

13    preliminary injunction is the way to -- is necessary,

14    given what the procedural background is leading up to

15    this matter.

16          There was a -- there was a tolling agreement that

17    was discussed.  And if you read the tolling agreement, it

18    has some language that said that the -- ultimately the

19    Department may or the Secretary may bring legal

20    proceedings.  And in exchange for that, the Secretary

21    agrees to withhold immediate filing of any legal

22    proceedings.  And then buried in another paragraph, if

23    you read the fine print, there's mention of a 30-day

24    notice.  But now they're contending that the fine print,

25    we should have noted that it just related to claims for

1  wages and penalties and didn't apply to efforts to obtain

2  a temporary restraining order.

3          Back then, when they're discussing back and forth

4  this tolling agreement, it would have been nice to hear

5  about this tape that they had.  The tolling agreement

6  conversation occurred I think in February of this year.

7  The tape was in their possession since October of 2012.

8          THE COURT:  And again, on that issue I understand

9  what happened.  They have this tape.  They're concerned

10  about it.  They're hanging on to it.  And then they get

11  report that there's threats of violence.  That changes

12  everything.  Not to excuse them for not communicating

13  with you about it, but it changes everything.  And I

14  actually agree with them that the tolling agreement was

15  not designed for and did not capture this event.  It

16  wasn't what it was for.

17          Go ahead.

18          MR. HUNT:  Well, and we agree that the law

19  provides that threats are unlawful.  But the issue is

20  whether they have proof of that.  And what we have in the

21  declaration is secondhand, thirdhand information,

22  selective quotes, omitted -- statements taken out of

23  context, statements characterized.  We don't have -- we

24  don't know what the translation was.  We don't know

25  whether the persons that were hearing these comments even

1  understood them or whether there was a fair

2  characterization of the comments.

3       In our view, reliance upon an illegally recorded

4  conversation is -- doesn't weigh in favor of the

5  Government.  They may cite to some authorities that

6  suggest that they can use it.  But the fact that they

7  held onto it and decided when they were going to use it

8  doesn't assist them in obtaining a preliminary injunction

9  here.

10      It's our position that there is no emergency here

11 because there hasn't been any report that I'm aware of

12 since April, even crediting the investigator's

13 declaration on that.  Time has passed.  There hasn't been

14 any emergency that would warrant a preliminary

15 injunction.  And there's no -- there's no proof that

16 there's going to be some harm occurring in the future.

17      On the -- just on the basic prongs of the --

18 needed for a preliminary injunction, it's our position

19 that the Department cannot show irreparable harm because

20 eight months have elapsed, and even from April another

21 three weeks or more.

22      They can't show that they're going to succeed on

23 the merits because they're relying solely upon the

24 Elegant declaration.  We don't know whether the

25 employees -- there's a subset of employees, some of whom

1    may never have expressed that they were going to file a

2    complaint or wish to testify.  We don't know -- we can't

3    sort out that issue.

4         This business about the employees being worried

5    is a characterization, as admitted in the testimony

6    today.  And so the basis upon which they're seeking the

7    preliminary injunction today in our view is vague,

8    conclusory, and not based upon any -- any direct

9    evidence.

10        With regard to the balancing of the hardship

11   issue, if a preliminary injunction is ordered, then

12   Mr. Emami is going to be at risk for being cited for

13   contempt.  He really can't speak to his employees unless

14   he reads the script that is part of the temporary

15   restraining order; and it's our position that that

16   compelled statement shouldn't be required of him, that he

17   ought to be able to run his business and not be looking

18   over his shoulder, wondering if he's saying something

19   that will be claimed to have been improper later on.

20        We think that the persons that were being

21   interviewed had a right to know whether or not they could

22   speak not only with our client, but with the

23   investigator.  And because of the nature of the

24   investigation and somebody from the federal government

25   quizzing them, it would be, in our view, appropriate to

1   have language that states that a person can decline to

2   talk or can talk with both the Department and also with

3   the defendants.

4          We note that Your Honor did change their

5   temporary restraining order in one respect; namely, that

6   you added that defendants' attorneys could talk directly

7   with the employees, even though the defendants could not,

8   about the nature of the investigation.  But that, to us,

9   creates ethical issues under the Oregon bar rules, and we

10  would have concern that we were potentially violating

11  ORCP 4.2.

12         We believe the order is overly broad, but I don't

13  need to speak to that at this time, Your Honor.  If Your

14  Honor is going to enter some form of order, then we have

15  some ideas about how it should be phrased; and we would

16  either be prepared to discuss those directly with the

17  Court today or with counsel.

18         THE COURT:  By the way, have you talked to your

19  client about this problem and the allegations set forth

20  in the request for a temporary restraining order and

21  request for preliminary injunction?

22         MR. HUNT:  Yes.

23         THE COURT:  And have you told your client that he

24  has to comply with the FLSA and its requirements of

25  non-retaliation; and if not, that he's in big trouble?

1          MR. HUNT:  Yes.

2          THE COURT:  You've had that conversation?

3          MR. HUNT:  Yes.

4          THE COURT:  Thank you.

5          What do you want to tell me?

6          MS. BRINKERHOFF:  Well, first of all, I want to

7     clarify something that actually just occurred to me while

8     sitting here.

9          I actually had a conversation with Andrew Schpak

10    of your law firm back in February.  I did tell him at

11    that time that we had evidence that his -- that his

12    client was, you know, retaliating or threatening his

13    employees.  So it's not like that was not disclosed at an

14    earlier date, because it was.

15         THE COURT:  And actually, I wasn't even concerned

16    about that.  It's at the point you're making a decision

17    that you're going to go seek a temporary restraining

18    order.  As I understand it, the triggering event was the

19    April 9 -- when you learned about this conversation on or

20    about April the 9th.

21         MS. BRINKERHOFF:  Right.

22         THE COURT:  You're professionals.  You call the

23    other side and you say, "We've got a problem.  This is

24    how we're going to deal with it."  And you didn't do

25    that.

1        MS. BRINKERHOFF:  And part of that is because we

2   wanted to make an impression, not just -- and this kind

3   of goes to the Secretary's mandate.  We want to make an

4   impression not just on Mr. Emami, but on the employment

5   community at large that, you know, when you do something,

6   the Department of Labor isn't going to sit back and just

7   twiddle its thumbs and let you get away with it.

8   Something serious is going to happen to you, which is

9   what we tried to do in this case.

10        THE COURT:  What does that have to do with

11   letting the lawyer on the other side know?  Nothing,

12   right?  You let the other side know.  That's how we live

13   here.  We let the other side -- we communicate with each

14   other about what's going on because you're professionals.

15        MS. BRINKERHOFF:  Right, yes.

16        THE COURT:  And I don't care if the communication

17   was "Look, we got a message that your guy was threatening

18   physical harm.  We're going after a TRO."  I'm okay with

19   that.  But you call them and let them know this is what

20   happened.  And in the meantime, that puts them in a

21   position where they go talk to their client and say, "If

22   you did this, you've got to knock it off."  Because

23   ultimately what we want is the behavior stopped.

24        MS. BRINKERHOFF:  Yes.

25        THE COURT:  And if it's going on, the behavior

1   doesn't stop between April the 9th and to the time you

2   get a TRO.

3           MS. BRINKERHOFF:  I have a note to myself here

4   that we notified defendants' counsel, which may have been

5   Mr. Wagner, who is the business counsel for the

6   defendants, on April 26th that we had a problem.

7           So that was not three or four weeks.  That was

8   whatever, 10 days or something, or 15 days.  It wasn't

9   quite as bad as --

10          THE COURT:  What did you tell him?

11          MS. BRINKERHOFF:  I don't remember.

12          THE COURT:  Okay.  Go ahead.

13          MS. BRINKERHOFF:  So we understand that at some

14  point we are going to have to turn these tapes -- you

15  know, we're going to have to disclose the tapes.  We just

16  did not want to do it up until this point, because we

17  wanted to make sure that Mr. Emami wasn't going to use

18  those tapes to threaten his employees even further.  So

19  we were waiting for some sort of injunction from the

20  Court to make sure that they would -- that their rights

21  would be protected, as much as they could be.

22          And then I also just want to point out that I

23  don't think that we have heard anything from defendants

24  that they have actually denied making any sort of threats

25  or that they denied making the statements in the

1    declaration.

2           And then finally, I just want to say that we are

3    willing to, you know, listen to the Court or your

4    thoughts on what the -- what the statement should be that

5    Mr. Emami reads or the wording of the injunction.  We

6    just want to make sure that his employees are protected.

7           MR. HARNDEN:  If I could add one comment -- it's

8    a little dangerous for me to stand up at the end, Your

9    Honor.  But the point is they don't even give the

10   attorneys the tape to say, "This is what was going on."

11   The witness said the only person on the tape was

12   Mr. Emami.  So to say, "Well, we didn't want to get

13   anyone in trouble" I think misses the point.  They didn't

14   give us anything, including what common sense would have

15   told them to give us.

16          And then to come in without service on our client

17   and say, "We want an injunction," without having done any

18   of this seems a major stretch.  And this is not the time

19   for the Department to say, "Oh, we want to make a big

20   statement to the employers of Oregon."  This is a case

21   about Mr. Emami.

22          It is not fair to not serve someone, to not give

23   their counsel the tapes that they have had for months,

24   and then to come in and ask for an injunction.  I think

25   it's just grossly unfair to any defendant.

1            THE COURT:  Thank you.

2            I'm going to step off the bench for a few

3    minutes.  There are some notes I want to take down, and

4    then I will be back.  I will be back in 10 minutes.

5            (A recess is then taken.)

6            THE CLERK:  Remain seated.  Come to order.

7            THE COURT:  I have reviewed the four parts under

8    the *Winter* case in determining whether or not a

9    preliminary injunction should order -- should issue.  And

10   in this case the first thing I looked at is whether or

11   not the plaintiffs have proven that they are likely to

12   succeed on the merits, and I find that they have proven

13   that.  I'm convinced that the tape shows that the

14   defendant made remarks and later made threatening remarks

15   to physical safety.  He's made remarks that were intended

16   to intimidate his workers and the complainants in this

17   case, even though he doesn't know exactly who they are.

18           Secondly, I'm also convinced that the plaintiffs

19   have shown that there is a likelihood of irreparable harm

20   in this case.  The workers, as they suggest, need to know

21   that they are protected.  The behavior needs to stop.

22   And, therefore, they have shown that one.

23           There also is the question on the balance of the

24   equities that also favors the plaintiffs in this case,

25   and I also believe an injunction is in the public

1   interest.  I am therefore ordering that a preliminary

2   injunction should issue in this case.

3          I am not convinced that the way it was crafted as

4   part of the temporary restraining order is the

5   appropriate language or format for us as we go forward

6   with the preliminary injunction.

7          What I want to have happen is I want there to be

8   a draft of the preliminary injunction order which adopts

9   the language of the Fair Labor Standards Act.  And I

10  suggest that it be made in the form of a poster that can

11  be posted in the workplace and that a copy be served on

12  Mr. Emami by defense counsel.  They can review that with

13  him.  Although that won't be part of the order, I'm sure

14  that they will take care of that.

15         I don't know how big the workplace is.  I don't

16  know how many posters ought to be posted, and I don't

17  know the specific language, other than it should

18  generically say the Fair Labor Standards Act prohibits

19  retaliation.  Then you can look at the specific language

20  that's used in the Fair Labor Standards Act that

21  basically tells the defendant that he needs to obey the

22  law.

23         I expect you two -- that is, the plaintiffs and

24  the defendants -- to be able to work that language out

25  and also to be able to work out how many and how big the

 1    posters ought to be and where they ought to be posted.

 2            Questions from plaintiff?

 3            MR. BROWN:  I think we understand the Court's --

 4    we'll work to draft the language.

 5            THE COURT:  Thank you.

 6            Questions from defense?

 7            MR. HUNT:  No, Your Honor.  We'll work with them

 8    to come up with language that reflects the statute.

 9            THE COURT:  Okay.

10            MS. BRINKERHOFF:  I do have a question.

11            So what we are going to draft will replace that

12    one section in the TRO, and the other provisions will

13    stand as they've been drafted?

14            THE COURT:  No.  The TRO is over as of today.  It

15    dissolves because I'm issuing a preliminary injunction.

16    The preliminary injunction says you win.  Draft a poster

17    that's consistent with the requirements of the Fair Labor

18    Standards Act, and that's what will be posted throughout

19    the workplace or places.  I don't know.  Again, I'm not

20    familiar with what exactly that encompasses.

21            But the portions, for example, that were

22    requiring the defendant to read to his workforce what's

23    in that, I'm not requiring him to do that.  I'm requiring

24    him to put up the posters.  They can can be in Spanish

25    and in English and should be, because I understand the

1   workforce is -- at least many of them are Spanish

2   speaking.  So it should be in both languages.

3           MR. BROWN:  Your Honor, what about the provision

4   in the TRO that prohibited Mr. Emami from talking with

5   his workers directly?

6           THE COURT:  I mean, he's got to be able to talk

7   to his workers to conduct his business, I assume.

8           MS. BRINKERHOFF:  Right, but the provision -- I'm

9   sorry.  Go ahead.

10          MR. BROWN:  The provision just spoke to

11  prohibiting him from talking to his workers, except

12  through counsel and counsel's employees, about the

13  substance of the investigation itself.

14          THE COURT:  Again, you can draft language that

15  reflects the spirit of the Fair Labor Standards Act.

16  What you're trying to make sure is he's not trying to

17  intimidate them, not trying to in some way prohibit them

18  from pursuing their rights under the Fair Labor Standards

19  Act.  To the extent that you want to put language that

20  reflects that in the poster, I'm okay with that.

21          So he can't do anything that interferes with

22  their rights and ability to pursue their claims under the

23  Fair Labor Standards Act.

24          Thank you.

25          MR. HARNDEN:  Thank you, Your Honor.

1          MR. BROWN:  Thank you.

2          THE COURT:  All right.  Thank you.

3

4          (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            --oOo--

2

3            I certify, by signing below, that the

4        foregoing is a correct transcript of the record

5        of proceedings in the above-titled cause.  A

6        transcript without an original signature,

7        conformed signature or digitally signed signature

8        is not certified.

9

10

11
         /s/ Nancy M. Walker                    5-22-13
12       _____    _____
         NANCY M. WALKER, CSR, RMR, CRR        DATE
13       Official Court Reporter
         Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 62:11

## 1

**10** [7] - 14:4, 26:2, 27:8, 29:13, 29:15, 55:8, 57:4
**1000** [1] - 2:11
**10th** [1] - 25:20
**1120** [1] - 2:4
**15** [2] - 1:6, 55:8
**1876234** [1] - 5:1
**1st** [1] - 8:25

## 2

**2012** [3] - 13:10, 25:20, 49:7
**2013** [2] - 1:6, 5:1
**2300** [1] - 2:8
**26th** [1] - 55:6
**2nd** [1] - 8:25

## 3

**3** [1] - 3:5
**30** [3] - 14:5, 28:14, 28:16
**30-day** [1] - 48:23
**300** [1] - 2:4
**301** [1] - 2:11
**30th** [1] - 13:10
**326-8186** [1] - 2:12
**35** [4] - 14:9, 21:8, 33:3, 33:5
**3:13-CV-00728-HU** [1] - 3:4
**3:13-cv-728-HZ** [1] - 1:5

## 4

**4.2** [1] - 52:11
**40** [1] - 38:23
**499** [1] - 6:21

## 5

**5-22-13** [1] - 62:11
**50** [2] - 28:18, 30:9
**503** [1] - 2:12

## 6

**6** [1] - 6:2
**601** [1] - 2:8

## 7

**7th** [1] - 13:18

## 8

**8(c** [1] - 5:15
**883** [1] - 6:21

## 9

**9** [2] - 30:25, 53:19
**90-0091** [1] - 62:13
**97204** [1] - 2:11
**97204-3159** [1] - 2:9
**98104** [1] - 2:5
**9th** [8] - 8:15, 8:24, 9:15, 17:23, 18:4, 18:7, 53:20, 55:1

## A

**ability** [1] - 60:22
**able** [7] - 11:6, 21:24, 25:5, 51:17, 58:24, 58:25, 60:6
**above-titled** [1] - 62:5
**acceptable** [1] - 3:23
**access** [1] - 9:25
**account** [1] - 15:10
**accountable** [2] - 42:10, 43:7
**accurate** [2] - 17:19, 32:9
**act** [1] - 6:24
**Act** [12] - 5:12, 5:19, 5:24, 41:5, 42:1, 58:9, 58:18, 58:20, 59:18, 60:15, 60:19, 60:23
**Acting** [1] - 1:3
**action** [2] - 26:12, 43:4
**activities** [1] - 42:12
**acts** [1] - 42:10
**add** [1] - 56:7
**added** [3] - 28:8, 30:5, 52:6
**additional** [4] - 4:1, 6:1, 12:9, 34:6
**address** [6] - 3:21, 3:23, 4:18, 6:5, 7:7, 7:12
**addressing** [2] - 4:7, 4:10
**admissibility** [1] - 6:12
**admissible** [3] - 6:14, 6:16, 7:2
**admitted** [2] - 41:19,

51:5
**adopts** [1] - 58:8
**advance** [1] - 47:3
**affecting** [1] - 6:2
**afraid** [9] - 21:2, 21:13, 21:15, 32:18, 32:22, 33:6, 33:17
**agree** [6] - 7:16, 28:20, 38:4, 48:5, 49:14, 49:18
**agreement** [5] - 48:16, 48:17, 49:4, 49:5, 49:14
**agrees** [1] - 48:21
**ahead** [11] - 12:4, 19:1, 19:3, 21:11, 23:24, 30:21, 40:10, 46:24, 49:17, 55:12, 60:9
**al** [1] - 3:3
**allegations** [2] - 8:5, 52:19
**Amendment** [7] - 4:19, 4:23, 5:4, 5:9, 5:17, 5:19, 43:16
**Americable** [1] - 6:20
**AMERICABLE** [1] - 6:20
**amount** [1] - 13:23
**amounts** [1] - 24:14
**analysis** [3] - 40:9, 42:18, 42:23
**Andrew** [1] - 53:9
**answer** [2] - 18:23, 23:24
**anyway** [2] - 31:20, 47:6
**apparent** [1] - 24:17
**appear** [2] - 44:14, 45:14
**appearances** [1] - 3:6
**APPEARANCES** [1] - 2:1
**appeared** [1] - 44:20
**apply** [1] - 49:1
**approaches** [1] - 48:8
**appropriate** [3] - 29:1, 51:25, 58:5
**appropriately** [1] - 38:5
**approximate** [1] - 13:23
**April** [15] - 8:4, 8:15, 8:24, 8:25, 9:15, 17:23, 18:4, 18:7, 30:25, 50:12, 50:20, 53:19, 53:20, 55:1, 55:6
**argue** [1] - 44:14
**argument** [5] - 4:22,

5:3, 6:10, 7:14, 7:25
**assert** [1] - 44:8
**assist** [1] - 50:8
**associated** [1] - 12:23
**Association** [2] - 4:25, 5:22
**assume** [1] - 60:7
**assurance** [1] - 42:2
**assured** [1] - 21:19
**attachments** [1] - 15:11
**attempted** [1] - 47:1
**attorney** [5] - 36:4, 36:6, 36:7, 36:8, 44:20
**attorneys** [4] - 36:11, 36:13, 52:6, 56:10
**August** [1] - 13:10
**authorities** [1] - 50:5
**Avenue** [3] - 2:4, 2:8, 2:11
**aware** [3] - 6:11, 44:17, 50:11

## B

**bachelor's** [1] - 11:17
**background** [1] - 48:14
**bad** [1] - 55:9
**badgered** [1] - 39:2
**balance** [2] - 41:17, 57:23
**balancing** [1] - 51:10
**Banu** [2] - 2:7, 3:14
**bar** [1] - 52:9
**Barran** [1] - 2:7
**BARRINGTON** [2] - 1:8, 1:9
**Barrington** [2] - 13:1, 13:2
**base** [1] - 20:25
**based** [2] - 4:23, 51:8
**basic** [1] - 50:17
**basis** [1] - 51:6
**beat** [20] - 18:17, 18:18, 18:20, 18:23, 19:24, 31:8, 31:14, 31:17, 31:22, 32:1, 32:4, 34:21, 35:11, 35:17, 35:18
**beaten** [1] - 35:22
**beating** [1] - 39:9
**becomes** [3] - 21:25, 22:1, 24:17
**BEFORE** [1] - 1:20
**beg** [1] - 28:2
**began** [3] - 8:17, 29:7, 29:8
**begin** [1] - 13:9

**behalf** [2] - 10:19, 44:20
**behavior** [4] - 48:7, 54:23, 54:25, 57:21
**behind** [2] - 11:5, 11:10
**belief** [2] - 24:16, 46:4
**bell** [1] - 45:15
**below** [1] - 62:3
**bench** [1] - 57:2
**best** [1] - 17:18
**better** [2] - 11:4, 11:6
**between** [5] - 14:4, 26:2, 27:15, 29:15, 55:1
**big** [4] - 52:25, 56:19, 58:15, 58:25
**bit** [1] - 17:3
**bits** [2] - 28:21, 30:2
**Bloomberg** [1] - 45:3
**BNA** [1] - 45:3
**Board** [1] - 5:5
**Board's** [1] - 5:15
**boss** [2] - 36:15, 37:12
**bracketed** [1] - 38:4
**brackets** [2] - 27:24, 28:9
**break** [1] - 29:15
**breaks** [1] - 38:16
**brief** [3] - 5:23, 7:8, 41:18
**briefing** [2] - 5:2, 6:6
**briefly** [5] - 4:18, 6:5, 7:7, 11:15, 11:23
**bring** [3] - 19:21, 46:11, 48:19
**BRINKERHOFF** [36] - 8:11, 8:22, 9:2, 9:6, 9:11, 9:16, 9:19, 10:4, 10:7, 10:11, 11:11, 11:14, 19:2, 19:4, 19:5, 21:17, 22:9, 23:22, 30:15, 35:5, 37:24, 38:2, 39:6, 39:19, 40:8, 40:11, 53:6, 53:21, 54:1, 54:15, 54:24, 55:3, 55:11, 55:13, 59:10, 60:8
**Brinkerhoff** [3] - 2:2, 3:9, 3:23
**broad** [2] - 45:19, 52:12
**brought** [2] - 48:6, 48:12
**BROWN** [8] - 3:8, 3:20, 4:13, 4:17, 59:3, 60:3, 60:10, 61:1
**Brown** [2] - 2:2, 3:8

**Bruce** [2] - 2:2, 3:8
**bullet** [2] - 27:7
**burden** [3] - 3:18, 7:20, 40:12
**buried** [1] - 48:22
**business** [6] - 1:7, 47:1, 51:4, 51:17, 55:5, 60:7
**BY** [10] - 11:14, 19:5, 21:17, 22:14, 24:1, 30:23, 35:7, 38:2, 39:6, 39:23

## C

**California's** [1] - 6:24
**cannot** [3] - 22:2, 43:8, 50:19
**capacity** [1] - 1:11
**capture** [1] - 49:15
**care** [2] - 54:16, 58:14
**case** [25] - 3:3, 3:16, 4:24, 4:25, 5:2, 5:7, 5:8, 5:18, 5:19, 6:2, 6:3, 6:16, 6:19, 6:22, 12:1, 36:10, 44:5, 54:9, 56:20, 57:8, 57:10, 57:17, 57:20, 57:24, 58:2
**Case** [1] - 3:4
**cases** [4] - 5:21, 5:23, 11:25, 42:16
**casual** [1] - 38:17
**caught** [1] - 10:8
**certain** [3] - 27:16, 29:18, 29:19
**certified** [1] - 62:8
**certify** [1] - 62:3
**chain** [1] - 26:14
**change** [2] - 38:10, 52:4
**changes** [3] - 38:8, 49:11, 49:13
**character** [1] - 38:11
**characterization** [4] - 28:11, 33:1, 50:2, 51:5
**characterizations** [1] - 30:5
**characterize** [2] - 5:2, 27:23
**characterized** [2] - 38:3, 49:23
**characterizer** [1] - 21:5
**characterizing** [2] - 21:8, 27:23
**child** [1] - 14:3
**chose** [1] - 42:19
**CINEMAS** [1] - 1:7

**Cinemas** [5] - 3:3, 12:25, 13:1, 13:15, 23:6
**Circuit** [3] - 4:25, 5:4, 6:25
**cite** [1] - 50:5
**cited** [3] - 5:21, 44:9, 51:12
**Civil** [1] - 3:3
**claimed** [1] - 51:19
**claims** [2] - 48:25, 60:22
**clarification** [1] - 14:18
**clarify** [2] - 32:8, 53:7
**clear** [3] - 6:16, 26:15, 43:5
**clearly** [2] - 6:23
**clenched** [2] - 37:5, 37:7
**CLERK** [4] - 3:2, 10:15, 10:23, 57:6
**client** [9] - 47:25, 48:1, 48:11, 51:22, 52:19, 52:23, 53:12, 54:21, 56:16
**clients** [1] - 10:1
**closing** [1] - 42:25
**coach** [1] - 41:4
**coerce** [1] - 41:3
**coercion** [1] - 43:3
**coffee** [1] - 38:16
**Colin** [1] - 23:9
**colleagues** [1] - 20:11
**Columbia** [1] - 5:3
**comment** [2] - 27:25, 56:7
**comments** [7] - 27:22, 27:23, 27:24, 35:10, 45:5, 49:25, 50:2
**common** [1] - 56:14
**communicate** [2] - 9:7, 54:13
**communicating** [1] - 49:12
**communication** [2] - 47:4, 54:16
**community** [1] - 54:5
**companies** [1] - 12:23
**company** [3] - 1:9, 1:10, 12:8
**compelled** [1] - 51:16
**complainant** [3] - 18:14, 35:21, 35:22
**complainants** [1] - 57:16
**Complaint** [2] - 43:24, 44:3
**complaint** [12] - 19:17, 19:23, 20:4, 20:10,

20:14, 20:16, 20:22, 35:2, 37:9, 47:9, 47:10, 51:2
**complaints** [2] - 20:5, 20:7
**completed** [1] - 22:22
**compliance** [2] - 12:17, 41:25
**comply** [1] - 52:24
**complying** [1] - 45:1
**compound** [1] - 21:6
**computer** [1] - 26:5
**concern** [1] - 52:10
**concerned** [3] - 38:12, 49:9, 53:15
**concerning** [2] - 17:8, 18:7
**concluded** [4] - 5:15, 23:3, 46:3, 61:4
**conclusion** [2] - 21:1, 46:17
**conclusions** [1] - 44:9
**conclusory** [1] - 51:8
**conduct** [4] - 42:14, 43:8, 45:13, 60:1
**conference** [5] - 12:7, 12:15, 12:19, 12:20, 14:1
**conferences** [1] - 13:14
**confident** [1] - 29:11
**conflict** [1] - 5:11
**conformance** [1] - 7:1
**conformed** [1] - 62:7
**consistent** [1] - 59:17
**consistently** [1] - 7:1
**constrained** [1] - 41:10
**contact** [1] - 45:2
**contained** [1] - 9:12
**contempt** [4] - 45:22, 46:3, 48:12, 51:13
**contending** [1] - 48:24
**content** [2] - 15:6, 15:13
**context** [1] - 49:23
**contextual** [1] - 38:5
**continual** [1] - 24:18
**continues** [2] - 31:1, 38:12
**continuing** [7] - 19:5, 21:17, 24:1, 30:23, 35:7, 39:6, 41:8
**contrast** [1] - 41:24
**conversation** [20] - 6:15, 8:24, 9:17, 10:5, 14:5, 15:15, 18:6, 20:20, 24:12, 24:18, 31:11, 39:12, 39:13, 39:16, 48:3,

49:6, 50:4, 53:2, 53:9, 53:19
**conversations** [5] - 7:1, 14:4, 21:13, 39:8, 47:22
**conveyed** [1] - 29:5
**convinced** [3] - 57:13, 57:18, 58:3
**cooperate** [3] - 23:12, 23:14, 45:24
**cooperated** [1] - 45:8
**cooperating** [2] - 41:22, 47:7
**copy** [5] - 25:22, 26:10, 43:23, 43:25, 58:11
**corporation** [1] - 1:8
**correct** [26] - 23:7, 23:20, 24:4, 27:9, 27:12, 27:18, 28:4, 28:9, 28:10, 28:12, 28:13, 28:23, 29:25, 30:3, 30:4, 30:7, 31:3, 31:23, 32:8, 32:23, 33:2, 39:10, 39:17, 39:18, 44:16, 62:4
**correctly** [1] - 32:8
**counsel** [20] - 3:6, 3:10, 3:22, 4:19, 6:11, 18:23, 25:22, 38:3, 44:13, 45:14, 46:25, 47:1, 47:14, 47:23, 52:17, 55:4, 55:5, 56:23, 58:12, 60:12
**counsel's** [1] - 60:12
**country** [2] - 13:16, 13:18
**couple** [1] - 4:7
**course** [4] - 15:3, 18:8, 29:20, 46:10
**COURT** [58] - 1:1, 1:21, 2:10, 3:12, 3:15, 4:12, 4:16, 8:1, 8:19, 9:1, 9:3, 9:7, 9:14, 9:18, 9:23, 10:5, 10:9, 10:13, 11:4, 18:25, 19:3, 21:10, 22:11, 23:23, 30:20, 35:6, 37:22, 39:4, 39:20, 40:5, 40:7, 40:10, 43:12, 43:22, 44:2, 46:7, 46:21, 47:18, 49:8, 52:18, 52:23, 53:2, 53:4, 53:15, 53:22, 54:10, 54:16, 54:25, 55:10, 55:12, 57:1, 57:7, 59:5, 59:9,

59:14, 60:6, 60:14, 61:2
**Court** [21] - 3:23, 4:2, 4:4, 4:6, 5:3, 5:25, 6:19, 6:21, 6:25, 7:10, 7:24, 11:16, 41:6, 42:14, 43:6, 46:12, 52:17, 55:20, 56:3, 62:13
**court** [4] - 7:2, 9:4, 9:5, 11:9
**Court's** [4] - 5:10, 5:14, 7:22, 59:3
**Courthouse** [1] - 2:10
**cow** [1] - 41:21
**crafted** [1] - 58:3
**creates** [1] - 52:9
**credible** [2] - 40:18, 41:1
**crediting** [1] - 50:12
**cross** [1] - 22:11
**CROSS** [1] - 22:13
**CROSS-EXAMINATION** [1] - 22:13
**cross-examine** [1] - 22:11
**CRR** [2] - 2:10, 62:12
**CSR** [3] - 2:10, 62:12, 62:13
**curious** [1] - 9:4

## D

**D.C** [1] - 4:25
**dangerous** [1] - 56:8
**DATE** [1] - 62:12
**date** [2] - 22:24, 53:14
**DAVID** [1] - 1:11
**David** [3] - 12:22, 36:15, 37:12
**days** [4] - 26:4, 26:8, 55:8
**deal** [1] - 53:24
**decide** [2] - 7:15, 46:12
**decided** [5] - 5:8, 5:9, 9:20, 42:22, 50:7
**decides** [1] - 22:15
**decision** [4] - 5:22, 22:20, 27:20, 53:16
**declaration** [22] - 17:8, 17:11, 17:15, 17:19, 17:22, 20:23, 20:24, 21:18, 27:5, 27:8, 29:20, 30:24, 31:20, 32:7, 32:9, 32:21, 39:17, 44:10, 49:21, 50:13, 50:24, 56:1

**declarations** [1] - 44:10
**declare** [1] - 17:12
**decline** [1] - 52:1
**defects** [1] - 45:19
**defendant** [9] - 3:13, 18:3, 41:25, 42:21, 47:14, 56:25, 57:14, 58:21, 59:22
**defendant's** [3] - 16:5, 17:24, 41:25
**DEFENDANTS** [1] - 2:6
**Defendants** [1] - 1:12
**defendants** [14] - 10:1, 25:21, 41:19, 43:18, 44:13, 45:13, 47:1, 48:6, 52:3, 52:7, 55:6, 55:23, 58:24
**defendants'** [4] - 25:22, 47:6, 52:6, 55:4
**defense** [2] - 58:12, 59:6
**degree** [3] - 11:17, 11:18, 11:19
**delete** [1] - 27:14
**denied** [2] - 55:24, 55:25
**denying** [1] - 6:24
**department** [3] - 22:15, 22:17, 25:25
**Department** [23] - 1:4, 2:3, 11:21, 23:21, 40:11, 40:13, 40:24, 41:9, 41:15, 44:23, 45:6, 45:17, 45:21, 45:23, 46:2, 46:17, 47:13, 48:19, 50:19, 52:2, 54:6, 56:19
**Department's** [2] - 41:18, 43:4
**dependent** [1] - 46:16
**describe** [1] - 9:9
**described** [4] - 9:11, 13:4, 13:7
**designed** [2] - 42:9, 49:15
**detail** [2] - 9:9, 12:6
**determination** [1] - 5:10
**determine** [1] - 11:25
**determining** [1] - 57:8
**development** [1] - 11:18
**dialogue** [1] - 47:4
**differences** [1] - 42:4
**different** [1] - 24:9
**difficult** [1] - 17:3
**difficulty** [1] - 26:4
**digitally** [1] - 62:7
**DIRECT** [1] - 11:13
**direct** [7] - 22:19, 22:21, 31:22, 32:3, 32:5, 33:21, 51:8
**directed** [3] - 20:7, 20:15, 35:11
**directly** [12] - 32:24, 33:15, 33:17, 33:25, 34:2, 34:3, 36:5, 36:15, 36:17, 52:6, 52:16, 60:5
**disagree** [2] - 7:19, 46:22
**disclose** [3] - 20:13, 20:17, 55:15
**disclosed** [1] - 53:13
**discovery** [1] - 45:14
**discuss** [3] - 14:18, 14:20, 52:16
**discussed** [2] - 47:23, 48:17
**discussing** [3] - 14:3, 15:13, 49:3
**discussion** [2] - 5:16, 7:8
**dispute** [1] - 5:14
**dissolved** [2] - 7:18, 7:21
**dissolves** [1] - 59:15
**distracting** [1] - 6:6
**District** [2] - 2:10, 5:3
**DISTRICT** [3] - 1:1, 1:2, 1:21
**Division** [1] - 11:22
**Docket** [1] - 3:5
**domestic** [3] - 1:7, 1:9, 1:10
**done** [5] - 28:7, 37:14, 37:15, 42:22, 56:17
**dots** [2] - 27:15, 27:17
**doubt** [2] - 16:21, 42:5
**down** [4] - 21:25, 39:20, 40:5, 57:3
**draft** [4] - 12:2, 58:8, 59:4, 59:11, 59:16, 60:14
**drafted** [1] - 59:13
**drafting** [1] - 10:8
**drop** [1] - 12:3
**drop-ins** [1] - 12:3
**due** [1] - 43:15
**duly** [1] - 10:20
**during** [5] - 15:3, 18:8, 26:15, 30:10, 38:16
**duties** [1] - 11:23

**E**

**E-l-e-g-a-n-t** [1] - 11:3
**e-mail** [1] - 15:10
**early** [1] - 13:19
**Ed** [1] - 3:13
**editorial** [2] - 27:23, 38:4
**education** [1] - 11:16
**Edwin** [1] - 2:6
**effectively** [1] - 7:18
**efforts** [1] - 49:1
**eight** [4] - 22:6, 47:5, 50:20
**either** [7] - 4:23, 5:21, 12:1, 20:15, 42:24, 47:19, 52:16
**elapsed** [2] - 26:2, 50:20
**Elegant** [6] - 3:10, 11:1, 11:3, 11:15, 40:18, 50:24
**ELEGANT** [1] - 10:18
**Elegant's** [2] - 4:2, 10:12
**EMAMI** [1] - 1:11
**Emami** [68] - 12:22, 13:12, 13:13, 13:16, 13:20, 14:11, 15:15, 16:13, 16:20, 16:22, 16:24, 17:13, 17:20, 19:15, 19:16, 19:22, 20:3, 20:9, 20:21, 23:14, 24:19, 24:22, 25:17, 26:23, 27:1, 28:25, 29:6, 31:1, 31:16, 31:21, 32:2, 32:3, 32:5, 33:14, 33:18, 33:23, 33:24, 33:25, 34:15, 35:24, 37:7, 37:9, 38:12, 38:16, 39:2, 39:9, 40:15, 40:23, 41:3, 41:7, 42:13, 43:2, 43:8, 44:21, 45:7, 45:22, 45:23, 46:4, 46:16, 51:12, 54:4, 55:17, 56:5, 56:12, 56:21, 58:12, 60:4
**emergency** [2] - 50:10, 50:14
**emotion** [1] - 21:9
**emphasize** [1] - 42:25
**employed** [1] - 11:20
**employee** [7] - 16:5, 16:8, 17:23, 18:2, 18:3, 31:1, 31:4
**employees** [47] - 9:13, 12:12, 14:6, 14:8, 14:9, 14:22, 14:24,
14:25, 15:12, 19:12, 20:24, 21:2, 21:6, 21:19, 21:21, 22:3, 23:18, 25:2, 26:24, 32:11, 37:17, 38:13, 39:2, 40:16, 40:19, 40:21, 41:2, 41:7, 41:12, 41:13, 41:14, 41:20, 41:22, 42:2, 42:11, 43:2, 43:10, 44:11, 50:25, 51:4, 51:13, 52:7, 53:13, 55:18, 56:6, 60:12
**employers** [5] - 6:2, 41:11, 42:9, 43:5, 56:20
**employment** [2] - 18:9, 54:4
**encompasses** [1] - 59:20
**encouraging** [1] - 26:24
**end** [1] - 56:8
**ends** [1] - 23:4
**enforcement** [1] - 43:4
**engage** [3] - 42:11, 43:7, 48:7
**engaged** [1] - 43:8
**English** [8] - 14:12, 14:24, 15:17, 16:25, 24:25, 25:14, 25:16, 59:25
**enter** [2] - 23:5, 52:14
**entered** [1] - 44:19, 45:2
**entire** [2] - 4:22, 30:10
**equitable** [1] - 42:17
**equities** [2] - 41:17, 57:24
**essentially** [1] - 45:4
**establishment** [1] - 12:10
**et** [1] - 3:3
**ethical** [1] - 52:9
**evaluation** [1] - 21:5
**event** [2] - 44:5, 49:15, 53:18
**events** [3] - 18:7, 29:24, 44:12
**evidence** [8] - 4:2, 5:24, 6:12, 7:14, 34:20, 34:23, 51:9, 53:11
**evidentiary** [1] - 40:14
**exact** [2] - 21:8, 26:25
**exactly** [5] - 14:19, 18:21, 47:10, 57:17, 59:20
**EXAMINATION** [4] - 11:13, 22:13, 38:1,
39:22
**examine** [1] - 22:11
**examined** [1] - 10:20
**example** [1] - 59:21
**except** [1] - 60:11
**exception** [2] - 29:11, 29:14
**exchange** [1] - 48:20
**excuse** [3] - 26:21, 29:22, 49:12
**expect** [1] - 58:23
**expected** [1] - 36:7
**explain** [2] - 12:9, 31:16
**explains** [1] - 9:3
**expressed** [1] - 51:1
**extent** [1] - 60:19

**F**

**F.Supp** [1] - 6:21
**fact** [3] - 34:21, 40:25, 50:6
**facts** [2] - 44:8, 47:16
**factual** [2] - 4:1, 7:11
**fair** [2] - 50:1, 56:22
**Fair** [9] - 41:5, 42:1, 58:9, 58:18, 58:20, 59:17, 60:15, 60:18, 60:23
**familiar** [1] - 59:20
**far** [2] - 20:9, 44:15
**fashion** [1] - 5:25
**fast** [1] - 9:6
**favor** [3] - 41:18, 42:6, 50:4
**favorable** [1] - 34:14
**favors** [1] - 57:24
**feared** [1] - 37:18
**February** [2] - 49:6, 53:10
**federal** [7] - 6:11, 6:12, 6:13, 6:17, 7:2, 7:3, 51:24
**felt** [2] - 33:23, 45:23
**few** [8] - 3:21, 12:13, 12:14, 17:5, 19:10, 26:4, 26:8, 57:2
**Fifth** [1] - 2:4
**file** [5] - 9:20, 39:24, 39:25, 47:14, 51:1
**filed** [3] - 8:23, 8:25, 47:10
**filing** [1] - 48:21
**final** [3] - 12:15, 12:19, 12:20
**finally** [1] - 56:2
**findings** [1] - 12:16
**fine** [6] - 4:16, 14:21, 46:19, 46:21, 48:23,

48:24
**fire** [1] - 45:8
**firm** [1] - 53:10
**first** [16] - 3:19, 4:18, 5:13, 10:20, 10:24, 13:14, 14:1, 23:5, 23:9, 25:14, 38:3, 40:13, 43:1, 43:14, 53:6, 57:10
**First** [7] - 4:18, 4:22, 5:4, 5:9, 5:16, 5:19, 43:16
**firsthand** [1] - 44:11
**fist** [5] - 20:2, 37:5, 37:7, 37:10, 37:13
**five** [3] - 27:7, 28:20, 29:12
**fix** [2] - 48:1, 48:2
**FLSA** [2] - 42:12, 52:24
**fluent** [1] - 15:1
**follow** [3] - 14:2, 24:12, 31:16
**follow-up** [1] - 14:2
**followed** [2] - 13:17, 32:19
**follows** [1] - 10:21
**FOR** [4] - 1:2, 1:18, 2:2, 2:6
**foregoing** [1] - 62:4
**form** [6] - 26:7, 45:18, 47:2, 48:4, 52:14, 58:10
**formal** [1] - 48:5
**format** [1] - 58:5
**forms** [1] - 8:6
**forth** [2] - 49:3, 52:19
**forward** [6] - 8:16, 20:25, 21:16, 22:7, 41:14, 58:5
**fountain** [1] - 38:17
**four** [6] - 36:17, 37:19, 42:18, 55:7, 57:7
**four-stage** [1] - 42:18
**four-step** [1] - 42:18
**fourth** [1] - 42:7
**frankly** [1] - 10:7
**free** [1] - 11:8
**fundamental** [1] - 44:4
**future** [2] - 41:10, 50:16

### G

**gather** [1] - 33:3
**general** [4] - 3:22, 4:8, 26:22, 46:25
**generally** [1] - 24:22
**generically** [1] - 58:18
**given** [6] - 12:1, 18:23,

23:2, 40:4, 48:14
**goal** [1] - 43:1
**golpear** [3] - 18:16, 19:25, 31:12
**Government** [1] - 50:5
**government** [6] - 8:17, 8:19, 28:2, 33:20, 42:3, 51:24
**governs** [1] - 6:12
**granted** [1] - 44:9
**grossly** [1] - 56:25
**grounds** [2] - 5:4, 5:9
**group** [1] - 24:24
**Grove** [5] - 3:3, 12:25, 13:1, 13:15, 23:6
**GROVE** [1] - 1:7
**guarantee** [1] - 41:15
**guess** [3] - 13:14, 20:14, 23:10
**guy** [2] - 10:1, 54:17

### H

**hand** [3] - 10:16, 11:7, 37:13
**hanging** [1] - 49:10
**hard** [1] - 45:14
**hardship** [1] - 51:10
**harm** [10] - 8:6, 8:14, 8:18, 9:16, 10:2, 41:9, 50:16, 50:19, 54:18, 57:19
**harmed** [1] - 9:24
**Harnden** [2] - 2:6, 3:13
**HARNDEN** [3] - 3:13, 56:7, 60:25
**HARRIS** [1] - 1:3
**Harris** [1] - 3:3
**head** [1] - 27:4
**hear** [10] - 4:2, 4:4, 7:24, 10:11, 24:22, 25:16, 29:21, 29:23, 33:3, 49:4
**heard** [11] - 8:13, 8:14, 16:22, 17:9, 18:13, 19:13, 24:2, 32:2, 34:1, 44:18, 55:23
**hearing** [7] - 7:10, 22:4, 35:17, 44:16, 44:17, 47:12, 49:25
**HEARING** [1] - 1:18
**heart** [1] - 5:14
**heavily** [1] - 42:6
**held** [6] - 7:1, 15:25, 39:16, 42:10, 43:7, 50:7
**helps** [1] - 11:9
**HERNANDEZ** [1] - 1:20

**herring** [1] - 7:4
**higher** [1] - 37:2
**higher-paying** [1] - 37:2
**history** [1] - 11:17
**hit** [2] - 31:14, 31:17
**hold** [1] - 42:16
**holding** [2] - 5:13, 5:17
**holdings** [1] - 42:20
**honestly** [1] - 23:10
**Honor** [22] - 3:2, 3:8, 3:20, 4:13, 5:6, 21:4, 22:10, 30:15, 35:5, 37:21, 39:3, 43:14, 44:17, 44:19, 48:5, 52:4, 52:13, 52:14, 56:9, 59:7, 60:3, 60:25
**HONORABLE** [1] - 1:20
**hope** [2] - 4:9, 23:17
**hoping** [4] - 21:21, 21:23, 21:24, 47:7
**Hour** [1] - 11:22
**hour** [8] - 3:11, 11:24, 12:21, 14:2, 20:4, 28:17, 43:3, 45:8
**hours** [3] - 14:1, 34:6, 38:23
**huge** [1] - 10:3
**hundred** [1] - 29:19
**HUNT** [21] - 18:22, 21:4, 22:14, 24:1, 30:17, 30:23, 35:7, 37:21, 39:3, 39:23, 43:14, 43:25, 44:3, 46:15, 46:25, 48:4, 49:18, 52:22, 53:1, 53:3, 59:7
**Hunt** [2] - 2:6, 3:14
**hunt** [1] - 43:13

### I

**idea** [1] - 22:3
**ideas** [1] - 52:15
**identified** [2] - 19:12, 19:18
**identifying** [1] - 15:12
**illegally** [1] - 50:3
**imitating** [1] - 28:2, 28:9
**immediate** [2] - 41:25, 48:21
**immediately** [2] - 19:11, 41:6
**important** [1] - 43:17
**impression** [2] - 54:2, 54:4

**improper** [1] - 51:19
**IN** [1] - 1:1
**inaccuracies** [1] - 7:11
**INC** [1] - 1:7
**inclined** [1] - 4:2
**include** [2] - 12:25, 27:19
**included** [2] - 27:18, 45:5
**including** [1] - 56:14
**inconsistencies** [1] - 7:11
**indicate** [1] - 14:15
**indicated** [3] - 22:4, 22:6, 22:7
**indicates** [1] - 27:17
**individual** [18] - 1:11, 17:24, 19:17, 19:19, 23:8, 30:13, 30:25, 31:8, 31:10, 31:23, 32:2, 35:8, 35:10, 35:11, 35:21, 46:9, 46:10, 46:16
**individual's** [1] - 18:8
**individuals** [3] - 33:5, 34:13, 36:14
**informant's** [1] - 30:16
**information** [4] - 12:9, 22:18, 22:21, 49:21
**informed** [1] - 26:13
**initial** [4] - 12:7, 13:13, 14:1, 35:1
**initiate** [1] - 12:5, 20:13
**initiated** [7] - 18:14, 20:5, 20:6, 20:7, 20:15, 20:16, 20:19
**initiating** [1] - 20:17
**injunction** [31] - 3:5, 3:17, 3:25, 4:21, 7:16, 7:17, 7:19, 8:16, 9:21, 40:9, 40:12, 42:7, 45:18, 48:13, 50:8, 50:15, 50:18, 51:7, 51:11, 52:21, 55:19, 56:5, 56:17, 56:24, 57:9, 57:25, 58:2, 58:6, 58:8, 59:15, 59:16
**INJUNCTION** [1] - 1:18
**instances** [1] - 27:13, 30:2
**instructive** [1] - 38:25
**intended** [2] - 47:14, 57:15
**interest** [8] - 41:20, 41:21, 41:24, 42:4, 42:8, 42:12, 58:1

**interested** [1] - 7:10
**interfere** [1] - 43:9
**interferes** [1] - 60:21
**international** [1] - 11:18
**International** [1] - 6:20
**interpret** [1] - 37:20
**interrupt** [1] - 9:23
**interview** [2] - 12:11, 36:8
**interviewed** [7] - 32:12, 33:4, 33:12, 34:18, 34:24, 36:14, 51:21
**interviewing** [1] - 13:11
**intimidate** [2] - 57:16, 60:17
**intimidating** [2] - 27:25, 28:1
**investigation** [29] - 12:6, 12:7, 12:22, 13:3, 13:8, 13:9, 13:11, 15:3, 20:8, 20:13, 20:16, 20:18, 22:16, 22:22, 23:1, 23:3, 23:12, 23:15, 26:23, 36:5, 38:24, 41:23, 43:3, 45:25, 47:7, 51:24, 52:8, 60:13
**investigations** [3] - 20:4, 20:15, 41:10
**investigative** [3] - 12:3, 23:3, 39:24
**investigator** [8] - 3:11, 11:22, 11:24, 12:21, 13:6, 31:5, 44:24, 51:23
**investigator's** [1] - 50:12
**investigators** [1] - 45:9
**involve** [1] - 13:11
**involved** [1] - 12:22
**involves** [1] - 21:6
**irreparable** [3] - 41:9, 50:19, 57:19
**issue** [16] - 3:17, 4:19, 4:23, 6:4, 6:6, 7:4, 7:7, 7:23, 9:14, 49:8, 49:19, 51:3, 51:11, 57:9, 58:2
**issued** [2] - 20:10, 45:16
**issues** [8] - 3:22, 3:24, 4:8, 43:15, 43:16, 48:6, 52:9
**issuing** [1] - 59:15

**items** [3] - 27:10, 28:20, 30:6
**itself** [4] - 7:23, 20:18, 46:22, 60:13

## J

**job** [10] - 21:3, 21:15, 32:20, 32:23, 33:7, 33:19, 34:1, 34:7, 34:8, 36:16
**jobs** [5] - 21:24, 34:4, 36:25, 37:2, 37:18
**JUDGE** [1] - 1:21
**JULIEANNA** [2] - 10:18, 11:2
**Julieanna** [2] - 3:10, 11:1
**jurisdiction** [1] - 43:6

## K

**keep** [2] - 21:24, 33:6
**kind** [7] - 4:9, 4:10, 6:5, 18:15, 39:2, 43:7, 54:2
**knock** [1] - 54:22
**knowledge** [1] - 44:11
**known** [1] - 16:13
**knows** [2] - 30:17, 30:19

## L

**labor** [1] - 14:3
**Labor** [17] - 1:3, 1:4, 2:3, 5:5, 5:12, 5:19, 11:21, 41:5, 42:1, 54:6, 58:9, 58:18, 58:20, 59:17, 60:15, 60:18, 60:23
**language** [15] - 14:10, 14:23, 16:24, 25:14, 48:18, 52:1, 58:5, 58:9, 58:17, 58:19, 58:24, 59:4, 59:8, 60:14, 60:19
**languages** [1] - 60:2
**large** [1] - 54:5
**last** [4] - 10:24, 11:2, 23:9, 46:7
**latitude** [1] - 46:2
**law** [11] - 6:8, 6:16, 6:18, 7:3, 7:4, 7:6, 11:19, 31:4, 49:18, 53:10, 58:22
**lawyer** [2] - 9:25, 54:11
**lawyers** [2] - 43:19, 48:6

**lead** [1] - 13:6
**leading** [3] - 18:22, 18:24, 48:14
**learn** [2] - 47:2, 47:11
**learned** [3] - 26:11, 44:18, 53:19
**least** [2] - 23:18, 60:1
**left** [2] - 36:22, 36:25
**legal** [4] - 3:22, 7:25, 48:19, 48:21
**legitimate** [1] - 41:20
**less** [1] - 8:22
**letter** [5] - 12:2, 12:4, 12:5, 12:6
**letting** [1] - 54:11
**liability** [2] - 1:9, 1:10
**Liebman** [1] - 2:7
**likelihood** [1] - 57:19
**likely** [2] - 40:13, 57:11
**limited** [2] - 1:9, 1:10
**line** [2] - 42:15, 44:25
**listen** [5] - 16:15, 17:4, 25:5, 26:7, 56:3
**listened** [1] - 17:6
**listening** [1] - 25:13
**live** [1] - 54:12
**LLC** [2] - 1:8, 1:10
**LLP** [1] - 2:7
**look** [2] - 12:10, 58:19
**Look** [1] - 54:17
**looked** [1] - 57:10
**looking** [1] - 51:17
**lose** [8] - 21:15, 32:19, 32:22, 33:19, 33:25, 34:4, 34:6, 36:16
**losing** [1] - 21:2, 37:18
**lost** [1] - 46:7

## M

**mail** [1] - 15:10
**major** [1] - 56:18
**Management** [1] - 13:1
**MANAGEMENT** [1] - 1:8
**manager** [4] - 12:16, 13:15, 23:6, 36:6
**managing** [1] - 12:8
**mandate** [2] - 43:9, 54:3
**Manufacturers** [2] - 5:1, 5:22
**MARCO** [1] - 1:20
**master's** [1] - 11:18
**material** [1] - 38:4
**matter** [12] - 6:1, 6:9, 6:17, 7:13, 21:20,

22:23, 23:19, 36:11, 39:24, 41:2, 46:12, 48:15
**matters** [2] - 35:24, 35:25
**mean** [4] - 31:13, 31:14, 46:8, 60:6
**means** [3] - 3:17, 3:18, 23:2
**meant** [1] - 14:19
**meantime** [1] - 54:20
**meet** [1] - 3:25
**meeting** [8] - 13:17, 15:16, 15:20, 15:25, 16:1, 16:11, 17:20, 45:7
**member** [1] - 12:8
**mention** [4] - 32:7, 37:4, 42:15, 48:23
**mentioned** [2] - 20:24, 35:23
**merits** [3] - 40:14, 50:23, 57:12
**message** [2] - 42:9, 54:17
**met** [3] - 7:15, 7:20, 40:11
**microphone** [2] - 11:6, 11:10
**mid** [2] - 16:1, 16:3
**miedo** [1] - 32:18
**might** [5] - 9:24, 20:11, 40:23, 41:3
**million** [1] - 6:2
**mind** [2] - 8:8, 16:21
**minds** [1] - 46:3
**minute** [1] - 15:22
**minutes** [7] - 14:5, 28:15, 28:16, 28:18, 30:9, 57:3, 57:4
**misbehaving** [1] - 29:1
**mischaracterization** [2] - 4:24, 5:8
**misreading** [1] - 4:23
**misses** [1] - 56:13
**mission** [1] - 43:1
**Monday** [1] - 9:5
**money** [2] - 34:7, 36:16
**month** [2] - 8:19, 8:22
**months** [5] - 12:14, 47:5, 47:22, 50:20, 56:23
**morning** [2] - 3:8, 39:8
**most** [1] - 7:8
**MOTION** [1] - 1:18
**motion** [7] - 3:4, 6:21, 6:24, 8:25, 9:20, 10:8, 20:1

**move** [1] - 11:7
**moved** [1] - 44:25
**MR** [32] - 3:8, 3:13, 3:20, 4:13, 4:17, 18:22, 21:4, 22:14, 24:1, 30:17, 30:23, 35:7, 37:21, 39:3, 39:23, 43:14, 43:25, 44:3, 46:15, 46:25, 48:4, 49:18, 52:22, 53:1, 53:3, 56:7, 59:3, 59:7, 60:3, 60:10, 60:25, 61:1
**MS** [36] - 8:11, 8:22, 9:2, 9:6, 9:11, 9:16, 9:19, 10:4, 10:7, 10:11, 11:11, 11:14, 19:2, 19:4, 19:5, 21:17, 22:9, 23:22, 30:15, 35:5, 37:24, 38:2, 39:6, 39:19, 40:8, 40:11, 53:6, 53:21, 54:1, 54:15, 54:24, 55:3, 55:11, 55:13, 59:10, 60:8

## N

**name** [6] - 10:24, 11:1, 11:2, 17:24, 23:9
**namely** [1] - 52:5
**names** [1] - 10:25
**nancy** [1] - 2:10
**Nancy** [1] - 62:11
**NANCY** [1] - 62:12
**national** [1] - 45:4
**National** [5] - 4:25, 5:5, 5:12, 5:18, 5:21
**nature** [1] - 47:19, 51:23, 52:8
**necessary** [3] - 21:25, 22:1, 48:13
**necessity** [1] - 21:22
**necks** [1] - 40:21
**need** [7] - 10:2, 11:7, 27:3, 48:1, 48:2, 52:13, 57:20
**needed** [3] - 8:15, 17:6, 50:18
**needless** [1] - 47:15
**needs** [1] - 57:21, 58:21
**never** [5] - 20:13, 20:21, 20:22, 29:15, 51:1
**nice** [1] - 49:4
**Ninth** [1] - 6:25
**NLRA** [1] - 5:16
**NLRB** [3] - 4:24, 5:1, 6:2

**non** [1] - 52:25
**non-retaliation** [1] - 52:25
**none** [2] - 5:21, 5:23
**noon** [1] - 37:14
**note** [4] - 4:22, 43:17, 52:4, 55:3
**noted** [2] - 6:25, 48:25
**notes** [1] - 57:3
**nothing** [2] - 41:13, 54:11
**notice** [1] - 48:24
**notified** [3] - 36:11, 47:9, 55:4
**nowhere** [1] - 47:3
**NRLB** [1] - 5:11
**number** [2] - 43:15, 45:19

## O

**OAK** [1] - 1:7
**Oak** [5] - 3:3, 12:25, 13:1, 13:15, 23:6
**obey** [1] - 58:21
**object** [1] - 23:22
**objection** [7] - 18:22, 18:25, 21:10, 30:15, 30:20, 35:5, 39:3
**obtain** [1] - 49:1
**obtained** [2] - 7:2, 45:6
**obtaining** [1] - 50:8
**occasions** [1] - 13:24
**occur** [1] - 10:6
**occurred** [6] - 8:4, 9:14, 18:8, 44:5, 49:6, 53:7
**occurring** [1] - 50:16
**occurs** [1] - 12:6
**October** [4] - 16:3, 25:20, 26:2, 49:7
**OF** [2] - 1:2, 1:19
**office** [4] - 27:21, 28:7, 29:2, 40:4
**Office** [1] - 2:3
**Official** [1] - 62:13
**official** [1] - 1:11
**often** [1] - 38:22
**omitted** [1] - 49:22
**ON** [1] - 1:18
**once** [5] - 12:1, 17:6, 20:18, 26:11, 35:8
**one** [19] - 6:14, 6:19, 8:1, 8:2, 13:14, 15:20, 16:18, 19:12, 21:7, 30:12, 30:13, 34:17, 41:4, 47:16, 52:5, 56:7, 57:22, 59:12

**ones** [2] - 22:5, 36:1
**ongoing** [2] - 38:24, 42:14
**oOo** [1] - 62:1
**opinion** [1] - 5:14
**opportunity** [4] - 5:6, 44:14, 44:18, 45:13
**opposing** [2] - 38:3, 47:23
**opposite** [1] - 27:7
**OR** [2] - 2:9, 2:11
**ORCP** [1] - 52:11
**order** [27] - 8:21, 43:21, 44:7, 44:9, 44:15, 44:19, 44:23, 45:2, 45:16, 45:17, 46:8, 46:13, 46:22, 47:2, 49:2, 51:15, 52:5, 52:12, 52:14, 52:20, 53:18, 57:6, 57:9, 58:4, 58:8, 58:13
**ordered** [1] - 51:11
**ordering** [1] - 58:1
**orders** [1] - 47:20
**OREGON** [1] - 1:2
**Oregon** [9] - 1:7, 1:7, 1:8, 1:10, 6:8, 7:6, 52:9, 56:20, 62:13
**original** [1] - 62:6
**ought** [5] - 42:23, 51:17, 58:16, 59:1
**overlap** [2] - 24:13, 24:17
**overly** [2] - 45:19, 52:12
**overruled** [6] - 18:25, 21:10, 23:23, 30:20, 35:6, 39:4
**owed** [1] - 12:17
**owner** [5] - 12:8, 12:16, 12:19, 12:20, 36:5

## P

**paid** [1] - 36:16
**papers** [6] - 11:7, 43:15, 43:19, 43:20, 47:13, 48:5
**paragraph** [2] - 27:8, 48:22
**paraphrase** [1] - 17:15
**pardon** [2] - 19:2, 28:3
**part** [6] - 23:3, 44:22, 51:14, 54:1, 58:4, 58:13
**participate** [1] - 45:24
**particular** [3] - 13:8, 19:18, 27:14

**parties'** [1] - 42:4
**parts** [3] - 15:22, 15:23, 57:7
**party** [3] - 6:14, 6:15, 29:23
**passed** [2] - 47:5, 50:13
**past** [2] - 12:12, 14:9
**paying** [1] - 37:2
**payroll** [1] - 12:11
**penalties** [1] - 49:1
**people** [3] - 19:10, 21:8, 34:14
**percent** [1] - 29:19
**perception** [1] - 47:6
**period** [2] - 23:4, 30:10
**peripheral** [2] - 4:9, 5:17
**person** [37] - 6:15, 13:22, 13:25, 14:1, 16:4, 16:7, 16:10, 18:2, 18:7, 18:11, 18:12, 19:14, 19:15, 19:16, 19:22, 19:24, 19:25, 21:7, 24:6, 25:7, 25:8, 30:8, 31:15, 31:17, 31:18, 31:25, 32:1, 32:4, 34:12, 35:1, 35:17, 35:18, 35:21, 41:4, 52:1, 56:11
**personally** [1] - 29:23
**persons** [8] - 25:12, 33:4, 33:11, 36:18, 37:17, 49:25, 51:20
**phone** [3] - 9:25, 13:22, 14:3
**phrase** [1] - 28:5
**phrased** [1] - 52:15
**phrases** [2] - 28:8, 38:5
**physical** [10] - 8:6, 8:14, 8:18, 8:23, 9:16, 10:2, 40:20, 45:10, 54:18, 57:15
**pick** [1] - 11:6
**pieces** [3] - 28:21, 28:24, 30:2
**places** [2] - 37:1, 59:19
**plaintiff** [1] - 59:2
**Plaintiff** [2] - 1:5, 10:19
**PLAINTIFF** [1] - 2:2
**plaintiffs** [5] - 3:16, 57:11, 57:18, 57:24, 58:23
**play** [2] - 4:5, 26:5
**playing** [1] - 26:5

**plural** [1] - 15:19
**podium** [1] - 4:15
**point** [20] - 7:12, 21:20, 22:24, 25:21, 26:9, 26:12, 26:15, 36:4, 36:10, 36:11, 36:12, 37:13, 46:8, 46:19, 53:16, 55:14, 55:16, 55:22, 56:9, 56:13
**points** [3] - 27:7, 44:14
**portions** [4] - 27:6, 27:15, 27:16, 59:21
**Portland** [3] - 1:7, 2:9, 2:11
**position** [6] - 23:21, 48:10, 50:10, 50:18, 51:15, 54:21
**positive** [2] - 28:19, 34:18
**possession** [5] - 9:12, 15:4, 15:8, 25:19, 49:7
**posted** [4] - 58:11, 58:16, 59:1, 59:18
**poster** [2] - 58:10, 59:16, 60:20
**posters** [3] - 58:16, 59:1, 59:24
**posting** [1] - 5:13
**potentially** [1] - 52:10
**prefer** [1] - 7:25
**preliminary** [23] - 3:4, 3:17, 3:25, 4:21, 7:16, 7:19, 9:21, 40:9, 40:12, 45:18, 48:13, 50:8, 50:14, 50:18, 51:7, 51:11, 52:21, 57:9, 58:1, 58:6, 58:8, 59:15, 59:16
**PRELIMINARY** [1] - 1:18
**preocupado** [1] - 32:16
**prepared** [3] - 4:1, 4:5, 52:16
**presence** [1] - 16:13
**present** [6] - 4:1, 7:14, 12:12, 12:18, 14:9, 16:11
**presented** [1] - 47:15
**presently** [1] - 11:20
**press** [2] - 45:4, 45:12
**presumably** [1] - 45:21
**prevail** [1] - 42:24
**prevent** [1] - 5:25
**print** [2] - 48:23, 48:24

**privacy** [1] - 6:24
**privilege** [1] - 30:16
**problem** [11] - 9:8, 9:9, 9:10, 10:3, 44:22, 46:14, 47:25, 48:2, 52:19, 53:23, 55:6
**problems** [1] - 19:21
**procedural** [3] - 43:15, 44:5, 48:14
**procedure** [1] - 7:9
**PROCEEDINGS** [1] - 1:19
**proceedings** [8] - 6:13, 7:2, 45:22, 48:12, 48:20, 48:22, 61:4, 62:5
**process** [5] - 8:17, 12:3, 12:9, 18:14, 43:16
**professionals** [2] - 53:22, 54:14
**prohibit** [1] - 60:17
**prohibited** [1] - 60:4
**prohibiting** [1] - 60:11
**prohibits** [1] - 58:18
**promulgated** [1] - 5:11
**prongs** [1] - 50:17
**proof** [4] - 3:18, 40:14, 49:20, 50:15
**protect** [3] - 40:24, 43:2, 43:9
**protected** [4] - 41:16, 42:2, 42:11, 55:21, 56:6, 57:21
**proven** [2] - 57:11, 57:12
**provenance** [1] - 40:17
**provide** [1] - 25:24
**provided** [2] - 25:21, 26:3
**provides** [2] - 42:17, 49:19
**provision** [3] - 60:3, 60:8, 60:10
**provisions** [1] - 59:12
**public** [3] - 42:7, 42:12, 57:25
**purposes** [1] - 11:9
**pursue** [2] - 22:16, 60:22
**pursuing** [1] - 60:18
**put** [8] - 4:20, 8:20, 28:5, 29:20, 32:21, 37:12, 59:24, 60:19
**puts** [1] - 54:20

## Q

**questioning** [1] - 11:5
**questions** [10] - 14:17, 22:9, 25:1, 38:15, 38:17, 38:20, 38:21, 39:19, 59:2, 59:6
**quickly** [1] - 4:10
**quit** [1] - 36:21
**quite** [5] - 6:8, 19:10, 26:22, 46:2, 55:9
**quizzing** [1] - 51:25
**quote** [1] - 17:16
**quoted** [3] - 30:1, 30:3, 30:6
**quotes** [2] - 17:19, 49:22
**quoting** [1] - 32:24

## R

**raise** [1] - 10:16
**raised** [5] - 3:22, 4:8, 4:19, 37:10, 43:15
**Ramachandran** [2] - 2:7, 3:14
**range** [1] - 46:2
**rather** [1] - 44:4
**read** [5] - 5:6, 6:9, 48:17, 48:23, 59:22
**reads** [2] - 51:14, 56:5
**realized** [1] - 8:15
**really** [9] - 4:23, 5:17, 7:12, 8:13, 41:2, 41:19, 42:17, 44:13, 51:13
**reason** [3] - 11:7, 20:9, 20:17
**reasons** [1] - 36:24
**receive** [1] - 16:2
**received** [2] - 16:3, 34:7
**receiving** [2] - 19:11, 26:8
**recent** [2] - 4:24, 39:13
**recently** [1] - 5:4
**recess** [1] - 57:5
**recognize** [2] - 16:17, 16:19
**recognized** [1] - 16:18
**recollection** [1] - 17:18
**record** [4] - 3:7, 10:24, 11:9, 62:4
**recorded** [2] - 15:23, 50:3
**recording** [13] - 4:4, 4:5, 6:7, 6:14, 6:22, 6:23, 7:5, 8:3, 9:12,

16:11, 16:15, 16:22, 45:7

**recordings** [21] - 7:1, 8:12, 15:4, 15:5, 15:7, 15:13, 15:14, 15:15, 15:19, 15:21, 16:2, 16:4, 16:8, 17:3, 17:9, 24:2, 24:4, 29:13, 29:16, 40:16

**records** [2] - 12:11

**RECROSS** [1] - 39:22

**RECROSS-EXAMINATION** [1] - 39:22

**red** [1] - 7:4

**redirect** [1] - 37:23

**REDIRECT** [1] - 38:1

**refer** [2] - 6:19, 27:14

**reflection** [1] - 45:1

**reflects** [3] - 59:8, 60:15, 60:20

**regard** [2] - 7:3, 51:10

**regarding** [2] - 36:9, 43:3

**rejecting** [1] - 6:21

**related** [1] - 48:25

**relating** [1] - 3:24

**Relations** [3] - 5:5, 5:12, 5:19

**reliable** [1] - 40:18

**reliance** [1] - 50:3

**relief** [2] - 42:8, 42:17

**reluctant** [2] - 21:16, 41:14

**relying** [1] - 50:23

**remain** [2] - 10:16, 57:6

**remarks** [13] - 17:12, 17:15, 17:17, 17:19, 25:8, 25:10, 25:13, 34:15, 40:15, 40:19, 57:14, 57:15

**remedies** [1] - 4:20

**remedy** [1] - 5:25

**remember** [2] - 26:16, 26:25, 55:11

**replace** [2] - 7:18, 59:11

**report** [3] - 45:4, 49:11, 50:11

**reported** [7] - 31:1, 37:7, 37:8, 45:3, 45:10, 45:12, 48:8

**REPORTER** [1] - 2:10

**reporter** [1] - 11:9

**Reporter** [1] - 62:13

**represent** [1] - 15:14

**represented** [2] - 36:4, 36:6

**request** [3] - 8:20, 52:20, 52:21

**required** [1] - 51:16

**requirement** [1] - 5:13

**requirements** [2] - 52:24, 59:17

**requiring** [3] - 59:22, 59:23

**resolution** [2] - 21:23, 47:8

**resolved** [3] - 21:22, 22:2, 23:19

**respect** [4] - 32:9, 32:10, 47:3, 52:5

**respects** [1] - 45:20

**respondent's** [2] - 5:22, 6:6

**response** [2] - 4:19, 7:8

**restrained** [2] - 42:13, 46:9

**restraining** [15] - 8:20, 43:21, 44:7, 44:15, 44:19, 44:23, 45:17, 46:8, 47:19, 49:2, 51:15, 52:5, 52:20, 53:17, 58:4

**restrains** [1] - 41:6

**retaliating** [2] - 41:12, 53:12

**retaliation** [5] - 8:6, 9:13, 42:11, 52:25, 58:19

**retaliatory** [1] - 42:14

**review** [2] - 5:11, 58:12

**reviewed** [1] - 57:7

**Richard** [2] - 2:6, 3:14

**rights** [3] - 55:20, 60:18, 60:22

**risk** [2] - 40:25, 51:12

**RMR** [2] - 2:10, 62:12

**road** [1] - 21:25

**Roberts** [1] - 6:20

**role** [2] - 12:21, 13:3

**Room** [1] - 2:11

**rule** [4] - 5:5, 5:10, 5:15, 6:1

**rule-making** [1] - 6:1

**rules** [2] - 45:1, 52:9

**run** [2] - 20:19, 51:17

**S**

**safety** [1] - 57:15

**Schpak** [1] - 53:9

**score** [1] - 46:25

**script** [1] - 51:14

**seated** [2] - 10:23, 57:6

Seattle [1] - 2:5

**second** [5] - 6:4, 13:17, 39:12, 41:6, 43:4

**Second** [1] - 2:8

**secondhand** [1] - 49:21

**secondly** [1] - 57:18

**Secretary** [4] - 1:3, 3:9, 48:19, 48:20

**Secretary's** [5] - 41:22, 41:24, 42:6, 43:9, 54:3

**section** [3] - 5:12, 5:18, 59:12

**Section** [1] - 5:15

**see** [2] - 23:19, 46:14

**seek** [5] - 8:16, 42:8, 45:22, 46:3, 53:17

**seeking** [2] - 45:18, 51:6

**seem** [1] - 7:21

**selected** [4] - 27:10, 28:24, 28:25, 29:2

**selective** [2] - 28:21, 49:22

**selectively** [1] - 30:1

**self** [1] - 41:21

**self-interest** [1] - 41:21

**send** [8] - 12:2, 12:4, 19:24, 32:6, 37:10, 39:14, 42:9, 43:5

**sense** [3] - 15:24, 24:15, 56:14

**sent** [5] - 15:5, 15:10, 24:14, 25:20, 43:19

**sentence** [3] - 21:14, 30:2, 37:8

**sentences** [1] - 17:12

**September** [4] - 8:3, 13:18, 13:19, 16:1

**serious** [1] - 54:8

**serve** [1] - 56:22

**served** [7] - 42:13, 43:19, 43:23, 43:25, 44:4, 58:11

**service** [2] - 45:3, 56:16

**set** [1] - 52:19

**SETH** [1] - 1:3

**several** [2] - 17:12, 24:3

**sharing** [1] - 47:13

**short** [1] - 15:22

**shoulder** [1] - 51:18

**show** [7] - 28:25, 38:10, 40:12, 42:20, 42:24, 50:19, 50:22

**shown** [2] - 57:19,

57:22

**shows** [1] - 57:13

**side** [7] - 9:8, 46:11, 47:16, 53:23, 54:11, 54:12, 54:13

**sides** [1] - 47:17

**signal** [1] - 43:5

**signature** [3] - 62:6, 62:7

**signed** [3] - 39:16, 44:20, 62:7

**signing** [2] - 17:8, 62:3

**similarly** [1] - 7:4

**simply** [3] - 5:7, 6:8, 44:4

**single** [1] - 34:12

**sit** [1] - 54:6

**site** [1] - 12:12

**sitting** [1] - 53:8

**situation** [1] - 5:23

**six** [1] - 15:22

**six-minute** [1] - 15:22

**smaller** [1] - 24:14

**snippets** [1] - 15:22

**solely** [1] - 50:23

**solicitor** [2] - 30:6, 44:24

**Solicitor** [1] - 2:3

**solicitor's** [4] - 27:20, 28:7, 29:2, 40:4

**someone** [9] - 19:24, 28:5, 31:22, 32:3, 32:6, 35:12, 35:13, 35:15, 56:22

**sometime** [1] - 8:14

**sometimes** [2] - 12:3, 12:4, 24:13

**somewhere** [1] - 44:24

**soon** [2] - 8:17, 9:21

**sorry** [4] - 28:2, 43:22, 46:7, 60:9

**sort** [8] - 15:23, 43:2, 44:25, 45:15, 46:19, 51:3, 55:19, 55:24

**sought** [2] - 42:8, 47:9

**space** [1] - 11:2

**Spanish** [9] - 14:25, 15:1, 15:18, 18:16, 20:1, 24:25, 31:11, 59:24, 60:1

**speaking** [6] - 16:24, 16:25, 24:19, 24:23, 31:5, 36:12, 60:2

**specific** [5] - 3:24, 4:20, 44:8, 58:17, 58:19

**specifically** [2] - 31:10, 47:23

**spell** [1] - 10:24

**spend** [2] - 4:9, 7:22

**spirit** [1] - 60:15

**spokesperson** [1] - 45:5

**stage** [1] - 42:18

**stairway** [1] - 10:15

**stand** [3] - 10:14, 56:8, 59:13

**standard** [1] - 7:16

**Standards** [9] - 41:5, 42:1, 58:9, 58:18, 58:20, 59:18, 60:15, 60:18, 60:23

**standing** [1] - 10:16

**stark** [1] - 42:5

**start** [2] - 3:21, 4:7

**starts** [1] - 23:9

**state** [11] - 3:6, 6:8, 6:18, 7:3, 9:4, 10:23, 17:22, 21:18, 31:10, 33:12, 42:16

**statement** [11] - 27:14, 30:24, 31:21, 35:14, 35:15, 35:16, 35:18, 35:20, 51:16, 56:4, 56:20

**statements** [7] - 27:6, 27:16, 27:24, 44:9, 49:22, 49:23, 55:25

**states** [1] - 52:1

**STATES** [2] - 1:1, 1:21

**States** [2] - 1:4, 2:10

**stating** [2] - 20:3, 45:6

**statute** [8] - 6:11, 6:13, 6:17, 42:16, 42:22, 46:1, 46:20, 59:8

**steer** [1] - 20:20

**step** [6] - 8:16, 10:15, 39:20, 40:5, 42:18, 57:2

**steps** [2] - 13:6, 13:7

**still** [5] - 18:2, 18:3, 36:18, 38:24, 43:18

**stop** [1] - 55:1, 57:21

**stopped** [1] - 54:23

**stretch** [1] - 56:18

**stuck** [1] - 40:21

**subjective** [1] - 21:5

**submitted** [1] - 15:7

**subset** [1] - 50:25

**substance** [1] - 60:13

**succeed** [3] - 40:14, 50:22, 57:12

**suffer** [1] - 41:9

**suggest** [4] - 34:17, 50:6, 57:20, 58:10

**suggestion** [1] - 31:21

**Suite** [2] - 2:4, 2:8

**summarize** [2] - 11:15, 11:23
**summarizing** [1] - 25:8
**summary** [2] - 25:11, 26:25
**summons** [1] - 44:3
**supervisor** [8] - 22:19, 22:20, 22:21, 23:2, 26:6, 26:9, 26:13
**supervisors** [2] - 11:25, 19:11
**supposed** [1] - 46:11
**suppress** [2] - 6:22, 6:25
**surprised** [1] - 6:9
**Susan** [2] - 2:2, 3:9
**sworn** [1] - 10:20

**T**

**table** [2] - 3:10, 11:5
**talks** [1] - 12:2
**tangentially** [1] - 13:2
**tape** [34] - 4:4, 4:5, 6:7, 6:14, 6:22, 6:23, 8:3, 8:12, 24:21, 24:22, 25:5, 25:19, 25:22, 25:24, 26:11, 26:16, 26:17, 26:22, 27:3, 27:11, 27:22, 28:14, 28:22, 29:4, 29:7, 29:8, 40:16, 45:7, 49:5, 49:7, 49:9, 56:10, 56:11, 57:13
**tape-recording** [8] - 4:4, 4:5, 6:7, 6:14, 6:22, 6:23, 8:3, 45:7
**tape-recordings** [2] - 8:12, 40:16
**tapes** [6] - 29:12, 30:1, 55:14, 55:15, 55:18, 56:23
**taping** [1] - 6:15
**temporary** [14] - 8:20, 43:21, 44:7, 44:15, 44:18, 44:22, 45:17, 47:19, 49:2, 51:14, 52:5, 52:20, 53:17, 58:4
**Tengo** [1] - 32:18
**tenor** [1] - 38:19
**terminated** [1] - 34:24
**test** [1] - 3:24
**testified** [5] - 32:11, 36:1, 38:12, 40:17, 40:19
**testifies** [1] - 10:20
**testify** [8] - 21:19,

21:20, 21:23, 22:1, 22:4, 22:8, 45:24, 51:2
**testimony** [10] - 4:3, 7:24, 10:12, 24:3, 29:14, 31:7, 37:5, 39:7, 39:8, 51:5
**THE** [70] - 1:1, 1:2, 1:20, 2:2, 2:6, 3:2, 3:12, 3:15, 4:12, 4:16, 8:1, 8:19, 9:1, 9:3, 9:7, 9:14, 9:18, 9:23, 10:5, 10:9, 10:13, 10:15, 10:23, 11:1, 11:4, 18:25, 19:3, 21:10, 21:12, 22:11, 23:23, 23:25, 30:20, 30:22, 35:6, 37:22, 39:4, 39:5, 39:20, 40:5, 40:6, 40:7, 40:10, 43:12, 43:22, 44:2, 46:7, 46:21, 47:18, 49:8, 52:18, 52:23, 53:2, 53:4, 53:15, 53:22, 54:10, 54:16, 54:25, 55:10, 55:12, 57:1, 57:6, 57:7, 59:5, 59:9, 59:14, 60:6, 60:14, 61:2
**therefore** [2] - 57:22, 58:1
**they've** [2] - 37:2, 59:13
**Third** [1] - 2:11
**thirdhand** [1] - 49:21
**thoughts** [1] - 56:4
**threat** [9] - 8:18, 8:23, 9:17, 18:15, 19:6, 19:9, 19:10, 33:21, 45:10
**threaten** [1] - 55:18
**threatened** [12] - 8:5, 33:12, 33:13, 33:18, 33:19, 33:23, 33:25, 34:3, 34:4, 34:9, 41:3, 45:7
**threatening** [7] - 10:2, 40:15, 41:12, 41:20, 53:12, 54:17, 57:14
**threats** [9] - 9:12, 18:13, 40:20, 41:7, 41:8, 42:14, 49:11, 49:19, 55:24
**three** [9] - 9:1, 9:2, 13:22, 14:4, 23:4, 36:17, 37:19, 50:21, 55:7
**three-year** [1] - 23:4
**throughout** [1] - 59:18

**thumbs** [1] - 54:7
**tilts** [1] - 41:17
**titled** [1] - 62:5
**today** [6] - 3:2, 48:10, 51:6, 51:7, 52:17, 59:14
**together** [1] - 8:20
**tolling** [5] - 48:16, 48:17, 49:4, 49:5, 49:14
**tone** [1] - 38:10
**took** [4] - 8:8, 26:6, 27:10, 40:25
**top** [1] - 27:2
**total** [1] - 28:14
**touched** [1] - 13:2
**tour** [1] - 12:10
**transcript** [2] - 62:4, 62:6
**TRANSCRIPT** [1] - 1:19
**translate** [1] - 24:24
**translating** [4] - 25:7, 30:8, 30:9, 30:10
**translation** [3] - 15:17, 25:9, 49:24
**translator** [3] - 30:12, 30:14, 30:18
**tried** [2] - 41:3, 54:9
**triggering** [1] - 53:18
**TRO** [13] - 4:20, 7:9, 7:17, 7:20, 7:23, 9:21, 47:9, 54:18, 55:2, 59:12, 59:14, 60:4
**trouble** [7] - 14:13, 14:15, 17:1, 47:18, 48:11, 52:25, 56:13
**troubled** [1] - 47:21
**try** [1] - 26:6
**trying** [5] - 19:21, 20:20, 60:16, 60:17
**Tuesday** [1] - 9:5
**tugging** [1] - 8:2
**turn** [1] - 55:14
**turned** [2] - 23:1, 36:10
**twice** [1] - 13:21
**twiddle** [1] - 54:7
**two** [8] - 13:13, 13:22, 13:25, 14:4, 19:18, 23:4, 39:8, 58:23
**twofold** [1] - 43:1

**U**

**U.S** [2] - 2:3, 11:21
**ultimately** [3] - 47:11, 48:18, 54:23
**under** [8] - 5:10, 6:16,

42:12, 42:20, 52:9, 57:7, 60:18, 60:22
**understood** [3] - 14:20, 17:5, 50:1
**unfair** [1] - 56:25
**UNITED** [2] - 1:1, 1:21
**United** [2] - 1:3, 2:10
**unlawful** [1] - 49:19
**unless** [2] - 41:6, 51:13
**unring** [1] - 45:15
**up** [24] - 10:8, 10:13, 11:6, 13:17, 14:2, 18:20, 19:24, 26:13, 31:14, 31:16, 31:17, 31:22, 32:1, 32:4, 35:11, 35:17, 35:19, 35:22, 39:9, 48:14, 55:16, 56:8, 59:8, 59:24
**upside** [1] - 48:9
**urgency** [1] - 8:9
**uttered** [2] - 25:16, 27:1

**V**

**vacated** [1] - 5:4
**vague** [2] - 45:20, 51:7
**variables** [1] - 12:14
**VENTURE** [1] - 1:9
**Ventures** [1] - 13:2
**verbatim** [4] - 17:16, 17:17, 25:9, 30:11
**version** [1] - 47:16
**versus** [1] - 3:3
**view** [4] - 44:7, 50:3, 51:7, 51:25
**violated** [4] - 5:18, 6:18, 6:23, 6:24
**violates** [1] - 5:15
**violating** [1] - 52:10
**violation** [6] - 5:24, 6:8, 7:5, 41:5, 42:21, 46:13
**violations** [1] - 6:1
**violence** [2] - 45:10, 49:11
**voice** [4] - 16:19, 16:21, 38:8, 38:10
**voices** [3] - 16:17, 16:18, 24:21
**voluntarily** [1] - 36:20
**vs** [1] - 1:6

**W**

**WA** [1] - 2:5
**wage** [6] - 3:10, 11:23, 12:21, 20:4, 43:3,

45:8
**Wage** [1] - 11:22
**wages** [2] - 12:17, 49:1
**Wagner** [1] - 55:5
**waiting** [1] - 55:19
**WALKER** [1] - 62:12
**Walker** [2] - 2:10, 62:11
**wants** [1] - 4:4
**warrant** [2] - 44:8, 50:14
**warranted** [2] - 7:17, 40:13
**water** [1] - 38:17
**week** [1] - 38:23
**weeks** [5] - 9:1, 9:2, 12:14, 50:21, 55:7
**weigh** [1] - 50:4
**weighs** [1] - 42:5
**Westlaw** [1] - 55:1
**whole** [1] - 25:5
**wife** [1] - 23:14
**willing** [4] - 20:24, 22:1, 22:7, 56:3
**win** [1] - 59:16
**Winter** [1] - 57:8
**wish** [1] - 51:2
**withdraw** [1] - 37:20
**withhold** [1] - 48:21
**witness** [3] - 10:19, 40:18, 56:11
**WITNESS** [6] - 11:1, 21:12, 23:25, 30:22, 39:5, 40:6
**wondering** [1] - 51:18
**word** [15] - 15:19, 19:25, 20:1, 26:15, 31:7, 31:11, 31:12, 31:25, 32:14, 32:16, 32:17, 32:25, 33:8, 33:14, 34:9
**wording** [3] - 46:15, 46:19, 56:5
**words** [6] - 25:16, 27:1, 27:18, 29:4, 34:3, 46:1
**worker** [2] - 28:9, 45:9
**workers** [12] - 8:5, 9:24, 15:17, 19:18, 29:5, 31:2, 45:8, 57:16, 57:20, 60:5, 60:7, 60:11
**workforce** [2] - 59:22, 60:1
**workplace** [3] - 58:11, 58:15, 59:19
**worried** [9] - 9:24, 32:12, 32:15, 32:25, 33:9, 33:17, 51:4

**writer** [1] - 45:21

## Y

**year** [4] - 17:23, 18:7, 23:4, 49:6