IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THOMAS E. PEREZ, Secretary of Labor,
United States Department of Labor,

                Plaintiff,

      v.

OAK GROVE CINEMAS, INC., an Oregon
domestic business corporation; BARRINGTON
MANAGEMENT, LLC, an Oregon domestic
limited liability company; BARRINGTON
VENTURE, LLC, an Oregon domestic
limited liability company; and DAVID EMAMI,
an individual and in his official capacity,

                Defendants.

No. 03:13-cv-00728-HZ

FINDINGS OF FACT &
CONCLUSIONS OF LAW

Janet M. Herold, Regional Solicitor
Bruce L. Brown, Associate Regional Solicitor
Susan Brinkerhoff, Trial Attorney
Katherine M. Kasameyer, Trial Attorney
OFFICE OF THE SOLICITOR, U.S. DEPARTMENT OF LABOR
300 Fifth Avenue, Suite 1120
Seattle, Washington 98104

      Attorneys for Plaintiff

1 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Edwin A. Harnden
Richard C. Hunt
Damien T. Munsinger
BARRAN LIEBMAN LLP
601 S.W. Second Avenue, Suite 2300
Portland, Oregon 97204-3159

    Attorneys for Defendants

HERNANDEZ, District Judge:

    In this wage action brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (FLSA), Plaintiff Thomas Perez, the United States Secretary of Labor, brings three claims against Defendants Oak Grove Cinemas, Inc., Barrington Management LLC, Barrington Venture LLC, and David Emami.  Plaintiff first brings a claim against all Defendants for failure to pay overtime wages to thirty-five individuals[1] who performed work for one or more of the Defendant companies.  Second, Plaintiff brings a recordkeeping violation claim against all Defendants. Third, Plaintiff brings a retaliation claim against David Emami.

    This Court conducted a four-day bench trial in October 2014.  These are my Findings of Fact and Conclusions of Law.  Fed. R. Civ. P. 52(a)(1).  As explained herein, Plaintiff established that all Defendants violated the FLSA's overtime and recordkeeping provisions and further established that David Emami violated the anti-retaliation provision.  As a result, Plaintiff is awarded $512,290.26 in damages as well as injunctive relief.

FINDINGS OF FACT

    David Emami is the sole shareholder of Oak Grove Cinemas, Inc. (OGC), and is that company's president.  He also has a one-percent ownership interest in the two Barrington

---

[1] These are referred to as the "Exhibit A" employees because they are identified in Exhibit A to the First Amended Complaint.

2 - FINDINGS OF FACT & CONCLUSIONS OF LAW

companies.  His wife, Diana Emami, owns the remaining ninety-nine percent interest in the

Barrington companies.  OGC operates a movie theater.  Barrington Management manages and

leases different properties owned by the Emamis.  The nature of Barrington Venture's business

was not clearly established at trial although it appears to also manage properties.

David Emami has a master's degree in applied economics from Portland State University.

He has owned or managed businesses in Oregon since at least the 1980s.  He has been associated

with at least thirty-three different business entities in Oregon.  Ex. 31.  He is familiar with wage

and hour laws including minimum wage and overtime exemptions for movie theater employees.

He also knows that independent contractors do not receive overtime wages.  Diana Emami has a

business administration degree from Vilnius University.  OGC employs Diana Emami to do its

payroll work.  In this capacity, she adds up hours of its employees, submits payroll information to

a third party, and distributes paychecks.  Diana Emami performs similar bookkeeping functions

for both Barrington companies.

During the relevant time period from February 2010 through February 2013, OGC

employed several individuals who did no work for its movie theater operations.  Instead, these

workers performed construction, maintenance, landscaping, and similar tasks at OGC and

various properties owned by the Emamis, including their personal residences and commercial

properties managed by the Barrington companies.  David Emami testified that all three

Defendant companies shared employees.

Several of the workers who testified explained that they kept two time cards for each pay

period.  On one they recorded their morning start time and then later, in mid-afternoon, they

recorded their end time.  However, they then immediately "clocked in" on another time card

which they would use to record the remainder of that day's hours.  E.g., Ex. 17 at 4 (time cards

for July 16-31, 2012 for Filemon Santos Camarillo with one showing hours worked for OGC

from 6:00 a.m. - 2:30 p.m., with a thirty-minute lunch from 12-12:30, and the other showing

hours worked for Barrington on the same dates from 2:30 p.m. to anywhere from 5:30 to 7:30

p.m., as well as hours on weekends).  The workers clocked in and out by placing time cards in a

punch-type time clock or by handwriting their time on time cards.

For all hours worked, these workers typically received two checks each time they were

paid - one check from OGC and one check from Barrington.  E.g., Ex. 15 at 5 (paychecks to

Osbaldo Perez from OGC and Barrington Management dated March 5, 2010); Id. at 6 (paychecks

to Osbaldo Perez from OGC and Barrington Venture dated July 5, 2012).  Most of the workers

testified that they did not know why they received two checks each time.  However, Armando

Beas explained that David Emami told him that the workers received two checks because David

Emami did not want more than 40 hours per week on the OGC payroll and thus, additional hours

were paid with a Barrington Management or Barrington Venture check.  The workers did not

consider themselves to be employed by two separate companies.  They thought they were

employed by the Emamis, and paid little attention to the actual employing enterprise.  The tasks

and jobs they performed were consistent throughout the day and did not change when they

clocked out and then back in again.  Their rate of pay did not change.  Their work location did

not change.

David Emami hired workers for all of the Defendant companies.  He determined the rate

of pay, sometimes after obtaining input from other subcontractors he hired.  He determined

where workers would work on any particular day.  He regularly visited the various sites where

his workers were located, providing instruction to the workers and sometimes exhorting them to work faster.  Although David Emami tried to downplay his supervisory role and his presence at the various work sites, I reject this testimony as not credible.  The consistent testimony of the workers that David Emami had them fill out job applications, frequently told them where to work, and frequently visited them at the work sites is more reliable than David Emami's testimony indicating that he stayed at his Lake Oswego home doing some sort of unspecified "work."

The testifying workers acknowledged that they used some of their own small tools such as hammers and nail bags.  However, David Emami provided all of the landscaping equipment and tools as well as other construction tools such as saws, levels, drills, and screw guns, either directly or through his subcontractors.  Workers also used forklifts or bobcats which they did not provide themselves.  The testifying workers stated that they held no other jobs nor had their own companies when they worked for OGC and Barrington.  They did not have their own clients.  Armando Beas testified that he never received a Form 1099 from Defendants.

David and Diana Emami both testified that the workers asked to become independent contractors.  As a result, they treated the workers as employees while working for OGC, but as independent contractors while working for Barrington, even though there was no difference in location, pay, or duties.  The Emamis' testimony on this issue is not credible when weighed against the consistent testimony of the workers that they were employees of the Emamis.  If the workers had sought to be independent contractors, they would have likely requested the appropriate tax forms and would have demonstrated at least some indicia of independent contractor status.  Additionally, it is illogical that if the workers wanted to be independent

5 - FINDINGS OF FACT & CONCLUSIONS OF LAW

contractors, the Emamis would have kept them as employees of OGC for part of the time they worked each day. Instead, they would have treated the workers as independent contractors for all hours worked.

Six workers testified at trial. They all kept time cards. E.g., Exs. 10, 11, 15, 16, 17, 19 (various time and pay records for Armando Beas, Pedro Camarillo, Osbaldo Perez, Luis Tuyub, Filemon Santos Camarillo, and Jhonny Zuloaga). According to Diana Emami, she used the time cards to prepare the payroll. For time attributed to OGC, she added up the hours and sent the information to Quick Books payroll service along with the hourly rate. Quick Books calculated the appropriate deductions, prepared the payroll checks, and sent them back to Diana Emami electronically. Diana Emami printed the checks and the pay stubs, or what she referred to as the "check stubs," on paper stock especially formatted for this purpose. The pay stub contained deduction information and was separated from the actual paycheck by a perforated line. Diana Emami stated she folded the paper on the perforated line and put the folded paper, meaning both the pay check and the pay stub, in an envelope for the employee. She also testified that the information she received from Quick Books contained, in a single page, the pay check, the pay stub, and then a duplicate of the pay stub. Diana Emami removed the duplicate of the pay stub before putting the pay check and pay stub in an envelope for the worker.

Diana Emami issued paychecks on the 5th and the 20th of each month. To illustrate her practice, she explained that for hours worked in the month of September, a worker would receive a check on the 20th of September, and another on the 5th of October. The checks issued on those two dates paid the worker for hours worked from September 1st through September 30th. According to Emami, she considered the first of the two checks a "draw" against the worker's

wages owed at the end of the month.  In contrast to the OGC checks where the amounts were

calculated by Quick Books, for the time attributable to either one of the Barrington companies,

Diana Emami performed the calculations by adding the hours worked and multiplying those by

the worker's hourly rate.  Diana Emami prepared the Barrington paychecks herself.  No

deductions were made from the paychecks issued to workers by either of the Barrington

companies because the Emamis considered the workers to be independent contractors for those

hours.

 The employee time cards show that the employees kept time for two periods: from the 1st

through the 15th of the month, and then from the 16th to the end of the month.  E.g., Exs. 10, 11,

15-20 (various time and pay records for several workers); see also Exs. 506-514 (time cards for

several workers).   This is consistent with the receipt of paychecks dated the 20th of the month

and the 5th of the next month.

 Diana Emami testified that payroll records for the thirty-five Exhibit A workers were lost

in a sewer backup which flooded the basement area in the Emamis' home where those records

were kept.[2]  Thus, the Emamis were unable to produce complete payroll records to Plaintiff

during Plaintiff's investigation and in this lawsuit.  Plaintiff was able to obtain copies of checks

issued to the thirty-five employees by directly subpoenaing Defendants' bank.  See Ex. 21

(summary chart of Umpqua Bank records).  Plaintiff also obtained some pay-related documents

directly from the Exhibit A employees.  Defendants were eventually able to locate some time

---

 [2]  Although I am dubious about the validity of this testimony, I do not make an explicit
finding that Defendants purposefully destroyed records.  As explained below, even without such
a finding, the evidence supports a conclusion that the Emamis' failure to pay overtime was willful
and that their conduct was not in good faith.

7 - FINDINGS OF FACT & CONCLUSIONS OF LAW

cards.  In the end, while there are some payroll records, they are far from complete.

CONCLUSIONS OF LAW

I.  Employees v. Independent Contractors

Defendants' Fourth Affirmative Defense asserts that the Exhibit A workers were independent contractors, not employees.  As noted above, the Emamis testified that several of their workers requested that they be independent contractors.  As a result, the Emamis considered their workers to be independent contractors for any hours worked over 40 in a week and one of the Barrington companies then paid them for the excess hours without the deductions made when they were paid by OGC.

Under the relevant authority, the workers are properly considered employees for all hours worked.  An "employee" "means any individual employed by an employer" subject to certain exceptions not applicable here.  29 U.S.C. § 203(e)(1).  An "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C.  203(d).  To employ "includes to suffer or permit to work."  29 U.S.C. § 203(g).

The FLSA is to be construed expansively in favor of coverage, recognizing that broad coverage is essential to accomplish the goals of this remedial legislation.  See Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 296-97 (1985); Hale v. Arizona, 967 F.2d 1356, 1362 (9th Cir. 1992).  "[N]either the common law concepts of 'employee' and 'independent contractor' nor contractual provisions purporting to describe the relationship are determinative of employment status."  Mathis v. Hous. Auth. of Umatilla Cnty., 242 F. Supp. 2d 777, 783 (D. Or. 2002) (internal quotation marks and brackets omitted); see also Real v. Driscoll Strawberry Assocs., Inc., 603 F.2d 748, 754 (9th Cir. 1979) (courts use expansive interpretation of the

8 - FINDINGS OF FACT & CONCLUSIONS OF LAW

definitions of "employer" and "employee" under the FLSA; common law concepts of "employee" and "independent contractor" are "not conclusive determinants of the FLSA's coverage").

Rather, to determine employment status for the remedial purposes of the FLSA, the "economic realities test" is the applicable standard. Boucher v. Shaw, 572 F.3d 1087, 1091 (9th Cir. 2009); Real, 603 F.2d at 755. Courts consider the facts as a whole and rely on six factors to analyze the economic realities of the relationship:

> 1) The degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; and 6) whether the service rendered is an integral part of the alleged employer's business.

Donovan v. Sureway Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981) (internal quotation marks omitted).

The factors are aids used to determine the degree of dependence by the individual on the entity. E.g., Tony & Susan Alamo Found., 471 U.S. at 301 (workers entirely dependent on employer for long periods suggests employment relationship); Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1311 (5th Cir. 1976) (factors are "tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is dependence that indicates employee status").

David Emami hired the workers. He determined their rate of pay. He often told them where to work on any particular day and frequented the various locations where the workers performed an array of tasks as he determined. He controlled the manner in which the work was to be performed. He frequently told them to hurry up. His supervisory employee or

9 - FINDINGS OF FACT & CONCLUSIONS OF LAW

subcontractor also directed the workers, but those individuals were employed by David Emami.

The workers had no opportunity for "profit or loss" depending on their managerial skill. David Emami testified that the workers generally were all performing primitive construction work and were unskilled. While the workers had some investment in their own small tools, they did not provide any of the landscaping equipment or more specialized or heavy equipment used at various projects. The workers did not employ helpers. Although the jobs performed by the OGC employees were not an integral part of the movie theater business, the evidence showed that in addition to running a movie theater, OGC supplied the labor for the Emamis' other businesses. The trial testimony of all the witnesses established that running the movie theater is not the primary purpose of the Emamis' collective property-related businesses. Given that all three businesses shared all of the workers, it is clear that the workers' landscaping and construction work was an integral part of the Emamis' property-related business interests. Moreover, as noted above, none of the employees worked for a non-Emami entity during the time they worked for the Emamis. They did not have other clients. They did not own their own companies. Additionally, the workers were paid by the hour, not by the job, often punching a time clock.

The only evidence suggesting that the employees were independent contractors is the non-credible testimony of the Emamis. All relevant facts show that the "economic reality" of the relationship between the workers and the Emamis is that the workers were entirely dependent on the Emamis and their businesses. Finally, while only six employees testified, Defendants presented no evidence suggesting that they treated the remaining twenty-nine employees any differently than the six who appeared at trial. It is reasonable to conclude that all the Exhibit A

individuals were employees for all of the hours they worked for the Emamis and any of the three Defendant companies.

## II.  Covered Employer - Single Enterprise

Under 29 U.S.C. § 203(s)(1)(A)(ii), an "[e]nterprise engaged in commerce or in the production of goods for commerce means an enterprise . . . (ii) . . . whose annual gross volume of sales made or business done is not less than $500,000[.]"  There is no dispute that OGC meets this threshold and is thus a covered enterprise.  However, Defendants' Second Affirmative Defense contends that Barrington Management and Barrington Venture were not covered "enterprises" within the meaning of the statute because the gross volume of business conducted by each of those entities in most years was less than $500,000.  They also assert that their businesses were not a common enterprise under 29 U.S.C. § 203(r)(1) because they were not engaged in "related activities."  The evidence at trial established otherwise.

The FLSA defines "enterprise" to mean

the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor.

29 U.S.C. § 203(r)(1).  As the Ninth Circuit has explained, "[i]f these three elements - related activities, unified operation or common control and common business purpose - are present, different organizational units are grouped together for the purpose of determining FLSA coverage."  Chao v. A-One Med. Servs., Inc., 346 F.3d 908, 915 (9th Cir. 2003).  In cases where the facts support a conclusion that multiple entities constitute a single "enterprise" for FLSA

11 - FINDINGS OF FACT & CONCLUSIONS OF LAW

purposes, it is irrelevant that one of the entities does not meet the $500,000 threshold.  Id. at 914-15.  In assessing the three relevant elements, the court should liberally construe the FLSA.  Reich v. Bay, Inc., 23 F.3d 110, 114 (5th Cir. 1994).  Courts should look to the "actual or pragmatic operation and control" of the enterprise.  Donovan v. Grim Hotel Co., 747 F.2d 966, 970 (5th Cir. 1984).

Although part of OGC's business was running the movie theater, the testimony established that it simultaneously had the purpose of providing labor for the maintenance and construction of other properties owned or managed by one of the two Barrington companies.  Thus, the three companies are "related" and engage in "related activities" by sharing the OGC labor pool for the work required at all of the Emami properties.  Second, the three companies were under the common control of the Emamis who together own 100% of the entities, hire the workers, set wages, supervise the work, and do all of the employment-related bookkeeping.  There is no question that the performance of the employees was controlled by the Emamis.  Third, the three companies had a common business purpose of property management with OGC supplying the labor and the other two companies providing the need for the labor.

Because Defendants' three businesses have related activities, are under the common control of the Emamis, and have a common business purpose, they are properly treated as a single enterprise engaged in commerce under sections 203(r)(1) and 203(s)(1)(A).

III.  David Emami's Individual Liability

Under 29 U.S.C. § 203(d), an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  The Ninth Circuit has noted that "[t]he overwhelming weight of authority is that a corporate officer with operational

12 - FINDINGS OF FACT & CONCLUSIONS OF LAW

control of a corporation's covered enterprise is an employer along with the corporation, jointly

and severally liable under the FLSA for unpaid wages."  Boucher, 572 F.3d at 1094 (internal

quotation marks omitted); see also Solis v. Velocity Exp., Inc., No. 03:09-cv-00864-MO, 2010

WL 2990293, at * 2 (D. Or. July 26, 2010) (noting that an "individual may be personally liable

for FLSA violations if he or she exercises control over the nature and structure of the

employment relationship or economic control over the relationship," and that a "corporate officer

may qualify as an employer if he or she had a significant ownership interest in the corporation

with operational control of significant aspects of the corporation's day-to-day functions; the

power to hire and fire employees; the power to determine salaries; or the responsibility to

maintain employment records.") (internal quotation marks and brackets omitted).

     David Emami, as sole shareholder of OGC, has a significant ownership interest of that

entity.  While he is only a one-percent owner of the Barrington companies, he performs work for

those companies by ensuring that the Barrington companies' projects are built on time and by

assisting Diana Emami in managing those companies.  As previously noted, he hired the

employees and frequently directed their work.  And, as the sole shareholder of OGC, he had the

authority to hire and fire, sign paychecks, and determine the rate of pay.  Based on this evidence,

David Emami is an "employer" under section 203(d).

IV.  Willfulness

     Generally, FLSA claims are subject to a two-year statute of limitations.  29 U.S.C. §

255(a); Haro v. City of Los Angeles, 745 F.3d 1249, 1258 (9th Cir. 2014) ("Successful FLSA

plaintiffs can recover for unlawfully withheld overtime pay for two years back from the filing

date of a cause of action").  The statute of limitations may be increased to three years, however,

13 - FINDINGS OF FACT & CONCLUSIONS OF LAW

when the employer has acted willfully.  29 U.S.C. § 255(a); Haro, 745 F.3d at 1258 ("[w]hen a

violation is 'willful,' however, the statute of limitations extends to three years").  "To show

willfulness, a plaintiff must demonstrate that the employer either knew or showed reckless

disregard for the matter of whether its conduct was prohibited by the statute." Id. (internal

quotation marks omitted).  An employer who knows of a risk that its conduct is contrary to law,

yet disregards that risk, acts willfully.  Id.

     Defendants' failure to pay overtime was willful.  The testimony established that the

Emamis knew they were required to pay overtime for any hours their employees worked in

excess of 40 hours per week.  They are educated in business and economics and have an

extensive history of running dozens of their own businesses.  David Emami knew about a

specific and discrete overtime exemption for cinema employees, indicating that he knew that for

other employees, hours worked over 40 hours in a week carried a premium wage.  He also knew

that independent contractors did not receive overtime.

     Yet, despite this knowledge, the Emamis were determined to avoid their obligation and

did so by concocting a scheme in which they considered their workers to be employees of one

company, OGC, but independent contractors of either of the other two Barrington companies.  As

part of the scheme, they had employees fill out two time cards for every day worked, splitting the

time between OGC and Barrington, and issued two paychecks for each pay period, taking

deductions from the OGC check but not from the Barrington checks.  Requiring the employees to

divide the hours worked into two companies with separate time cards for the same days worked

shows a purposeful intent to evade the FLSA's overtime requirements.  Employee testimony also

shows David Emami knew of his overtime obligation but made a deliberate decision to not pay

14 - FINDINGS OF FACT & CONCLUSIONS OF LAW

it.  Osbaldo Perez testified that David Emami told him that he did not pay overtime.  Jhonny

Zuloaga stated that David Emami told him that David Emami offered lots of hours of work, but

did not pay overtime.  Armando Beas testified that David Emami told him that he could be in

trouble with the government by not paying overtime.

Additionally, the Emamis deprived the workers of information which the workers could

have used to verify that they were not being paid adequately under the law by failing to regularly

provide them pay stubs.  I reject Diana Emami's testimony that she provided a pay stub with each

OGC paycheck.  The employees' testimony was consistent that they did not receive pay stubs,

and when they asked for copies of pay stubs for legitimate income verification purposes such as

an apartment rental, reduced school lunch costs, or a child's medical insurance, they were

rebuffed.  The employees' ability to recall these specific instances of conduct strengthens the

credibility of their testimony.  The fact that this occurred with more than one employee and in the

context of income verification purposes adds to the weight of their testimony over that of Diana

Emami.

Additionally, as discussed previously, I reject the Emamis' testimony that the employees

asked to be independent contractors.  As a result, when all the facts are considered, there is only

one reasonable conclusion to be made:  Defendants knew of the legal obligation to pay overtime

to their employees for any hours worked in excess of 40 hours per week, yet they deliberately

chose to ignore their legal obligation and instead, attempted to skirt the law by making

employees use two time cards and by issuing two paychecks.  The appropriate statute of

15 - FINDINGS OF FACT & CONCLUSIONS OF LAW

limitations in this case is three years.[3]

## V. Recordkeeping Claim

The FLSA requires employers to "make, keep, and preserve" records of employees' "wages, hours, and other conditions and practices of employment." 29 U.S.C. §§ 211(c), 215(a)(5). Even if unintentional, the reason for the loss of records is not a defense to a recordkeeping violation. Chao v. Me & Lou's Rest., No. CV07-385-E-EJL, 2008 WL 4832880, at *3 (D. Idaho Nov. 5, 2008) (summary judgment awarded to plaintiff on recordkeeping violation when defendant's records lost in a flood). The Emamis' own testimony establishes that at a minimum they failed to preserve the relevant employment records. Thus, they violated the statute.

In a recent case, the Ninth Circuit explained the significance of an employer's failure to keep accurate records of its employees' time:

> In cases where an employer has not kept accurate records of employees' time, Mt. Clemens Pottery allows the Secretary to prove an FLSA violation by showing that employees performed work for which they were improperly compensated and producing some evidence to show the amount and extent of that work "as a matter of just and reasonable inference." [Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680] at 687, 66 S. Ct. [1187, 90 L. Ed. 1515 (1946)]. We have held that the Secretary's evidence may consist of "fairly representative testimony" from a sample of employees. McLaughlin v. Ho Fat Seto, 850 F.2d 586, 589 (9th Cir. 1988). If the Secretary carries his burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be

---

[3] Although the Complaint was filed on May 1, 2013, the action is deemed to have commenced on February 27, 2013 pursuant to a tolling agreement between the parties. See Ex. 5 to Hunt May 12, 2014 Decl. [ECF 77-2, 77-4]. Additionally, while Plaintiff's investigation into Defendants' wage practices initially focused on records going back to August 2010, two years before the investigation began in August 2012, this does not limit the statute of limitations, especially considering that Plaintiff's discovery requests, once litigation commenced, covered more than a three-year period. See Ex. 2 to Brown June 4, 2014 Decl. [ECF 83].

16 - FINDINGS OF FACT & CONCLUSIONS OF LAW

drawn from the [Secretary's] evidence." <u>Mt. Clemens Pottery</u>, 328 U.S. at 687–88, 66 S. Ct. 1187.

<u>In re Perez</u>, 749 F.3d 849, 853 (9th Cir. 2014).  Whether the evidence at trial allows for a "just and reasonable inference" of the hours worked by the Exhibit A employees is discussed below.

## VI.  Retaliation Claim

The FLSA makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee[.]"  29 U.S.C. § 215(a)(3).  The statute "protect[s] persons who report illegal conduct to government agencies or complain about such conduct to their employers, even though they have not yet instituted a formal proceeding."  <u>Leonard v. St. Rose Dominican Hosp.</u>, 310 F.3d 653, 655 (9th Cir. 2002).  The anti-retaliation provision is to be interpreted broadly to "give effect to the statute's remedial purpose."  <u>Id.</u>  It is designed to encourage employees to report alleged violations of the FLSA's substantive provisions without fear of reprisal.  <u>See</u> <u>Lambert v. Ackerley</u>, 180 F.3d 997, 1004, 1008 (9th Cir. 1999) (remarking that the FLSA protects "employees who turn to the Labor Department or the courts for a remedy").

Osbaldo Perez testified that after Plaintiff began investigating Defendants' wage practices, David Emami spoke with him as well as two other employees, Armando Camarillo and Andres Alvarez.  Osbaldo Perez, who stated that he speaks a little English but did not understand English "very well," translated David Emami's comments.  According to Osbaldo Perez, David Emami told the employees to hang up if they got calls from the government and to say they did not want

17 - FINDINGS OF FACT & CONCLUSIONS OF LAW

any trouble.  David Emami also spoke to the employees about punching or hitting any employee who became a witness for the government.  He put up his middle finger and made a punching motion with his hand.

Another employee, Armando Beas, who supervised many other employees and who speaks and understands English very well, testified that David Emami told him that he was being investigated by "somebody" as a result of some "fucking Mexicans" causing some problems. Armando Beas stated that David Emami told him to tell the employees that if anyone called them, they should tell the caller they did not speak English and hang up.  He further testified that David Emami told him that if somebody ever talked to the government or cooperated with the government, that person would "face the real Mr. Emami and he will no longer want them in his life and in his company."

Employee Luis Tuyub testified that David Emami talked to him about Plaintiff's investigation, stating that if he ever found out about employees suing him, "he would have us beat up."  Filemon Santos Camarillo testified that at one point, David Emami told at least some of the employees that he did not want to have trouble with the government and thus, they needed to write down up to 40 hours on one card and any additional hours on a separate piece of paper. At that point, they were paid by check for the 40 hours and in cash for any hours more than 40. Filemon Santos Camarillo noted that David Emami was "very angry" when he made these statements and although he could not remember exactly, he thought this conversation occurred sometime in November 2012, after Plaintiff began its investigation into Defendants' wage practices.

Filemon Santos Camarillo also recalled overhearing David Emami make comments about

Plaintiff's investigation, including a reference to the "mother fucking government" and further, that if the government called the employees, they should not answer.  Instead, Filemon Santos Camarillo testified, David Emami suggested they change their phone numbers.  According to Filemon Santos Camarillo, David Emami said something to the effect of if the employees talked to the government, David Emami would be hauled off to jail.  Filemon Santos Camarillo stated that he observed David Emami looking angry when making these comments.

Finally, employee Pedro Camarillo testified that David Emami told him that if the government called, he was supposed to hang up.  And if the government sent a letter, he should destroy it by using a shredder or tearing it up in pieces and putting it down the toilet.  Pedro Camarillo further testified that David Emami suggested that the employees just change their names and phone numbers.  Although David Emami did not explicitly state why he was afraid of the government's investigation, he made clear to Pedro Camarillo that if any of the employees received money as a result of the investigation, he would fire them.

In contrast to the employees' testimony, David Emami denied ever having made any threats of bodily harm or assault to his workers as a result of their cooperation with Plaintiff's investigator.  He also denied that he said he would hire someone to beat up his workers.  He explained that such threats made no sense because he is a sixty-four year old man with diabetes and the employees, all young with an average age of twenty-five, are bigger and stronger than he is.  He also denied that he used his middle finger in conversing with Osbaldo Perez and denied that he spoke to him about retaliation.  In regard to Filemon Santos Camarillo's testimony that if the government called, he should not answer the phone or change his number, David Emami explained that Filemon Santos Camarillo must have asked David Emami a question to which

David Emami gave "him some insight" that it was his choice. And, whatever he said to Pedro Camarillo, what he meant to convey was that if a lawsuit resulted and David Emami had to hire attorneys, he would not be able to afford to keep any workers.

The consistency in the employees' testimony is notable. Five of the six testifying employees recounted statements by David Emami indicating his obvious displeasure with Plaintiff's investigation. Several of the employees described strikingly similar statements by David Emami instructing them to not answer the phone or to hang up if they were called by the government. More than one stated that he instructed them to change their phone numbers. Several of them recounted threatening statements, either of personal violence or of economic harm by firing employees who talked to the government. His comment to Filemon Santos Camarillo about being hauled off to jail is also a threat of economic harm because it implies that David Emami would no longer be able to employ the workers.

Even accepting David Emami's testimony that he did not threaten his employees with personal violence, directly or indirectly, the evidence establishes that he threatened to retaliate against them economically if they cooperated with Plaintiff's investigation. As noted, the testimony of the workers regarding the threats was notably similar. David Emami's suggestion that he was too old and infirm to inflict violence on his employees fails to account for the enormous economic power he wielded over them by being their employer. His threats of physical violence did not need to be actionable to suggest that cooperating with the Department of Labor's investigation would result in negative consequences of some sort. And, importantly, given my conclusion that Defendants acted willfully to violate the overtime law, David Emami had a strong motivation to keep his employees from talking to the investigator. It is clear that he

20 - FINDINGS OF FACT & CONCLUSIONS OF LAW

communicated to his employees that they would lose their jobs if he found out they had spoken with the Department's investigator.

Because the statute prohibits discrimination against employees who file a complaint as well as those who testify or are about to testify in "any proceeding" under the FLSA, employees who provide statements to the Department of Labor's investigator are engaging in protected conduct under the statute. Accordingly, threatening to terminate such employees is properly considered a form of "discrimination" because such threats thwart and interfere with the employee's protected right to participate in the investigation. As noted above, the purpose of the anti-retaliation provision is to encourage employees to report alleged violations of the statute's substantive provisions without fear of reprisal. Based on the evidence, David Emami violated the anti-retaliation provision of the FLSA.

VII.  Overtime Claim

The FLSA requires employers to pay their employees one and one-half times their regular rate of pay for any hours worked in excess of 40 in one week. 29 U.S.C. § 207(a)(1); Klem v. Cnty. of Santa Clara, Cal., 208 F.3d 1085, 1089 (9th Cir. 2000). Defendants did not dispute that they failed to pay their employees the required overtime wage premium for hours worked in a week above 40. The six employee witnesses consistently testified that they typically worked more than 40 hours per week and did not receive the overtime wage premium for those excess hours. The time cards that Defendants were able to locate for several employees show, based on Defendants' own calculations, that many employees worked in excess of 40 hours per week. See Exs. 506-514 (copies of time records); Ex. 515 (summary of time card records including computation of an average weekly number of overtime hours for several employees).

21 - FINDINGS OF FACT & CONCLUSIONS OF LAW

The issue is not, therefore, whether the employees typically worked more than 40 hours per week (they did) or whether Defendants paid them the overtime wage premium (they did not). Instead, the issue is, in the absence of comprehensive pay-related records, can the calculation of the number of overtime hours worked by the Exhibit A employees and thus, the amount of overtime wages owed, be made as a just and reasonable inference from the records that do exist.

As noted above, because Defendants failed to keep or preserve records of their employees' time, Plaintiff's burden is to produce "some evidence" to show the amount of work "'as a matter of just and reasonable inference.'" In re Perez, 749 F.3d at 853 (quoting Mt. Clemens Pottery Co., 328 U.S. at 687). To meet its burden, Plaintiff relied on the testimony of six of the thirty-five Exhibit A employees as representative of the amount of work performed by the remaining twenty-nine Exhibit A employees. Alternatively, Plaintiff relied on checks issued by Defendants to the thirty-five Exhibit A employees from which, as explained more thoroughly below, Plaintiff calculated the number of hours the employee worked in a week and from that, calculated the number of overtime hours.

A.  Representative Testimony

The Ninth Circuit has made clear that "the Mt. Clemens Pottery standard allows district courts to award back wages under the FLSA to non-testifying employees based upon the fairly representative testimony of other employees." McLaughlin v. Ho Fat Seto, 850 F.2d 586, 589 (9th Cir. 1988). As Judge Acosta has noted, "there is no mathematical formula for satisfying the burden." Chao v. Westside Drywall, Inc., 709 F. Supp. 2d 1037, 1069-70 (D. Or. 2010). At a minimum however, when employees work in more than one job category, the testimony must be representative of the individuals within each category. Id. at 1069-70.

Each of the six witness employees testified about the hours he typically worked each day and each week in the summer months and in the winter months. Each witness employee testified about the types of jobs he performed while working for Defendants. While these testifying witness employees could, in theory, establish, on behalf of the remaining twenty-nine employees, the number of hours typically worked in a day and week, the witness employees in this case failed to do so. Because of the different jobs performed by all employees, their different locations, and that the witness employees regularly worked directly with only a handful of other Exhibit A employees, Plaintiff cannot rely on the six witness employees' testimony to establish the number of overtime hours worked by all Exhibit A employees.

Osbaldo Perez testified that during the time he was employed by Defendants, he performed construction, drywall, painting, yard work, and maintenance. Luis Tuyub did "a little of everything," including framing, concrete work, remodeling, tiling, asphalt, sheet rock, air conditioning, and welding. Filemon Santos Camarillo performed work at one of the Emamis' homes, including yard work, lifting heavy objects, and cleaning gutters. Additionally, away from the residences, he did both landscaping and construction work. Jhonny Zuloaga primarily did construction work, although he did landscaping work on one occasion. Pedro Camarillo started with landscaping and property maintenance and then did construction. Armando Beas did "general work," including painting, landscaping, and maintenance, but he also supervised many of the employees in framing, painting, cutting and pouring concrete, landscaping, and maintenance. Most of the witness employees worked in several locations.

Exhibit 2 is a list of the thirty-five Exhibit A employees. Each witness employee was asked to identify which of the Exhibit A employees he knew and worked with, and in regard to

23 - FINDINGS OF FACT & CONCLUSIONS OF LAW

those employees, what types of jobs the other employees performed.  Exhibits 2A through 2F

indicate which other employees the witness employee worked with.  Exs. 2A - 2F[4] (original

exhibits with highlighter).  While such testimony is relevant, it was too general to allow this

Court to determine as a just and reasonable inference that the identified Exhibit A employees

worked the same number of hours as the witness employee.

For example, Osbaldo Perez testified that he performed at least five different types of

work at six or seven different locations.  Although he named twenty-four of the Exhibit A

employees as people he worked with, most of them he identified as performing "construction," a

couple he identified as having performed painting, and two he noted as having done cleaning in

addition to construction and landscaping.  Luis Tuyub engaged in several different jobs at several

different locations.  He identified several of the Exhibit A employees that he knew and worked

with as "helpers."  When specifically asked if most of the identified people worked the same

hours as he did, Tuyub responded "not all" and then identified only seven of the previously

identified twenty-two as working the same hours.  Filemon Santos Camarillo testified that he

worked the same hours as his brother.  Beyond that, however, he testified that he worked at

several different locations but identified only one, "Robinson," as a place where he worked more

or less the same hours as the handful of others he worked with there.  Pedro Camarillo provided

similar testimony.  He worked in several places, noting that David Emami sent him to "almost

---

[4]  Osbaldo Perez worked with twenty-four of the thirty-five Exhibit A employees.  Ex.
2A.  Armando Beas supervised nineteen of the Exhibit A employees.  Ex. 2B.  Luis Tuyub
worked with twenty-two of the Exhibit A employees.  Ex. 2C.  Filemon Santos Camarillo
worked with seven of the Exhibit A employees.  Ex. 2D.  Jhonny Zuloaga worked with eighteen
of the Exhibit A employees.  Ex. 2E.  Pedro Camarillo worked with sixteen of the Exhibit A
employees.  Ex. 2F.

everywhere."  But, when questioned about how closely he worked with other Exhibit A employees, he testified that while he worked the same number of hours as another employee, he worked only one week with that person.  He identified Exhibit A employees Manual Paz Gonzalez and Armando Santos Camarillo as typically working the same hours as he did, but only one, Armando Santos Camarillo, was someone he worked with for a several-month period when both did landscaping.

I recognize that part of the problem for Plaintiff is the way Defendants used their employees as a mobile labor force for work in a number of different locations performing a number of different jobs.  Nonetheless, while the six witness employees consistently testified that they knew and worked with many of the non-testifying Exhibit A employees, the witness employees failed to establish that they consistently worked with enough of the non-testifying Exhibit A employees for a substantial period of time in performance of the same job.  Thus, the Court cannot make a just and reasonable inference that all Exhibit A employees worked a particular number of overtime hours for the three-year period at issue based on the testimony of the witness employees.

B.  Bank Records

Plaintiff subpoenaed records from Defendants' bank.  Claire Barba, a paralegal for Plaintiff, testified that she reviewed more than 1,800 pages of these Umpqua Bank records.  Each page contained copies of six checks, front and back.  They included checks made out to the Exhibit A employees from all three Defendant companies, as well as checks made out to other companies.

Barba went through the 1,800 pages of checks and created a spreadsheet which is found at

25 - FINDINGS OF FACT & CONCLUSIONS OF LAW

pages 2-55 of Exhibit 21.[5]  The entries are organized by Exhibit A employee name which appears in the first column on the left.  E.g., Ex. 21 at 2.  The next three columns to the right show the date, number, and amount of a check issued to an Exhibit A employee from OGC.  Id.  These entries are listed chronologically down the column.  Id.  Moving right, the next three columns show the date, number, and amount of a check issued to an Exhibit A employee by Barrington Management.  Id.  Still moving right, the next three columns show the date, number, and amount of a check issued to an Exhibit A employee by Barrington Venture.  Id. at 5.  All of this information was taken directly from the checks obtained from Umpqua Bank.  Barba did nothing but copy information from the face of the checks and put it into the spreadsheet.

The next column to the right is the total amount of the checks issued by all three Defendant companies on a particular date which the spreadsheet shows as "total per pay pd."  Id. at 2.  Barba explained that the employees received checks about every two weeks.  The dates correspond with Defendants' practice of issuing checks on or about the 5th and 20th of each month.  Barba simply added up the checks issued for the same pay period and put the amount in that column.

At this point, Plaintiff possessed information directly from Defendants' own bank records showing amounts the Exhibit A employees received from Defendants on dates which corresponded to the dates paychecks were issued.  Plaintiff then used this information, coupled

_____

[5]  The page numbering of Exhibit 21 caused some confusion at trial because pages 2 through 55 contain a typewritten page number that was generated with the spreadsheet, beginning with page 1, in addition to handwritten numbers showing the actual page of the exhibit.  Thus, the second page of the exhibit shows in handwriting that it is page 2 of 55 but it also has a typewritten number showing the number 1.  Page 1 of the exhibit was created independently of the spreadsheet and is a summary of amounts shown at other points in the spreadsheet.  I refer to the handwritten page numbers in the bottom right corner of all pages.

with information on hourly rates provided by Defendants, and calculated the number of hours worked per week. Barba testified that she obtained an hourly wage for each Exhibit A employee from Defendants' Exhibit 516.[6] From this, Barba calculated the hours worked per week by taking the total amount of money paid by Defendants to the Exhibit A employee for a particular pay period and dividing it by the hourly rate. This gave her the number of hours for that period of time. Because the checks were issued twice per month instead of weekly or every other week, the time spanned more than two weeks. Thus, after dividing the total amount of money received for the pay period by the hourly rate, Barba then divided that figure by 2.2. For example, Exhibit A employee Basillo Aban Balam received a total of $1,282.60 on May 5, 2010. Ex. 21 at 2. His hourly rate, according to Defendants' Exhibit 516, was $8.50. Dividing $1,282.60 by $8.50 produces a figure of 150.9. Dividing that by 2.2. produces a figure of 68.59. Thus, the column headed "Hours/wk" for that pay period shows 68.59, meaning he worked 68.59 hours per week for the pay period for which he was paid on May 5, 2010. Id. According to Diana Emami's testimony, this would be the period he worked from April 16 - 30, 2010.

Next, Barba subtracted 40, the number of regular hours worked, and inserted the remaining hours in excess of 40 in a column headed "Total OT hours/week." Id. In another column, she noted the "OT Differential," which is the hourly rate divided by 2, representing the overtime premium of 50% of the employee's hourly wage which the law requires be added to the regular hourly wage for hours worked in excess of 40 in a week. 28 U.S.C. 207(a)(1).

Then, Barba multiplied the "Total OT hours/week" by the "OT Differential," and next

---

[6] Defendants' Exhibit 516 was previously submitted in support of Defendants' Motion for Partial Summary Judgment which sought to limit damages to $31,980.86. [ECF 77, 77-13]

27 - FINDINGS OF FACT & CONCLUSIONS OF LAW

multiplied that figure by 2.2 to arrive at a figure representing the amount of overtime premium owed to the Exhibit A employee for that pay period.  Thus, for example, with Basillo Aban Balam, after determining that he worked 68.59 hours for the period for which he received checks dated May 5, 2010, Barba calculated that the "Total OT hours/week" was 28.59 (68.59 - 40).  She then multiplied 28.59 by $4.25 which was half of the employee's $8.50 hourly wage.  This produced a figure of $121.50 which represents the amount of overtime premium wages for a one week period.  Multiplying $121.50 by 2.2 produced the sum of $267.30 representing the overtime premium owed for that pay period.  That is the figure shown in the column headed "OT hours/week OT Differential 2.2 (weeks per pay period)."  Ex. 21 at 2.  Finally, the last column shows "Total OT Due" for each Exhibit A employee.  E.g., id.  There, Barba simply added all the amounts in the preceding column showing the amount of overtime premium wages owed for each pay period and arrived at the total figure owed to that employee.  Id.  Page 1 of Exhibit 21 is a summary of the total amounts owed to each Exhibit A employee.  Ex. 21 at 1.

During her testimony, Barba explained that since preparing Exhibit 21, she had found a few errors.  She noted two errors in hourly wage, both where she used the rate of $8.80 when Exhibit 516 provided a $9 hourly rate.  Ex. 21 at 13 (entry for Pedro Camarillo for July 5, 2012); at 33 (entry for Isael Paz for January 20, 2012).  She also explained that a series of seven rows for Osbaldo Perez contained a mistake created by a misalignment of checks between OGC and Barrington Management.  Ex. 21 at 38.  The mistake begins with the OGC check dated November 5, 2010 and instead of adding the Barrington Management check with that same date to the OGC check, she mistakenly added the Barrington check dated October 20, 2010.  Id.  This misalignment continues through the February 4, 2011 OGC check.  Id.

28 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Barba also explained that there was a double entry error for Andres Alvarez on March 21, 2011 when she mistakenly entered the same OGC check twice. Ex. 21 at 4. However, she counted only one of the checks in making her calculations so the error did not affect the amount of overtime premium wages she concluded were owed for that employee. And, she explained that when she observed more than one check from the same Defendant company on the same date, she did not count one of those checks. E.g., Ex. 21 at 43 (showing one check issued to Armando Santos Camarillo by OGC on November 21, 2011 and two checks issued to him by Barrington Management on that same date; Barba excluded one of the checks from Barrington based on an assumption that it was reimbursed expenses and not wages).[7]

By performing this series of calculations for each Exhibit A employee, Barba determined the amount of overtime premium wages owed to each employee for the February 2010 through February 2013 time period. Ex. 21. The total owed for all Exhibit A employees based on Barba's calculations is $302,131.62. Id. at 1.

Plaintiff argues that in the absence of actual payroll records showing the number of hours worked by each Exhibit A employee per week, its method allows for a just and reasonable inference of the amount of overtime wages owed. Noting that the law does not require precision when Defendants fail to keep required pay records, Plaintiff contends that using the bank records provides as close to an objective view as possible of the amount of money Defendants paid their employees every fifteen days. Moreover, any errors or isolated aberrations are inherent in an estimate which, as a result of Defendants' recordkeeping failure, is exactly what the law allows

---

[7] Neither party asked Barba to explain how she chose which of the two checks issued by the same company on the same date was the reimbursement check.

29 - FINDINGS OF FACT & CONCLUSIONS OF LAW

the Court to rely on in determining the overtime wages owed.

I conclude that Plaintiff has met its burden of proving the number of overtime hours because the bank records consist of "some evidence" from which "the amount and extent of [the] work" may be derived as "'a matter of just and reasonable inference.'" In re Perez, 749 F.3d at 853 (quoting Mt. Clemens Pottery, 328 U.S. at 687). While Defendants raise some legitimate concerns, which are addressed below, there is nothing inherently unreliable, unjust, or unreasonable about Plaintiff's reliance on the bank records and its method of calculation. The fact remains that while there are some time records for some employees, there are W2s from OGC for employees showing net and gross payments, and there are some reimbursement receipts for some employees, only the bank records allow a comprehensive review of all the payments made to all the Exhibit A employees by all Defendant companies for the entire time period at issue.

Furthermore, that the bank records may not allow for an exact calculation of the amounts owed to the Exhibit A employees is purely a fault of Defendants. Not only did they fail to preserve the pay-related records, they paid their employees twice per month instead of weekly or every other week, they did not note that a check was for reimbursement instead of wages on the face of the check, they created a fiction of independent contractor status and used the separate Barrington entities for part of the wage payments, and they routinely failed to provide pay stubs to their employees.

Defendants raised several concerns about Plaintiff's bank record calculations in an attempt to negate the reasonableness of the inference created by Plaintiff's evidence. Defendants made an issue out of the fact that Barba relied on the amount in a check without knowing if that

30 - FINDINGS OF FACT & CONCLUSIONS OF LAW

amount was gross or net, after deductions had been made.  Defendants established through Diana Emami's testimony that at least one employee, Armando Baes, had a deduction for a garnishment for several months in 2011.  See also Ex. 564 at 4-8.  The W2s also show deductions for social security, medicare, and state and federal income taxes for all OGC employees.  Ex. 26.

Barba's reliance on the net amount reflected in the OGC checks she obtained from Umpqua Bank benefits Defendants.  For example, if the employee's gross wages for the pay period are $500 and the employee's hourly rate of pay is $10, then the number of hours worked in the pay period is 50.  If the net wages for the pay period are $300 after deductions, whether the deduction be for a garnishment or taxes or anything else, and the hourly rate is $10, then the number of hours worked in the pay period is 30.  Because it is in Defendants' interest to have the calculations establish fewer hours worked in a pay period, using the net amounts from the OGC checks did no harm to Defendants and actually worked in their favor.

Next, Defendants established through testimony and documents that some of the checks counted by Barba were for reimbursements of various expenses such as medical bills, gas purchases, parking, etc.  Barba testified that she did not include what she assumed were reimbursement checks in her calculations and she omitted "double" checks, meaning if there was more than one check issued to an employee by the same Defendant entity on the same date, she counted only one as wages.  Defendants established that this was not always the case.  For example, Armando Santos Camarillo received two checks from Barrington Management on May 5, 2010, in two different amounts.  Ex. 551 at 83.  Barba counted both of them even though Diana Emami indicated that at least a portion of one was for reimbursement of medical expenses.  Id.  In another example for that same employee, Armando Santos Camarillo received two checks

on October 20, 2010 from Barrington Management, one of which Diana Emami shows as reimbursement for medical expenses.  Id.  In contrast to the argument about deductions, Defendants are harmed by Barba's inclusion of non-wage payments in her calculations.  If the amount the employee received according to the check is $500 and the hourly wage is $10, the number of hours worked for that pay period is 50.  But, if only $300 of that $500 check is for wages and the remaining $200 was for a reimbursed expense, then the number of hours worked for that pay period is only 30.  Including non-wage amounts inflates the number of hours worked per pay period.

However, while Defendants properly challenge the inclusion of some non-wage amounts, the evidence they rely on is neither "evidence of the precise amount of work performed" nor substantial enough to negate the reasonableness of the inference to be drawn from Plaintiff's evidence.  Defendants provide reimbursement receipts for six of the thirty-five employees.  Exs. 553-563.  Exhibit 553 contains a prescription slip indicating a medication price of $25 for Pedro Gutierrez.  It also shows the actual receipt indicating that the total charge was $4.32.  Ex. 553.  A handwritten note indicates that this was part of check number 13309 issued in conjunction with the pay period November 16-30, 2010.  Id.  The entry on Exhibit 21 for this pay period shows that Barrington Management issued a check bearing that number in the amount of $200.99 to Pedro Gutierrez.  Ex. 21 at 20.  Exhibit 551, which is Exhibit 21 amended by Diana Emami to highlight what Defendants contend are Exhibit 21's errors, indicates that the entire check of $200.99 was for medical bill reimbursement, even though the receipts show only $25 or $4.32.  Ex. 551 at 39.  If the medical bill was $4.32 or even $25, Barba's mistake is trivial because including that extra amount for that pay period would not result in a significant change to the

32 - FINDINGS OF FACT & CONCLUSIONS OF LAW

number of overtime hours worked per pay period.  Even if the entire $200.99 was mistakenly

counted as wages, it amounts to a very small percentage of the $5,195.66 owed to this employee.[8]

Exhibit 554 shows three receipts for parking for a total of $20.64 which Defendants

reimbursed to Oscar Montiel as part of check number 14419 on July 6, 2011.  Ex. 554, at 1; Ex.

21 at 29.  Another receipt dated March 30, 2012, shows a charge of $226 from an urgent care

clinic but without any indication on the actual receipt that it was for Oscar Montiel.  Ex. 554 at 2

(showing name of Benitez on receipt).  There is a handwritten entry on the receipt suggesting

payment for this expense was made to Oscar Montiel as part of the check issued for work

performed between April 1 - 15, 2012.  Id.  The total amount of overtime premium wages owed

to Oscar Montiel calculated by Barba is $10,891.57.  Ex. 21 at 30.  The fact that approximately

$250 was assumed to be wages instead of reimbursements is an insignificant mistake.  Receipts

for two more employees produce the same result.  Osbaldo Perez was reimbursed a total of

$26.75 for parking in October 2012.  Ex. 555.  Manual Paz Gonzales was reimbursed a total of

$33 for parking in June 2011.  Ex. 556.

The reimbursement receipt evidence presented by Defendants as to these four employees

is insignificant given that they are isolated instances of fairly minor amounts of money when

---

[8]  Exhibit 21 shows Pedro Gutierrez received $1,458.63 for that pay period.  Ex. 21 at 20.
Under Barba's calculations, he worked 38 hours of overtime for each week in that pay period,
resulting in $355.52 owed in overtime premium wages for that pay period.  Id.  Subtracting
$200.99 from the total of $1,458.63 and re-performing the calculations results in a figure of
67.25 hours per week, or 27.25 hours of overtime wages for each week.  ($1,458.63 minus
$200.99 = $1,257.64; $1,257.64 divided by the $8.50 hourly rate = $147.96; $147.96 divided by
2.2 = 67.25; 67.25 minus 40 hours = 27.25 overtime hours).  This in turn results in $259.83 owed
in overtime premium wages for the pay period, a difference of about $101, or less than 2% of the
total owed for this employee (27.25 multiplied by overtime premium of $4.25 = $115.81;
$115.81 multiplied by 2.2 = $254.78, a difference of $100.74; $100.74 is less than $103.91
which is 2% of $5,195.66).

33 - FINDINGS OF FACT & CONCLUSIONS OF LAW

compared to the overall total wages paid to the employee. These receipts are not evidence of precise hours worked and fail to demonstrate that Plaintiff's method of calculating wages owed based on the checks from Umpqua Bank is unreasonable.

Defendants produced more extensive reimbursement records for two other employees: Armando Santos Camarillo and Andres Alvarez. Exs. 557-563 (containing dozens of receipts for each employee for each year in 2010, 2011, and 2012). The amounts at issue for these two employees are more than *de minimis*. However, the reimbursement evidence still does not show precise hours worked. And, the fact that Defendants have demonstrated that the calculations performed by Plaintiff as to two of thirty-five employees contain a significant error by including large amounts of reimbursed expenses as wages does not undermine the reasonableness of the method as a whole. If Defendants had reimbursement evidence for the other employees, Defendants undoubtedly would have introduced it at trial. As indicated, the law allows Plaintiff to create a reasonable and just inference of the hours worked. Showing errors as to just two of thirty-five employees may show some mistaken assumptions as to a couple of employees but it does not establish that the method itself lacks integrity.

Furthermore, the record allows the Court to make the necessary corrections as to these employees and deduct the reimbursement amounts from the total wages calculated in each pay period. In Exhibit 551, Diana Emami created a new spreadsheet based on Exhibit 21, the spreadsheet created by Barba. There, Diana Emami highlighted the errors she alleges were made by Plaintiff: (1) inclusion of reimbursement made to employee; (2) wrong hourly wage; (3) inclusion of loan made to employee; and (4) mistake in calculation of overtime based on semi-

monthly pay period.[9]  Ex. 551 at 2.  She then recalculated the amounts after deducting the

improperly included reimbursement amounts.  Ex. 551.  Thus, by deducting the improperly

included reimbursement amounts, Exhibit 551 contains figures in the "Total per pay pd" column

different from those Barba calculated and as shown in that column in Exhibit 21.[10]

Exhibit 551 also includes a different hourly wage than the one used by Plaintiff in its

calculations.  As noted above, Barba relied on the hourly rate provided by Defendants in support

of their partial summary judgment motion and as seen in Exhibit 516.  In changing the hourly

rate in Exhibit 551, Diana Emami consistently made it higher than the one used by Plaintiff.

With a higher hourly rate, the number of hours worked is lower.  For example, with a $300 check

and $10 per hour, the number of hours worked in that pay period is 30.  If the hourly rate is $15

instead of $10, the number of hours worked in that pay period is 20.  Obviously, it is in

Defendants' interest to have a higher hourly wage which produces a lower number of hours using

Plaintiff's calculation method.  Diana Emami testified that she changed the hourly rate in Exhibit

551 from the one used by Plaintiff in Exhibit 21 because the higher hourly wage was the number

she had for Barrington Management.  I do not credit this testimony as it is unsupported, self-

serving, and contradicts the hourly rates used by Defendants themselves earlier in the litigation.

Thus, while Exhibit 551 appropriately contains adjustments to the total amount per pay period for

any reimbursements or loans made to Exhibit A employees, I disregard the changes it made to the

---

[9]  As I remember the testimony, the adjustment Diana Emami made for "DOL mistakenly
calculates overtime on semi-monthly pay period" was unexplained.

[10]  The recalculated total per pay period also includes adjustments for four employees who
apparently received loans from Defendants which should not have been counted as wages.  Ex.
551 at 63, 64, 67, 68, 75, 99, 100, 101.

hourly rate.[11]

Another issue raised by Defendants is that the more accurate evidence, and thus the evidence carrying more weight, for calculating the number of hours worked is found in the employees' actual time cards. Despite having allegedly lost most of the payroll records, Defendants were able to find some time cards for some employees. Exhibit 507 contains seventeen months of time cards for Luis Gonzalez from August 2010 to December 2011, plus one time card showing three days of work in March 2012 and another showing one day of work in April 2012. Exhibit 508 contains fifteen months of time cards for Manuel Amado from October 2010 through December 2011, plus one card for two days worked in September 2010, and three cards showing only a few days worked in each of April, July, and August 2012. In contrast to Exhibit 507 which has only one time card for Luis Gonzalez for each time period, Exhibit 508 has two time cards for Manuel Amado for some of the time periods and only one for others. Exs. 507, 508.

Exhibit 509 contains time cards for Pedro Gutierrez for July 2010 through January 2011, plus one card showing days worked in the second half of June 2010. Exhibit 510 contains time cards for Jesus Levya for July 2010 through February 2011, plus one card showing days worked in the second half of June 2010. Exhibit 511 contains time cards for Carlos Gonzalez for

---

[11] Some records and testimony show some different hourly rates for some employees. For example, as discussed below, Armando Santos Camarillo's time records suggest he made $8.40 per hour at times, and often made $9 per hour. Jhonny Zuloaga testified that he made $9 per hour. Filemon Santos Camarillo said at some point he made $10 per hour but that was not the wage he made when he started. It remains, however, that Diana Emami's testimony regarding the hourly rates she used in Exhibit 551 is unsupported by any other evidence in the record. Moreover, Defendants' own records produced in discovery support the hourly rates used by Plaintiff. Ex. 25. Diana Emami testified that the hourly rates shown in Exhibit 25 are the rates she used to determine the employees' pay.

February through June 2011, plus one card showing two days worked in July 2011.  Exhibit 512 contains time cards for Miguel Gutierrez for July 2010 through January 2011, plus one card showing days worked in the second half of June 2010.  Exhibit 513 contains time cards for Jose Hurtado for July 2010 through December 2011, with the exception of the May 2011 time card which shows only two days worked, and a card for only the second half of September 2010.  As with some of the other time card exhibits, there are sometimes only one time card for a pay period and sometimes two.  Ex. 513.  Finally, Exhibit 514 contains time cards for Pedro Beas for March and June 2010 and a few days in April 2010, as well as some random time cards for a few other individuals.

Diana Emami testified that she took the time cards in Exhibits 507 - 513 (excluding those for Pedro Beas and the other few individuals with isolated time cards), and added the number of hours for each individual then calculated the number of hours and overtime hours worked each week.  She created a summary of these calculations seen in Exhibit 515.  She then averaged the number of overtime hours for the seven employees for whom she had the most complete records and determined that the average overtime hours per week was 7.149.  She then calculated the amount of overtime wages owed to each of the Exhibit A employees by taking each week they worked and multiplying the 7.149 average hours of overtime by the overtime wage premium (based on one-half of the hourly wage) to arrive at the amount of overtime wages owed for that employee for the week.  Ex. 516.  If she had the actual overtime hours worked for the week, she used those instead of the 7.149 average hours.  E.g.  Ex. 516 at 4.  Even when she had the actual overtime hours, however, some of those employees still lacked time cards for some pay periods.  In that situation, she calculated an average for that employee based on the time cards she had

showing the actual overtime hours and used that average for the periods which lacked time cards. E.g., Ex. 516 at 5, 20.  This resulted in figures higher and lower than the 7.149 hours average depending on the employee.  Id.

The total overtime wages owed under Diana Emami's calculations based on the time card evidence is $56,740.40.[12]  Diana Emami also testified that in reviewing her calculations, she found a few minor errors.  She further testified that based on some additional time cards received from Plaintiff as part of Plaintiff's trial submissions, the average number of overtime hours per week should be adjusted downward to 5.99.  But, she continued to rely on the 7.149 figure in her calculations and her testimony.

The problem with the time card evidence is that it is far from complete.  There are records for only seven of thirty-five employees.[13]  While a few of them cover a significant period of time, four of them cover only an approximate five- to eight-month period.  They inconsistently have sometimes one card per pay period and sometimes two.  While even the single pay period cards show overtime hours worked, given the consistent testimony that employees regularly used two time cards for each day, one for OGC and one for Barrington, the fact that some of the pay periods have only one time card makes the time cards unreliable as a basis for calculating the

---

[12]  Given Defendants' position that their failure to pay overtime was not willful, Diana Emami's calculations of "total amount owed" starts in February 2011, applying a two-year statute of limitations.

[13]  Although there were also time card records for Armando Beas, during closing argument Plaintiff conceded that when it re-performed its calculations including the claimed reimbursements and loans, it concluded that Armando Beas was not owed any overtime wage premiums, effectively dismissing him from the case.  Thus, his time records are not relevant. Moreover, Diana Emami testified that she excluded his time card records from her calculation of the average number of overtime hours worked per week because it would have skewed the figure downward as a result of his working so few overtime hours based on his time cards.

overtime hours worked by the Exhibit A employees. Because they are incomplete, they are not

evidence of the precise amount of work performed. And, because there are only three employees

with significant time records, the time card records do not negate the reasonableness of the

inference drawn from the Umpqua Bank records.

Additionally, the discrepancy between the amounts owed based on time card records as

calculated by Diana Emami and based on the checks as calculated by Barba, is not as great as it

first appears. I reviewed the time card records for Luis Gonzalez, Manuel Amado, and Jose

Hurtado, the three employees with the most substantial time card records submitted by

Defendants. Exs. 507, 508, 513. In Exhibit 516, Diana Emami relied on the time card records to

created an unpaid wage estimate. In her calculations, as noted in Footnote 12, she began with the

work week of February 27, 2011. Ex. 516. Barba's calculations included time back as far as

February 27, 2010 if the employee received checks between February 27, 2010 and February 28,

2011. Ex. 21 at 1. Thus, the sums owed in overtime hours as calculated by Barba appear to be

much higher than those as calculated by Diana Emami because Diana Emami's calculations fail

to include any time these employees actually worked before February 27, 2011.

When one compares the overlapping periods of time, the amounts owed for these three

employees are not that far apart. Starting with Luis Gonzalez, Diana Emami calculated that he is

owed $1,661.19 in overtime wages. Ex. 516 at 20. Barba calculated that he is owed $3,403.44.

If Barba's figures are recalculated to begin with the checks dated March 21, 2011, which would

cover work beginning March 1, 2011 just two days after February 27, 2011, then the amount

owed in overtime to Luis Gonzalez is reduced to $1,354.25. Ex. 21 at 18. Additionally, Diana

Emami included five weeks in January 2012 which Barba did not include. Ex. 516 at 20.

39 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Deducting that sum ($250.15) from Diana Emami's total leaves $1,411.04.  The difference between Barba's calculations based on the pay checks and Diana Emami's calculations based on the time cards for Luis Gonzalez from approximately February 27, 2011/March 1, 2011 until December 2011, is $56.79, with the time records producing the greater sum.

Next, I looked at the time records for Manuel Amado.  Diana Emami calculated that he was owed $2,556.42 in overtime wages from February 27, 2011 until August 2012.  Ex. 516 at 4-6.  Barba's calculations started with a check dated October 10, 2010 and ended with a check dated October 5, 2011.  Ex. 21 at 6.  Although Barba's calculations show Manuel Amado working some time between November 2011 and November 2012, the time appears to be sporadic and never resulted in overtime hours worked.  Id.  Thus, Barba calculated no overtime wages owing for the intermittent hours after September 2011.  Barba calculated that Manuel Amado was owed $1,426.60 in overtime wages.  Id.

When only the overlapping time is calculated, the difference between the amounts owed is $332.50.  When omitting amounts allegedly owed before the March 21, 2011 checks, Barba's calculations show that Manuel Amado is owed $1,148 in overtime.  Ex. 21 at 6.  Diana Emami's calculations based on the time cards for the same time period show that Manuel Amado is owed $1,480.50.  Ex. 516 at 4-6 (omitting sums for weeks October 2, 2011 and thereafter as they were not used by Barba).  The difference between Barba's calculations based on the pay checks and Diana Emami's calculations based on the time cards for Manuel Amado from approximately February 27, 2011/March 1, 2011 until September 2011, is $332.50, with the time records producing the greater sum.

Finally, in regard to Jose Hurtado, Barba calculated that he is owed $5,017.18 in overtime

wages based on pay checks issued July 20, 2010 to October 20, 2011. Ex. 21 at 21. Although the pay checks suggest he worked through December 2011, he worked relatively few hours at the end of the year with no overtime. Id. Based on the time cards, Diana Emami calculated that Jose Hurtado is owed $1,468.50 in overtime. Ex. 516 at 20-22. When Barba's figures are recalculated to begin with the checks dated March 21, 2011, then the amount owed in overtime to Jose Hurtado $1,541.42. Ex. 21 at 20. Diana Emami's calculations for the same period show that he is owed $1,426.50 ($,1468.50 less $42 for the overtime in the week beginning November 6, 2011 which Barba omitted). The difference between Barba's calculations based on the pay checks and Diana Emami's calculations based on the time cards for Jose Hurtado from approximately February 27, 2011/March 1, 2011 until October 2011, is $114.92, with the pay checks producing the greater sum.

My point here is to illustrate that when the same period of time is examined, the difference between the amounts owed as calculated by the time cards and the amounts owed using the pay checks is not substantial. For these three employees, the total difference is $274.37 (Barba's figures total $4,043.67 in overtime wages owed; Diana Emami's figures total $4,318.04 owed). As explained above, the time cards are not complete enough records upon which to base overtime calculations for all of the Exhibit A employees. However, even if I were to rely on the time cards, my calculations regarding Luis Gonzalez, Manuel Amado, and Jose Hurtado show that the sums claimed are in line with the sums claimed based on the pay checks. This reinforces my conclusion that there is nothing inherently unreliable about Plaintiff's methodology. Moreover, although my calculations show that using the pay checks seems to favor Defendants, as explained below, I downwardly adjust the total amount owed by 10% to account for the

41 - FINDINGS OF FACT & CONCLUSIONS OF LAW

imprecision inherent in relying on the pay checks and Plaintiff's methodology.

Defendants further take issue with the fact that Barba's calculations on occasion produced an absurd result. Defendants illustrated this issue with some of the calculations made regarding checks issued to Armando Santos Camarillo. Defendants did not show that the issue existed as to any of the calculations made as to any other Exhibit A employee. Although I have not independently verified every other entry in Exhibit 21, I have spot checked some of the calculations and find no similar aberrations.

Barba's testimony and Exhibit 21 show that for a period of time in 2010, her methodology produced figures showing that Armando Santos Camarillo worked 32.63 hours per day, 21 hours of which were overtime, for a particular two-week period. Ex. 21 at 42 (figures for May 5, 2010).[14] Part of the problem with this entry seems to be that Barba counted two checks issued to Armando Santo Camarillo by Barrington Management on the same day. Id. If the second Barrington Management check is omitted, the record shows that Armando Santos Camarillo worked 68.47 hours that week, or 9.78 hours per day if dividing the total hours by 7 days, a far more reasonable figure.[15]

_____

[14] To reach this figure, the first May 5, 2010 entry for the total per pay period of $1,280.38 was divided by $8.50 (hourly rate) to produce the sum of $150.63 which is then divided by 2.2 to produce the sum of 68.47 hours worked per week for that pay period, leaving 28.47 hours of overtime worked per week for that pay period. Ex. 21 at 42. The second May 5, 2010 entry for the total per pay period is $2,991.07. Id. Performing the same calculations produces the figure of 119.95 hours of overtime per week for that pay period. Id. The total overtime hours for that week is 148.42 (28.47 + 119.95). Dividing that figure by 7 days results in 21.2 hours of overtime for each day in that week. Taking the total hours worked for the week (68.47 + 159.95 = 228.42) and dividing that by 7 days results in a 32.63 hour workday.

[15] Armando Santos Camarillo's time card for April 16-30, 2010 shows that he worked 10 of the 15 days in that pay period for a total of 111 hours, or 11.1 hours per day. Ex. 18 at 3. Thus, omitting the second Barrington check produces a number of hours worked per day very

42 - FINDINGS OF FACT & CONCLUSIONS OF LAW

The record also shows that for four additional pay periods in 2010, Barba's figures, when recalculated to show the number of hours worked in the entire month, are not supported by Armando Santos Camarillo's time records which Plaintiff submitted as a trial exhibit.  Ex. 18.[16] Thus, for example, on cross-examination, Defendants were able to establish that according to Barba's figures, Armando Santos Camarillo worked 422 hours for the month of September 2010 but according to his time cards, he worked 318 hours that month.  Compare Ex. 21 at 42 (entries for September 20, 2010 and October 5, 2010) with Ex. 18 at 8, 9.

In Exhibit 551, Diana Emami made adjustments to the entries in Exhibit 21 for the checks issued to Armando Santos Camarillo.  Ex. 551 at 83-85.  Some entries are highlighted in blue, indicating that Plaintiff mistakenly included reimbursement amounts in its calculations.  For a significant portion of the checks issued by Barrington Management, however, there is an amount inserted in parentheses and listed under the "Barrington Venture" column which she subtracted from what Barba had included in the total per pay period.  Ex. 551 at 83-84.  No explanation of this is contained in the exhibit.  However, Diana Emami testified that the figures in these parentheses listed under "Barrington Venture" were amounts reimbursed to Armando Santos Camarillo in his paychecks issued by Barrington Management.  This occurs for each one of the entries challenged during Barba's cross-examination.  With the reimbursed amounts deducted, the hours for the month as calculated based on the pay check records from the bank, align with the hours shown on the time cards.  Compare Ex. 551 at 83 (entries for November 19, 2010 and

close to what the time card shows.

[16]  As Defendants' counsel noted during closing argument, the time records for Armando Santos Camarillo are the only ones that allow for a "complete comparison" between Exhibit 21 and actual time records.

43 - FINDINGS OF FACT & CONCLUSIONS OF LAW

December 5, 2010 showing checks issued for work performed in the month of November 2010; with reimbursed amounts deducted, the calculations show a total of 290.4 hours worked in November 2010 when using an $8.50 per hour wage[17]) with Ex. 18 at 13-14 (showing 292 hours recorded for November 2010 on time sheet).

Defendants are correct that Barba's calculations for Armando Santos Camarillo produced a number of hours worked in a week that is unreasonable or unsupported by the time records. However, I reject Defendants' contention that this error undermines Plaintiff's reliance on the Umpqua Bank checks generally. Defendants established that for one particular employee who happened to make a significant number of purchases for Defendants for which he was reimbursed, the calculations are unreliable. But, Defendants failed to show that this occurred with any other employee. And, while Defendants showed that the number of hours worked in a month was sometimes more than the number Armando Santos Camarillo wrote down on his own time sheet, this appears to be related to the erroneously included reimbursement amounts. Moreover, the only reason Defendants were able to compare the hours worked per month as calculated by Barba with the time sheets kept by Armando Santos Camarillo was because Plaintiff submitted the employee's time records, presumably having obtained them from Armando Santos Camarillo himself. That is, Defendants' failure to keep the relevant payroll records created this mess and they cannot now be heard to complain that the calculation of overtime wages owed is imperfect.

---

[17] Minus reimbursements, the November 19, 2010 check was for $1,336.50 and the December 6, 2010 check was for $1,132.50, making the total paid for November 2010, based on the pay checks, $2,469. Ex. 551 at 83. Divided by an $8.50 hourly rate produces the sum of 290.47 hours worked for the month of November 2010.

Additionally, the record contains information from which to accurately calculate the overtime owed to Armando Santos Camarillo. Exhibit 568 is a summary of time card evidence prepared by Diana Emami which includes the time records Defendants received as part of Plaintiff's trial submissions. For every week beginning August 30, 2010 through the week beginning August 27, 2012, Diana Emami listed the number of hours and overtime hours Armando Santos Camarillo worked. Ex. 568 at 14-16. Exhibit 21 shows that Armando Santos Camarillo began receiving checks from Defendants on August 24, 2009, but because the relevant time period commences February 27, 2010, any time worked before that date should not be included. Ex. 21 at 42. Because Diana Emami's calculations did not include the period from February 27, 2010 through August 29, 2010, Exhibit 568 does not address those weeks.

Some of the time records for Armando Santos Camarillo for the period between February 27, 2010 and August 29, 2010 are in Exhibit 18. There is a time card for April 16-30, 2010, another for May 16-31, 2010, one for July 1-15, 2010, and a handwritten time sheet account of hours for August 16-31, 2010. Ex. 18 at 3, 5-7. By consulting the calendar in Exhibit 22, one can determine the workweek for each of these time records. By relying on Exhibits 18 and 22, I calculated the following hours for the following complete weeks (meaning Monday through Sunday): (1) 25 hours for the week beginning Monday, April 19, 2010; (2) 76.5 hours the week of May 17, 2010; (3) 71.5 for the week beginning May 24, 2010; (4) 76 hours for the week beginning July 5, 2010; (5) 70 hours for the week of August 16, 2010; and (6) 73 hours for the week of August 23, 2010.

Although the incomplete records do not allow for an exact calculation of the number of

45 - FINDINGS OF FACT & CONCLUSIONS OF LAW

hours worked per week for all the weeks beginning March 1, 2010[18], the complete weeks

contained in the records listed in the previous paragraph amount to an average number of hours

per week of 65.33 (total hours for the 6 weeks listed is 392; divided by 6 weeks equals 65.33).

Subtracting 40 hours of regular time, leaves an average of 25.33 hours of overtime for those 6

weeks.  Other than those 6 weeks, for the remaining 20 weeks commencing with the week of

March 1, 2010 and ending with the week commencing August 23, 2010, the average of 65.33

hours per week is applied, meaning an average of 25.33 hours of overtime for each of those 20

weeks.  For the 6 weeks noted above, the actual overtime hours as noted are used.

Similarly, at the more recent end of the applicable time period, Diana Emami's

calculations in Exhibit 568 end with the week commencing August 27, 2012.  Ex. 568 at 16.  The

applicable time period runs until February 27, 2013, and Exhibit 21 shows that Armando Santos

Camarillo received checks from Defendants until January 19, 2013.  Ex. 21 at 44.

Some of the time records from September 3 through January 2013 are in Exhibit 18.  Ex.

18 at 114, 117, 121, 127, 130, 131.  By consulting the calendar in Exhibit 22, one can determine

the workweek for each of these time records.  By relying on Exhibits 18 and 22, I calculated the

following hours for the following complete weeks (meaning Monday through Sunday): (1) 63

hours for the week beginning Monday, September 3, 2012; (2) 65 hours the week of October 1,

2012; (3) 62 hours for the week beginning Monday, October 8, 2012; (4) 69 hours for the week

---

[18]  Although the claim begins February 27, 2010, I omit any hours worked on February
27, 2010 and February 28, 2010 as *de minimis* and because the workweek starts only two days
later on March 1, 2010.

beginning October 15, 2012; (5) 73 hours for the week of October 22, 2012[19]; (6) 68 hours for

the week of October 29, 2012; (7) 71 hours for the week of November 5, 2012; (8) 67 hours for

the week of December 3, 2012; (9) 77 hours for the week of December 10, 2012; and (10) 65 for

the week of December 17, 2012.  Id.

Adding the number of hours of these weeks together and averaging them shows that for

these 10 weeks, Armando Santos Camarillo worked an average of 68 hours per week, meaning

28 hours of overtime on average for those 10 weeks.  Other than the 10 weeks noted in the

preceding paragraph, for the remaining 9 weeks commencing with the week of September 3,

2012, and ending with the week commencing January 7, 2013, the average of 68 hours per week

is applied, meaning an average of 28 hours of overtime for each of those 9 weeks.  For the 10

weeks noted above, the actual overtime hours as noted are used.

Applying the $8.50 and $8.80[20] hourly rates for Armando Santos Camarillo from Exhibit

---

[19]  The entry on the card for Barrington for Tuesday, October 23, 2012 appears to contain
an error of a morning shift from 3:30 to 12:00.  I omitted that entry from my calculation.

[20]  Some of the records related to this employee suggest that he earned a slightly lower or
higher hourly rate.  E.g., Ex. 18 at 2 (showing $8.40 hourly rate for February 2010); at 7
(handwritten note on August 2010 time sheet suggesting he was paid $9 per hour); at 8 (same for
September 2010); at 17 (same for December 2010); at 24 (same for February 2011); at 54 (same
for April 2012).  I continue to apply the rates as they appear in Exhibit 21 for the reasons
previously explained that Defendants themselves relied on the rates in Exhibit 21 in estimating
the wages owed and because any discrepancy is de minimis.  For example, for the week
beginning Monday, August 16, 2010, the time cards show Armando Santos Camarillo worked 70
hours, or 30 hours of overtime.  Ex. 18 at 7.  With an $8.50 hourly rate, his overtime premium is
$4.25.  30 hours multiplied by $4.25 is $127.5.  At $9 per hour, the overtime premium is $4.50.
When 30 hours are multiplied by $4.50, the sum is $135, a difference of $7.50.  I recognize that
over a period of three years, or 156 weeks, this figure would increase, but even assuming he
worked 30 hours of overtime in every single week of the 156 weeks, the difference between an
$8.50 hourly rate and a $9 hourly rate produces the amount of $1,170 ($7.50 x 156 weeks).
Given the total amount owed, this amount is insignificant.  Additionally, for any time he earned
$8.40 an hour, the $8.50 an hour used by Plaintiff benefits Defendants.  And, for a period of one

47 - FINDINGS OF FACT & CONCLUSIONS OF LAW

21 to his overtime hours for the period starting March 1, 2010 and ending with the week

commencing January 7, 2013, the overtime wages owed are $17,584.48.  This number is

achieved by using the hourly rates from Exhibit 21 multiplied by overtime hours per week as

seen in Exhibit 568 (which is a summary of Exhibit 18's time records) at pages 14-16.  Exhibit 21

is also used to determine the start and end date of Armando Santos Camarillo's employment with

Defendants as established by the dates that Defendants issued checks to him.  During closing

argument, Plaintiff tendered a "Demonstrative Exhibit 21" which contains the calculations just

described, as well as other calculations described below.  Instead of making these calculations

myself, I have relied on the sums reflected in Plaintiff's Demonstrative Exhibit 21 with one

exception:  for the weeks <u>not</u> summarized in Exhibit 568, I performed the calculations myself as

indicated above as based on the time records in Exhibit 18.

      As to the remaining thirty-three Exhibit A employees,[21] Plaintiff's Demonstrative Exhibit

21 shows the overtime amounts owed for each of those employees by relying on the hourly rates

from Exhibit 21 and the number of hours as calculated by Diana Emami in Exhibit 551, with the

exception of the hours Diana Emami adjusted based on the unexplained reason she described in

Exhibit 551 as "DOL mistakenly calculates overtime based on semi-monthly pay period."

<u>Compare</u> Exhibit 551 <u>with</u> Demon. Ex. 21.  Demonstrative Exhibit 21 contains no new evidence.

It replicates evidence from the other exhibits and contains the calculation for each employee

year, the difference is only $.20 because Plaintiff uses an $8.80 rate beginning January 2, 2012.
Moreover, as discussed below, I make an overall downward adjustment of 10% to account for
unexposed errors.

    [21] Omitting Armando Beas whom Plaintiff dismissed during closing, there are a total of
thirty-four employees.

48 - FINDINGS OF FACT & CONCLUSIONS OF LAW

based on the evidence received at trial.

I conclude that Defendants owe overtime to each of the thirty-three remaining Exhibit A employees in the amounts shown in Demonstrative Exhibit 21, with the exception of Armando Santos Camarillo.  Thus, Defendants owe the following overtime wages to the following employees:

| Name | Amount Owed |
| --- | --- |
| Aban Balam, Basillo | 6,420.20 |
| Aguilar, Eliseo R. | 426.58 |
| Alvarez, Andres | 24,756.87 |
| Amado, Manuel | 1,426.60 |
| Ballesteros, Roberto | 259.46 |
| Beas, J. Jesus | 349.98 |
| Beas, Pedro | 0.00 |
| Camarillo, Pedro | 13,655.61 |
| Canul, Mario | 18,376.99 |
| Cruz, Manuel | 620.97 |
| Garcia, Manuel | 3,048.35 |
| Gonzalez, Carlos | 877.87 |
| Gonzalez, Luis | 3,403.44 |
| Gutierrez, Miguel | 4,820.29 |
| Gutierrez, Pedro | 5,195.66 |
| Hurtado, Jose Manuel | 5,017.18 |

Leyva, Jesus                              1,973.70

Lopez Samano, Humberto                    5,497.10

May Castillo, Manuel Jesus               12,921.64

Mendoza, Marciano                        13,952.51

Montiel, Oscar                           10,793.25

Paz, Gabriel                              1,816.42

Paz, Isael                               28,134.08

Paz Gonzalez, Manuel                      7,508.21

Perez, Fermin                             2,701.35

Perez, Francisco                          4,189.01

Perez Cardenas, Osbaldo                  20,819.28

Sanchez Fiallo, Juventino                 9,770.71

Santos Camarillo, Filemon                 8,651.93

Tlaxcala, David                          13,497.37

Tlaxcala, Maria                          25,979.68

Tuyub, Luis                               5,383.04

Zuloaga Lopez, Jhonny                     4,775.89

Total:                                 $267,021.22

When the $17,584.48 owed to Armando Santos Camarillo is added, the total owed is

$284,605.70. However, as indicated in Footnote 20, I recognize that any method, even if it

allows for a just and reasonable inference, is imperfect. Although Mt. Clemens Pottery allows

for imprecision, I adjust the total owed downward by 10% ($28,460.57) to account for variances

in the hourly rate or in the number of hours.  Thus, the total damages awarded to Plaintiff is $256,145.13.

VIII.  Liquidated Damages

The FLSA allows a claim for liquidated damages in the amount of unpaid overtime.  29 U.S.C. § 216(b) (employers who fail to pay overtime are "liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages.").  Liquidated damages are remedial, not punitive, because they compensate employees for losses they may have suffered by not receiving their wages on time. Chao v. Barbeque Ventures, LLC, 547 F.2d 938, 941 (8th Cir. 2008).

As the Ninth Circuit recently stated, "[d]ouble damages are the norm; single damages are the exception.  Liquidated damages are mandatory unless the employer can overcome the difficult burden of proving both subjective good faith and objectively reasonable grounds for believing that it was not violating the FLSA." Haro, 745 F.3d at 1259 (citation and internal quotation marks omitted).  To avoid liquidated damages, the employer must demonstrate it "had an honest intention to ascertain and follow the dictates of the Act and that it had reasonable grounds for believing that its conduct complied with the Act." Local 246 Util. Workers Un. of Am. v. S. Cal. Edison Co., 83 F.3d 292, 298 (9th Cir. 1996) (internal quotation marks and brackets omitted).

Defendants did not act in good faith.  For the reasons previously explained, Defendants had no honest intention to follow the law but instead purposefully intended to evade the law's requirements.  They had no reasonable grounds for believing that their conduct complied with the FLSA because the evidence establishes that despite their knowledge of the overtime law, they

created a scheme by which they denied their employees overtime wages.  See Haro, 745 F.3d at 1259 (facts which showed willful violations also established a lack of good faith); see also A-One Med. Servs., 346 F.3d at 920 (noting that a "finding of good faith is plainly inconsistent with a finding of willfulness" and finding that company owner's "reckless belief that formal separation of the two [defendant] entities would justify nonpayment of overtime wages is legally insufficient as a good faith defense").

Accordingly, the damages awarded in the previous section in the amount of $256,145.13 are doubled for a total damage award of $512,290.26.

IX.  Injunctive Relief

The FLSA allows for injunctive relief to enjoin future wage violations.  29 U.S.C. § 217. "In deciding whether to grant injunctive relief, a district court must weigh the finding of violations against factors that indicate a reasonable likelihood that the violations will not recur." Brock v. Big Bear Mkt. No. 3, 825 F.2d 1381, 1383 (9th Cir. 1987).  The court "must give substantial weight to the fact that the Secretary seeks to vindicate a public, not a private, right." Brock v. Shirk, 833 F.2d 1326, 1331(9th Cir. 1987) (internal quotation marks omitted), vacated on other grounds, Shirk v. McLaughlin, 488 U.S. 806 (1988).  Although "the district court has discretion to deny injunctive relief in appropriate cases, this discretion is limited by consideration of the importance of prospective relief as a means of ensuring compliance with the provisions of the FLSA."  Id.

Relevant factors to consider are the evidence of current compliance, any record of past violations, and the likelihood of future compliance.  See Big Bear, 825 F.2d at 1383.  A history of repetitive violations or a finding of bad faith weigh "heavily in favor of granting a prospective

injunction." Id.

Plaintiff argues that David Emami's retaliatory threats and open disregard of the FLSA's requirements are factors justifying a permanent injunction against future violations. I agree. Additionally, Defendants failed to establish that they have abandoned their unlawful practices or have taken substantial steps toward compliance. All three companies still exist. During his testimony, David Emami stated he had only three employees left after he instituted a rule of working no more than 8 hours in a day. When asked if any of them worked more than 40 hours in a week, he said one of them worked 20 extra hours the previous week on a painting job, indicating that the 8-hour per day rule was not consistently enforced. When asked if he paid that employee overtime wages for the extra hours, he did not emphatically indicate that he had. Instead, he stated he "believed" Diana Emami was paying the overtime. No independent evidence of this payment was offered.

Diana Emami testified that after meeting with the DOL investigator, she changed the way she paid the employees so that "all amounts" would go through OGC payroll from which deductions would be taken. This testimony is contradicted, however, by the Umpqua Bank records which show several employees still receiving checks from two different companies into 2013. Ex. 21 at 5 (checks to Andres Alvarez through February 5, 2013 issued by both OGC and Barrington Venture); at 44 (checks to Armando Santos Camarillo through January 19, 2013 issued by both OGC and Barrington Venture); at 53 (some checks to Maria Tlaxcala between September 6, 2012 and January 19, 2013 by both OGC and Barrington Venture). Additionally, Filemon Santos Camarillo testified that around November 2012, David Emami told him to write 40 hours of work on one card for which he was paid in a check, and write any additional hours on

53 - FINDINGS OF FACT & CONCLUSIONS OF LAW

a piece of paper for which he was paid in cash.

The evidence established Defendants' intentional disregard for the law, threats of retaliatory action by David Emami, willfulness and a lack of good faith, and a questionable commitment to future compliance. As a result, Plaintiff is entitled to a permanent injunction.

CONCLUSION

Defendants have violated the reccordkeeping, overtime, and anti-retaliation provisions of the FLSA. 29 U.S.C. §§ 207(a)(1), 211(c), 215(a)(3). Plaintiff is entitled to a monetary judgment in the amount of $512,290.26. Plaintiff is also entitled to a permanent injunction enjoining Defendants from future violations of the FLSA.

Plaintiff shall prepare a judgment in accordance with these Findings of Fact and Conclusions of Law. Plaintiff shall confer with Defendants about the proposed judgment and if there is no objection, shall submit it to this Court for review. If Defendants have objections, Plaintiff shall notify the Court which will then schedule a telephone conference with counsel.

IT IS SO ORDERED.

Dated this ___17___ day of ___Dec___, 2014

_____
Marco A. Hernandez
United States District Judge